**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| COMPTEL, |
| Plaintiff, |
| v. |
| FEDERAL COMMUNICATIONS COMMISSION, |
| Defendant. |

Civil Action No. 06-01718 (HHK)

**MOTION FOR SUMMARY JUDGMENT OF**
**INTERVENOR-DEFENDANT AT&T INC.**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7(h) and 56.1, Intervenor-Defendant AT&T Inc. ("AT&T") moves for summary judgment.

Plaintiff CompTel's Complaint seeks access, pursuant to the Freedom of Information Act ("FOIA"), to documents that AT&T submitted to the Federal Communications Commission ("FCC") in connection with an FCC investigation that was initiated when AT&T voluntarily disclosed concerns about certain invoices it had submitted to the federal universal service fund administrator. These documents — which are in the government's hands only as a result of AT&T's forthright disclosure — contain names and identifying information of AT&T employees involved in the submission of the invoices that raised concerns, as well as extensive additional details relating to those invoices. If disclosed to CompTel — which is a trade organization representing the interests of AT&T's competitors, and which in the past has sought to use the existence of FCC investigations to impugn AT&T's integrity — the documents at issue could be used to attempt to embarrass, harass, and stigmatize AT&T. The documents therefore fall within FOIA Exemption 7(C), which protects "records or information compiled for law enforcement

purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

In the alternative, and at a minimum, the FCC correctly determined that portions of the documents at issue are protected under FOIA's confidential commercial information exception (Exemption 4), 5 U.S.C. § 552(b)(4).  The requested documents include data about AT&T's costs and pricing, information about payment dates and practices, descriptions of AT&T's internal systems, processes, and operations, and identifying information for AT&T's staff, contractors, and customers.  This information is confidential and competitively sensitive, and its public disclosure would pose a serious competitive threat to AT&T.   The FCC therefore properly redacted that material pursuant to Exemption 4.

Pursuant to Local Rules 7(a) and 7(c), attached are a memorandum in support of this motion with accompanying declarations, a statement of undisputed facts, and a proposed order granting summary judgment.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Colin S. Stretch
_____

</div>

Gary L. Phillips (D.C. Bar No. 334037)         Colin S. Stretch (D.C. Bar No. 470193)
James P. Lamoureux (D.C. Bar No. 431631)    Kelly P. Dunbar (D.C. Bar No. 500038)
AT&T INC.                                                    KELLOGG, HUBER, HANSEN, TODD,
1120 20th Street, N.W.                                      EVANS & FIGEL, P.L.L.C.
Washington, D.C. 20036                              1615 M Street, N.W., Suite 400
                                                               Washington, D.C. 20036
                                                               Tel.: (202) 326-7900
                                                               Fax: (202) 326-7999

*Counsel for AT&T Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2007, I served, via ECF, a true and correct copy of the foregoing document and its attachments to:

Mary Catherine Albert
COMPTEL
900 17th Street, N.W., Suite 400
Washington, D.C. 20006
Tel: (202) 926-6650
malbert@comptel.org

*Counsel for CompTel*


Peter S. Smith
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530-0001
Tel: (202) 307-0372
Fax: (202) 514-8780
peter.smith@usdoj.gov

*Counsel for the Federal Communications Commission*


/s/  Emily S. Albertson

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COMPTEL,

      Plaintiff,

      v.

FEDERAL COMMUNICATIONS
COMMISSION,

      Defendant.

Civil Action No. 06-01718 (HHK)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF INTERVENOR-DEFENDANT AT&T INC.

Gary L. Phillips (D.C. Bar No. 334037)
James P. Lamoureux (D.C. Bar No. 431631)
AT&T INC.
1120 20th Street, N.W.
Washington, D.C. 20036

Colin S. Stretch (D.C. Bar No. 470193)
Kelly P. Dunbar (D.C. Bar No. 500038)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

*Counsel for AT&T Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 6

I.      THE REQUESTED DOCUMENTS ARE EXEMPT FROM DISCLOSURE
      PURSUANT TO FOIA EXEMPTION 7(C) ................................................................ 7

      A.     Exemption 7(C) Covers All of the Requested Documents ..................................... 7

              1.     The Requested Documents Were Compiled For Law-Enforcement
                   Purposes ........................................................................................................ 7

              2.     Disclosure of the Requested Documents Would Threaten AT&T's
                   Personal Privacy Interests ............................................................................ 8

              3.     The Invasion of AT&T's Privacy is Unwarranted ................................... 14

      B.     Because the Documents Are Protected by Exemption 7(C), the FCC May
              Not Disclose Them ........................................................................................... 21

II.     IN THE ALTERNATIVE, THE FCC PROPERLY REDACTED INFORMATION
     THAT IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 4 ......................... 23

      A.     The Records Sought are Commercial ................................................................. 23

      B.     The Records Sought Were Obtained from a "Person" ......................................... 23

      C.     The Records Sought are "Confidential" ............................................................. 24

CONCLUSION ................................................................................................................ 27

DECLARATION OF ANN ROTATORI

DECLARATION OF KELLY P. DUNBAR

# TABLE OF AUTHORITIES

<u>Page</u>

## Cases

*Allnet Communication Servs., Inc. v. FCC*, 800 F. Supp. 984 (D.D.C. 1992)...............................26

*American Fed'n of Labor v. FEC*, 177 F. Supp. 2d 48 (D.D.C. 2001)
    *aff'd*, 333 F.3d 168 (D.C. Cir. 2003) ................................................................22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................6

*Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102 (1987).........................................11

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .........................................................8

*Bast v. Department of Justice*, 665 F.2d 1251 (D.C. Cir. 1981)..........................................7

*Burke Energy Corp. v. Department of Energy*, 583 F. Supp. 507 (D. Kan. 1984) .........................26

*CAB v. United Airlines, Inc.*, 542 F.2d 394 (7th Cir. 1976) ...............................................13

*Campaign for Family Farms v. Glickman*, 200 F.3d 1180 (8th Cir. 2000)............................21, 22

*Carpenter v. Department of Justice*, 470 F.3d 434 (1st Cir. 2006) .................................8, 9, 15, 17

*CNA Fin. Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987)......................................24

*Cohen v. EPA*, 575 F. Supp. 425 (D.D.C. 1983) .........................................................14

*Computer Prof'ls for Soc. Responsibility v. United States Secret Serv.*, 72 F.3d 897
    (D.C. Cir. 1996) ..........................................................................16

*Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871
    (D.C. Cir. 1992) (en banc) .........................................................16, 24

*Davin v. Department of Justice*, 60 F.3d 1043 (3d Cir. 1995)..........................................11

*Delaware River Stevedores v. DiFidelto*, 440 F.3d 615 (3rd Cir. 2006) ......................................10

*Department of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989)...........................................................14, 15, 20

*Department of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487 (1994).........................21

*FBI v. Abramson*, 456 U.S. 615 (1982) ..................................................................6, 12

*Florida Med. Ass'n v. Department of Health, Educ. & Welfare*, 479 F. Supp. 1291
(M.D. Fla. 1979) ....................................................................................................10

*Foster v. Department of Justice*, 933 F. Supp. 687 (E.D. Mich. 1996) .........................................11

*Gilda Indus., Inc. v. United States Customs & Border Prot. Bureau*,
457 F. Supp. 2d 6 (D.D.C. 2006) .....................................................9, 23, 24, 25, 26

*G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977) ....................................................13, 14

*Grosjean v. American Press Co.*, 297 U.S. 233 (1936) ............................................................10

*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 425 F.2d 578 (D.C. Cir. 1970) ...............24

*Gulf & W. Indus. v. United States*, 615 F.2d 527 (D.C. Cir. 1979) ..............................................26

*Henzel v. United States*, 296 F.2d 650 (5th Cir. 1961) ...................................................................14

*Hopkins v. Department of Hous. & Urban Dev.*, 929 F.2d 81 (2d Cir. 1991) ..............................14

*In re Executive Office of the President*, 215 F.3d 20 (D.C. Cir. 2000) .........................................14

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005) ............................................8

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989) ......................................................6, 12

*Judicial Watch, Inc. v. Department of Justice*, 306 F. Supp. 2d 58 (D.D.C. 2004).........................9

*Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19 (D.D.C. 2000).........................23

*Kay v. FCC*, 867 F. Supp. 11 (D.D.C. 1994) ..................................................................................8

*KTVY-TV v. United States*, 919 F.2d 1465 (10th Cir. 1990)........................................................18

*McDonnell Douglas Corp. v. United States Dep't of the Air Force*, 375 F.3d 1182,
(D.C. Cir. 2004) ....................................................................................................26

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) .....................................................6

*National Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ....................................8, 17

*National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) ...............18

*National Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976) .......................14

*National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) ......................24

*Public Citizen Health Research Group v. FDA*, 704 F.2d 1280 (D.C. Cir. 1983) .......................23

*Rojem v. Department of Justice*, 775 F. Supp. 6 (D.D.C. 1991)....................................................17

*Rugiero v. Department of Justice*, 257 F.3d 534 (6th Cir. 2001) ....................................................7

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) ...............................................15, 18

*Sims v. CIA*, 642 F.2d 562 (D.C. Cir. 1980), *aff'd in part, rev'd in part,*
     471 U.S. 159 (1985)...............................................................................................................14

*St. Michael's Convalescent Hosp. v. California*, 643 F.2d 1369 (9th Cir. 1981)...........................9

*Tax Analysts v. IRS*, 294 F.3d 71 (D.C. Cir. 2002)........................................................................7

*Timken Co. v. United States Customs Serv.*, 491 F. Supp. 557 (D.D.C. 1980) ...........................26

*United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365 (1988) ......................10

*United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) ...........................................................13

*United States v. Zhang*, 833 F. Supp. 1010 (S.D.N.Y. 1993) .......................................................13

*Voinche v. FBI*, 940 F. Supp. 323 (D.D.C. 1996) .........................................................................11

*Washington Post Co. v. Department of Justice*, 863 F.2d 96 (D.C. Cir. 1988)............................14

*Westinghouse Elec. Corp. v. Brown*, 443 F. Supp. 1225 (E.D. Va. 1977) ...................................26

**Administrative Authorities**

Memorandum Opinion and Order, *SBC Communications Inc. and AT&T Corp.*
     *Applications for Approval of Transfer of Control*, 20 FCC Rcd 18290 (2005)................24

Order and Consent Decree, *SBC Communications Inc.*, 19 FCC Rcd 24014
     (Enf. Bur. 2004) ......................................................................................................................3

Report and Order and Order on Remand and Further Notice of Proposed Rulemaking,
     *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange*
     *Carriers*, 18 FCC Rcd 16978 (2003), *vacated in part and remanded,*
     *USTA v. FCC*, 359 F.3d 554 (D.C. Cir.), *cert. denied*, 543 U.S. 925 (2004) ...................24

Second Report and Order and Further Notice of Proposed Rulemaking, *Schools and Libraries*
     *Universal Service Support Mechanism*, 18 FCC Rcd 9202 (2003) ......................................2

**Statutes, Rules, and Regulations**

5 U.S.C. § 551(2) ...................................................................................................9, 23

5 U.S.C. § 552a ................................................................................................................9

5 U.S.C. § 552a(a)(2) ......................................................................................................9

5 U.S.C. § 552a(b) ........................................................................................................10

5 U.S.C. § 552(b)(4) ....................................................................................2, 4, 6, 9, 23

5 U.S.C. § 552(b)(5) ......................................................................................................5

5 U.S.C. § 552(b)(7) ......................................................................................................7

5 U.S.C. § 552(b)(7)(C) ..........................................................................1, 4, 6, 7, 8

5 U.S.C. § 706(2)(A) ....................................................................................................21

15 U.S.C. §§ 7201-7266 ..............................................................................................16

28 U.S.C. § 1391(c) ......................................................................................................11

47 C.F.R. § 0.457 ..........................................................................................................22

47 C.F.R. § 0.457(g) ....................................................................................................22

47 C.F.R. §§ 54.500-54.521 ..........................................................................................2

Fed. R. Civ. P. 56(c) ......................................................................................................6

**Other Materials**

Cindy R. Alexander, *On the Nature of the Reputational Penalty for Corporate Crime: Evidence*, 42 J. L. & Econ. 489 (1999) ........................................................12

American Heritage Dictionary 925 (2d ed. 1991) ..........................................................9

Ken Brown, *et al., Called to Account:  Indictment of Andersen in Shredding Case Puts Its Future in Question – Obstruction of Justice Count May Speed the Departure of Clients and Partners – Firm Calls It "Death Penalty,"* Wall St. J., Mar. 15, 2002 ....................................................................................12

Daniel R. Fischel & Alan O. Sykes, *Corporate Crime*, 25 J. Legal Stud. 319 (1996) ..................12

Letter from Maureen Flood, Director, Regulatory & State Affairs, CompTel, to
      Magalie Roman Salas, Secretary, FCC, CC Docket No. 98-141 (Jan. 24, 2002),
      *available at*
      http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=651298
      0842 ............................................................................................................................................19

Letter from H. Russell Frisby, Jr., President, CompTel, to Michael K. Powell,
      Chairman, FCC, CC Docket No. 01-194 (Aug. 31, 2001), *available at*
      http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=651276
      5282 ............................................................................................................................................19

Letter from H. Russell Frisby, Jr., President, CompTel, to David Solomon,
      Chief, Enforcement Bureau, FCC (May 21, 2001), *available at*
      http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=651256
      7860 ......................................................................................................................................19, 20

Christopher A. Wray & Robert K. Hur, *Corporate Criminal Prosecution
      in a Post-Enron World:  The Thompson Memo in Theory and Practice*,
      43 Am. Crim. L. Rev. 1095 (2006) ....................................................................................16

## <u>INTRODUCTION</u>

This case involves the misuse of the Freedom of Information Act ("FOIA") to attempt to gain access to documents that belong to a private party, that shed no light on the workings of government, and that are in the hands of the government only through the happenstance of a law-enforcement investigation.

The documents at issue were provided by Intervenor-Defendant AT&T Inc. ("AT&T")[1] to the Federal Communications Commission ("FCC") in connection with an FCC investigation that began when AT&T *self-reported* concerns about invoices it had submitted to the universal service fund administrator. In the course of that investigation, the FCC obtained extensive information from AT&T detailing the precise nature of AT&T's concerns regarding specific invoices, the identities of the people involved in the creation of those invoices, and the nature and extent of the company's internal controls. And at the conclusion of the investigation, AT&T entered into a consent decree that involved no admission of wrongdoing.

Now, CompTel — a trade association that represents AT&T's competitors in the marketplace and that has an ignominious record of maligning AT&T before the FCC — seeks access to the AT&T documents that the FCC collected in the course of its investigation. This Court should reject that request in its entirety. The documents that CompTel has requested are protected from disclosure under the FOIA's law-enforcement exemption (Exemption 7(C)), 5 U.S.C. § 552(b)(7)(C), which protects "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." The documents at issue contain records and information that describe in

---

[1] Prior to the merger between SBC Communications Inc. and AT&T Corp., AT&T Inc. was known as SBC Communications Inc. For that reason, the relevant proceedings before the FCC refer to "SBC."

detail the conduct of AT&T and its employees that led AT&T to bring this matter to the FCC's attention.  If disclosed, the details surrounding that conduct could be used to harass or stigmatize AT&T, which is exactly what CompTel has attempted to do with similar information in the past, and which is exactly the result that Exemption 7(C) was designed to foreclose.

In the alternative, and at a bare minimum, the FCC correctly found that portions of the requested documents are protected from disclosure under the FOIA's confidential commercial information exemption (Exemption 4), 5 U.S.C. § 552(b)(4).  Many of the requested documents contain confidential and sensitive commercial information — including cost, pricing, and operational data, as well as names of and contact information for AT&T's employees, customers, and suppliers.  This information, if disclosed to AT&T's competitors, could permit those competitors to compete unfairly against AT&T, by targeting their service offerings (and the price of those offerings) on the basis of inside information that is not normally available in the marketplace.  This information therefore falls squarely within Exemption 4.

## BACKGROUND

A.    In August 2004 — in connection with an investigation that commenced when AT&T voluntarily reported concerns about invoices submitted to the federal universal service fund administrator — AT&T informed the FCC of concerns regarding certain invoices related to the FCC's "Education Rate," or "E-Rate," program.  The E-Rate program is the universal service mechanism designed to assist eligible schools and libraries in gaining access to telecommunications and advanced services.  *See* 47 C.F.R. §§ 54.500-54.521; Second Report and Order and Further Notice of Proposed Rulemaking, *Schools and Libraries Universal Service Support Mechanism*, 18 FCC Rcd 9202, ¶¶ 1-90 (2003) (describing E-Rate program and rules).

In its August 2004 disclosure, AT&T explained that its Connecticut subsidiary, Southern New England Telephone Company, had submitted arguably improper invoices to the universal

service fund administrator relating to services performed for the New London, Connecticut school district.  At the same time as it made this disclosure, AT&T refunded all amounts collected pursuant to the questionable invoices, and it cancelled all outstanding invoices that raised similar concerns.

In response to AT&T's disclosure, the FCC's Enforcement Bureau conducted an investigation into AT&T's compliance with the FCC's E-Rate regulations in connection with the New London Public Schools, which was resolved in a consent decree that involved no admission of wrongdoing.  *See* Order and Consent Decree, *SBC Communications Inc.*, 19 FCC Rcd 24014 (Enf. Bur. 2004).

In the course of the Enforcement Bureau's investigation, the Bureau ordered AT&T to produce, and AT&T did produce, a wide range of documents.  These documents include detailed written responses to FCC interrogatories; names and job descriptions of AT&T employees involved in the arguably improper billing; completed universal service fund invoice forms; more than seventy-five pages of internal AT&T emails (including documents attached to the emails) that provide cost, pricing, and billing information in connection with the services provided to New London Public Schools and that indicate how AT&T came to invoice the universal service fund for certain aspects of those services; AT&T billing invoices and maintenance orders; invoices provided from AT&T's vendors for worked performed for AT&T; descriptions and pricing information of telecommunications products and services that AT&T's subsidiaries provide to schools and libraries in Connecticut and elsewhere; AT&T's Code of Business Conduct; and AT&T's view as to whether and the extent to which its employees had violated that code of conduct.  *See* Declaration of Ann Rotatori ¶ 5 ("Rotatori Decl.") (attached hereto).

    **B.**    On April 4, 2005, CompTel submitted a one-sentence FOIA request demanding the contents of the Enforcement Bureau's investigative file.[2]  On May 27, 2005, three days after being notified of CompTel's request, AT&T submitted a letter opposing disclosure.[3]  AT&T explained that the documents produced to the Bureau had been "compiled for law enforcement purposes" and were protected from disclosure under the FOIA's law-enforcement exemption (Exemption 7(C)), *see* 5 U.S.C. § 552(b)(7)(C).  AT&T also explained that the documents included competitively sensitive information that was protected from disclosure under the FOIA's exemption for confidential commercial information (Exemption 4), *see id.* § 552(b)(4).  CompTel responded approximately a month later with a letter filing in which it disputed AT&T's reliance on both exemptions.[4]

    On August 5, 2005, the FCC's Enforcement Bureau issued a letter ruling resolving CompTel's request.[5]  The Bureau rejected AT&T's reliance on the FOIA's law-enforcement exemption (Exemption 7(C)) with the cursory statement that, "[g]enerally, businesses do not possess 'personal privacy' interests as required for application" of that exemption.  *Id.* at 6.  At the same time, the Bureau found that portions of AT&T's documents — in particular, documents revealing AT&T's "pricing information" as well as "costs and pricing data, . . . billing and payment dates, and identifying information of [AT&T's] staff, contractors, and the

---

[2] *See* Email from Mary C. Albert, CompTel, to FOIA FCC (Apr. 4, 2005) (Dunbar Decl. Exh. A).

[3] *See* Letter from Jim Lamoureux, SBC Services, Inc., to Judy Lancaster, Enforcement Bureau, FCC, FOIA Control No. 2005-333 (May 27, 2005) (Dunbar Decl. Exh. B).

[4] *See* Letter from Mary C. Albert, CompTel, to Judy Lancaster, Enforcement Bureau, FCC, FOIA Control No. 2005-333 (June 28, 2005) (Dunbar Decl. Exh. C).

[5] *See* Letter from William H. Davenport, Enforcement Bureau, FCC, to Jim Lamoureux, SBC Services, Inc., and Mary Albert, CompTel, FOIA Control No. 2005-333 (Aug. 5, 2005) (Dunbar Decl. Exh. D).

representatives of its contractors and customers" — were exempt from disclosure as confidential

commercial information under Exemption 4.[6]  The Bureau also concluded that CompTel's

request encompassed documents in which Commission staff "discuss[ed] the issues and

investigation" and which were therefore protected from disclosure under the FOIA's

deliberative-privilege exemption (Exemption 5), which protects "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency," 5 U.S.C. § 552(b)(5).[7]

As a result of its holding on Exemption 4, the Bureau redacted competitively sensitive

information from the documents AT&T had provided.  Those redactions, which are explained in

more detail in the attached declaration, cover cost and pricing data related to services and

hardware used in connection with the New London Public School projects; amounts for which

AT&T invoiced the universal service fund administrator; invoice dates as well as the dates those

invoices were paid and then subsequently refunded; and names and identifying information of

AT&T's employees, vendors, and representatives of the company's contractors and customers.

*See* Rotatori Decl. ¶ 12; Dunbar Decl. Exh. D at 5.

AT&T and CompTel each filed applications asking the FCC to review the Enforcement

Bureau's decision.  AT&T challenged the Bureau's decision that the law-enforcement exemption

(Exemption 7(C)) is by definition inapplicable to corporations.[8]  For its part, because it had not

yet seen the redacted documents, CompTel filed a protective appeal challenging the Bureau's

---

[6] *Id.* at 5.

[7] *See id.* at 6.

[8] *See* Letter from Jim Lamoureux, SBC Services, Inc., to Samuel Feder, Acting General
Counsel, FCC, FOIA Control No. 2005-333 (Aug. 19, 2005) (Dunbar Decl. Exh. E).

application of the confidential commercial information exemption (Exemption 4) and the

deliberative privilege exemption (Exemption 5).[9]  Those applications for review remain pending.

## **ARGUMENT**

Summary judgment is appropriate when the record demonstrates that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Summary judgment may be awarded in a FOIA case solely on the basis of affidavits or

declarations "if the affidavits describe the documents and the justifications for nondisclosure

with reasonably specific detail, demonstrate that the information withheld logically falls within

the claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.

1981).

Summary judgment in favor of AT&T is warranted here.  The FOIA's statutory

exemptions "are intended to have meaningful reach and application."  *John Doe Agency v. John*

*Doe Corp.*, 493 U.S. 146, 151-52 (1989); *see also FBI v. Abramson*, 456 U.S. 615, 630-31

(1982) (Congress "recognized the important interests served by the [FOIA] exemptions").  Two

such exemptions — Exemption 7(C) which guards against disclosure of documents "compiled

for law enforcement purposes," 5 U.S.C. § 552(b)(7)(C), and Exemption 4, which protects

confidential, competitively sensitive information, *id.* § 552(b)(4) — apply here and stand in the

way of CompTel's opportunistic attempt to stigmatize AT&T in public and in regulatory

proceedings and to give its competitors an unfair advantage in the marketplace.

---

[9] *See* Letter from Mary Albert, CompTel, to Samuel Feder, Acting General Counsel, FCC, FOIA Control No. 2005-333 (Sept. 6, 2005) (Dunbar Decl. Exh. F).

## I.    THE REQUESTED DOCUMENTS ARE EXEMPT FROM DISCLOSURE PURSUANT TO FOIA EXEMPTION 7(C)

### A.    Exemption 7(C) Covers All of the Requested Documents

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  The Exemption "affords broad[] privacy rights to suspects, witnesses, and investigators."  *Bast v. Department of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981).  Exemption 7(C) applies to all of the requested documents here because (1) they were "compiled for law enforcement purposes," (2) their disclosure would invade AT&T's "personal privacy," and (3) that invasion is "unwarranted."  5 U.S.C. § 552(b)(7)(C).

### 1.    The Requested Documents Were Compiled For Law-Enforcement Purposes

CompTel's FOIA request seeks "[a]ll pleadings and correspondence contained in" the file the Enforcement Bureau created to investigate AT&T's compliance with E-Rate rules in New London.  Dunbar Decl. Exh. A.  The request thus goes directly to the records that the FCC obtained from AT&T as part of the investigation that AT&T itself initiated through its voluntary disclosure to the agency.  Furthermore, AT&T provided those records in response to the FCC's Letter of Inquiry, which the Enforcement Bureau issued as part of that investigation.  Under the circumstances, there can be no doubt that the requested records were "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7); *see*, *e.g.*, *Rugiero v. Department of Justice*, 257 F.3d 534, 550 (6th Cir. 2001) (Exemption 7 applies to "records compiled for civil enforcement purposes").[10]

---

[10] *See also Tax Analysts v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002) (Exemption 7 covers "civil and criminal matters" and "makes no distinction between agencies whose principal

2.      *Disclosure of the Requested Documents Would Threaten AT&T's Personal Privacy Interests*

The Enforcement Bureau rejected AT&T's reliance on Exemption 7(C) for one reason: in its view, "businesses do not posses 'personal privacy' interests" under Exemption 7(C).[11]  In fact, the text and purposes of the FOIA compel the conclusion that corporations have privacy interests within the meaning of Exemption 7(C), and that conclusion is buttressed by other contexts in which corporations are afforded privacy interests.

**a.**      Nothing on the face of Exemption 7(C) excludes corporations.  The Exemption protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  That text provides no basis for inferring a limitation excluding corporations.  *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) (the Court does "not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there").

Indeed, inferring such a textual limitation in this case would be doubly unwarranted as it would ignore the Supreme Court's teaching that "the concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea."  *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 165 (2004) (citation omitted); *see also Carpenter v.*

---

function is criminal law enforcement and agencies with both law enforcement and administrative functions"); *Kay v. FCC*, 867 F. Supp. 11, 18 (D.D.C. 1994) (Exemption 7 applies to FCC investigation that focused on "specifically alleged illegal acts" that could result in civil sanctions) (internal quotation marks omitted).

[11] Dunbar Decl. Exh. D at 6.

*Department of Justice*, 470 F.3d 434, 438 (1st Cir. 2006) ("[t]he privacy interest protected by

Exemption 7(C) is not a 'cramped' or limited notion of personal privacy"; rather, "Exemption

7(C) protects a broad notion of personal privacy") (citation omitted).

Nor can such an inference be drawn from the fact that Exemption 7(C) speaks of

"personal" privacy.  Nothing in that phrase indicates that Exemption 7(C) is limited to *natural*

persons.  On the contrary, Congress defined a "person" to include "an individual, partnership,

corporation, association, or public or private organization other than an agency."  5 U.S.C.

§ 551(2).  "Personal," in turn, is defined simply as "[o]f or pertaining to a particular person."

*E.g.*, American Heritage Dictionary 925 (2d ed. 1991).  And, in FOIA Exemption 4, which has

long been held to apply to corporations, *see, e.g.*, *Judicial Watch, Inc. v. Department of Justice*,

306 F. Supp. 2d 58, 67-68 (D.D.C. 2004), Congress protected "trade secrets and commercial or

financial information obtained from *a person*," 5 U.S.C. § 552(b)(4) (emphasis added); *see, e.g.*,

*Gilda Indus., Inc. v. United States Customs & Border Prot. Bureau*, 457 F. Supp. 2d 6, 9 (D.D.C.

2006) ("records are considered to be obtained from a person [under Exemption 4] as long as they

were submitted by a partnership, corporation, association, or public or private organization")

(citation and internal quotation marks omitted).[12]

Furthermore, the text and scope of the Privacy Act of 1974, 5 U.S.C. § 552a, demonstrate

that Congress knows how to extend privacy protections exclusively to natural persons when it

intends that result.  The privacy protections of that statute extend only to "individuals," *see* 5

U.S.C. § 552a(a)(2), which *excludes* "corporations or sole proprietorships," *St. Michael's*

*Convalescent Hosp. v. California*, 643 F.2d 1369, 1373 (9th Cir. 1981).  "In choosing the word

---

[12] The Enforcement Bureau extended protection to AT&T under Exemption 4 in this very case, thus acknowledging that AT&T is a "person" under FOIA.  *See infra* Part II.

'individual' as the object of the Privacy Act's protections, Congress demonstrated its awareness and preference for the narrower scope of that term, rather than the broader scope of the term 'person' to which the FOIA applies." *Florida Med. Ass'n v. Department of Health, Educ. & Welfare*, 479 F. Supp. 1291, 1307 (M.D. Fla. 1979).  Indeed, Congress used "person" and "individual" in the Privacy Act simultaneously, confirming that Congress understood the distinction between the two.  *See, e.g.*, 5 U.S.C. § 552a(b) ("[n]o agency shall disclose any record . . . to any *person*, or to another agency, except pursuant to a written request by, or with the prior written consent of, the *individual* to whom the record pertains") (emphases added).  Yet, unlike the Privacy Act, the FOIA includes no limitation excluding corporations from the coverage of Exemption 7(C).  The absence of such a limitation is compelling evidence that the scope of the Exemption is not so limited.  *See*, *e.g.*, *United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988).

That Exemption 7(C) uses the adjectival form of the word "person" — that is, "personal" — does not suggest a different result.  It is a "grammatical imperative[]" that "a statute which defines a noun has thereby defined the adjectival form of that noun." *Delaware River Stevedores v. DiFidelto*, 440 F.3d 615, 623 (3rd Cir. 2006) (Fisher, J., concurring).  Because Congress defined "person" to include a corporation, it follows that "the adjectival form of that noun" — *i.e.*, "personal" — likewise includes a corporation.  *See id.*  Moreover, the word "personal," no less than "person," can quite comfortably be used to refer to corporations.  For example, corporations have long been understood to be "persons" for the purposes of the Fifth and Fourteenth Amendments to the United States Constitution, *see*, *e.g.*, *Grosjean v. American Press Co.*, 297 U.S. 233, 244 (1936) ("a corporation is a 'person' within the meaning of the equal protection and due process of law clauses"), and therefore protected by the doctrine of

"personal" jurisdiction that inheres in the concept of due process, *see, e.g.*, *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 110 (1987); 28 U.S.C. § 1391(c) ("a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction").

There is, in short, no textual basis to support the Enforcement Bureau's assertion that the same Congress that deliberately selected the word "person" under the FOIA to encompass corporations nevertheless intended that the word "personal" would cover only natural persons.

**b.**    Excluding corporations from the protections of Exemption 7(C) would conflict not only with the text of that Exemption, but also with its purpose.

Exemption 7(C) rests on Congress's judgment that "[s]uspects, interviewees and witnesses have a privacy interest because disclosure [of requested information] may result in embarrassment or harassment." *Davin v. Department of Justice*, 60 F.3d 1043, 1058 (3d Cir. 1995); *see Foster v. Department of Justice*, 933 F. Supp. 687, 692 (E.D. Mich. 1996) ("The purpose of this exemption is to protect third-parties from embarrassment, reprisal or harassment."); *Voinche v. FBI*, 940 F. Supp. 323, 331 (D.D.C. 1996) (Exemption 7(C) "is designed to protect not only against the danger of physical harm but also against those invasions of personal privacy likely to be associated with the stigma frequently attached to law enforcement proceedings and investigations").  In other words, Exemption 7(C) protects the privacy of those parties participating in law-enforcement investigations — whether as suspects or cooperating parties — because the unwarranted disclosure of information pertaining to those investigations may be used to embarrass, harass, or stigmatize those parties.

That purpose plainly applies to corporations.  Corporations, like individuals, are routinely suspects or cooperating parties (or both) in law-enforcement investigations.  And it is well

established that corporations, like individuals, face the prospect of public embarrassment, harassment, and stigma based upon their involvement in such investigations.[13]  A construction of Exemption 7(C) that categorically excludes corporations would thus exclude a large array of actors that can be swept into law-enforcement investigations and then later made to suffer serious consequences.  That outcome is at odds with the Exemption's core purpose.

Beyond that, a cramped view of the scope of Exemption 7(C) could chill voluntary cooperation by corporations and other non-natural persons in law-enforcement investigations. Exemption 7 is structured to safeguard law-enforcement interests.  *See Abramson*, 456 U.S. at 630 (holding that, other than Exemption 7, "[n]o other provision [of] FOIA could compensate for the potential disruption in the flow of information to law enforcement agencies by individuals who might be deterred from speaking because of the prospect of disclosure"); *see also John Doe Agency*, 493 U.S. at 156 (finding that Exemption 7 as a whole reflects Congress's recognition that "law enforcement agencies have legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations") (citation and internal quotation marks omitted). Corporations, deprived of the protections of Exemption 7(C), may be less willing to cooperate and turn over documents in agency investigations if such documents can, as the Enforcement Bureau held, be made public based on nothing more than a one-sentence FOIA request.

---

[13] *See* Cindy R. Alexander, *On the Nature of the Reputational Penalty for Corporate Crime:  Evidence*, 42 J. L. & Econ. 489, 492 (1999) (citing study showing that "publicly traded corporations sustained substantial losses in goodwill when named as targets of [Federal Trade Commission] investigations for having possibly violated its regulations against false and misleading advertising"); Ken Brown, *et al., Called to Account:  Indictment of Andersen in Shredding Case Puts Its Future in Question -- Obstruction of Justice Count May Speed the Departure of Clients and Partners – Firm Calls It "Death Penalty*,*"* Wall St. J., Mar. 15, 2002, at A1 ("In the 212-year history of the U.S. financial markets, no major financial-services firm has ever survived a criminal indictment."); *cf.* Daniel R. Fischel & Alan O. Sykes, *Corporate Crime*, 25 J. Legal Stud. 319, 332 (1996) ("[c]orporations convicted of crimes may well suffer significant reputational losses").

c.      Finally, there is nothing extraordinary about Congress's decision to extend privacy protections to corporations under Exemption 7(C). The Supreme Court has already held, for example, that corporations have privacy interests under the Fourth Amendment. In *G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977), the Court noted that "business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context." *Id.* at 353. But the Court emphasized that "the intrusion into [G.M. Leasing's] *privacy*" at issue in the case "was not based on the nature of its business, its license, or any regulation of its activities." *Id.* at 354 (emphasis added). Because the intrusion in that case was in connection with the ordinary enforcement of the laws, the Court "[found] no justification for treating petitioner differently in these circumstances simply because it is a corporation." *Id.* [14]

The Supreme Court's decision in *G.M. Leasing* sets forth two principles relevant here. *First*, there is nothing unusual about speaking of corporations as possessing privacy interests. *See, e.g.*, *id.* at 354 ("It is one thing to seize without a warrant property resting in an open area or seizable by levy without an *intrusion into privacy*, and it is quite another thing to effect a

---

[14] Apart from *G.M. Leasing*, decisions of other federal courts establish that corporations have cognizable privacy interests. In *CAB v. United Airlines, Inc.*, 542 F.2d 394 (7th Cir. 1976), for example, the Seventh Circuit found that "while the expectation of privacy of a regulated carrier is limited, it nevertheless exists," reasoning that there "are internal corporate papers that stand at the heart of management effort, and so long as our carrier operations are rooted in private enterprise there is a strong element of privacy in such items (which is) a reason for limiting the occasion of (their) production." *Id.* at 399 (citation and internal quotation marks omitted). Similarly, in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), the D.C. Circuit held that "legitimate expectations of privacy can be invoked by corporations to suppress the fruits of a search of corporate premises," which, the court reasoned, "demonstrates an understanding that a compulsory search of even corporate premises may constitute an intrusion upon privacy." *Id.* at 304 (internal footnotes omitted); *see also United States v. Zhang*, 833 F. Supp. 1010, 1013 (S.D.N.Y. 1993) (corporation had "reasonable expectation of privacy in its offices").

warrantless seizure of property, *even that owned by a corporation*, situated on private premises to which access is not otherwise available for the seizing officer.") (emphases added).  For that reason, a construction of Exemption 7(C) that recognizes corporations' privacy interests would break no new ground.

*Second*, *G.M. Leasing* establishes that a departure from the presumption that a corporation has an expectation of privacy must be tied to some corporate attribute that warrants differential treatment.  Here, neither the FCC nor CompTel has suggested any reason that AT&T's documents, provided to the FCC in the course of a law-enforcement investigation, should be treated differently from documents submitted by an individual.  There is thus "no justification for treating [AT&T] differently . . . simply because it is a corporation."  *Id.*; *cf. Henzel v. United States*, 296 F.2d 650, 652 (5th Cir. 1961) ("a corporation has the same rights as a natural person to be free from illegal searches and seizures").[15]

    3.    *The Invasion of AT&T's Privacy is Unwarranted*

    **a.**    In the seminal decision involving Exemption 7(C) — *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989) — the Supreme Court made

---

[15] The D.C. Circuit has twice stated in dicta that Exemption 6, which protects the "personal privacy" interest in "personnel and medical files and similar files," does not apply to corporations.  *See National Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 685 & n.44 (D.C. Cir. 1976); *Sims v. CIA*, 642 F.2d 562, 572 n.47 (D.C. Cir. 1980), *aff'd in part, rev'd in part*, 471 U.S. 159 (1985).  Apart from being dicta, those statements are inapposite here because Exemption 6 is a different provision with a different text and purpose, and, in fact, Congress provided a "broader degree of protection to privacy interests" under Exemption 7(C) than under Exemption 6.  *Hopkins v. Department of Hous. & Urban Dev.*, 929 F.2d 81, 86 (2d Cir. 1991).  In *Cohen v. EPA*, 575 F. Supp. 425, 429 n.6 (D.D.C. 1983), this Court suggested that Exemptions 6 and 7(C) protect an identical privacy interest, but the Court offered no support for that suggestion and the decision is in any event not controlling here, *see In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000).  Finally, although *Washington Post Co. v. Department of Justice*, 863 F.2d 96 (D.C. Cir. 1988), suggests that commercial information may not give rise to privacy interests, that decision was limited to the facts of the case and did not hold that a corporation is categorically excluded from Exemption 7(C).  *See id.* at 101.

clear that "categorical decisions [under the FOIA] may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." *Id.* at 776. The Court further held that, "as a categorical matter[,] . . . a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no official information about a Government agency, but *merely records that the Government happens to be storing*, the invasion of privacy is unwarranted." *Id.* at 780 (emphases added).

That same categorical approach warrants protection from disclosure here. As far as AT&T is aware, putting aside any documents reflecting the FCC's own deliberations that may exist in the Enforcement Bureau's file, the only records responsive to CompTel's FOIA request are internal documents of AT&T. None of those records contains "official information" about the FCC or otherwise pertain to the conduct of the FCC. The request is instead aimed entirely at obtaining information about AT&T, contained in AT&T's own documents, that "the Government happens to be storing" only because AT&T brought this issue to the FCC's attention in the first place. *Id.* Under *Reporters Committee*, that interest lacks any weight. *See id.* at 774 ("the FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny, not that information about private citizens that happens to be in the warehouse of the Government be so disclosed") (emphases omitted). Application of a categorical rule prohibiting disclosure is accordingly appropriate. *See Carpenter*, 470 F.3d at 441 (disclosure of documents that a competitor provided to the government would not further the public interest "because reviewing such documents tells the public nothing about the actions of the government"); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("We now hold categorically that, unless access to the names and addresses of private individuals

appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute

compelling evidence that the agency is engaged in illegal activity, such information is exempt

from disclosure.").

The suitability of a categorical rule — at least when information stems from an

enforcement proceeding initiated by a voluntary disclosure — is confirmed by the adverse effect

the possibility of disclosure would have on companies' willingness to report possible rule

violations.  Particularly in the wake of recent changes to the legal obligations governing publicly

traded corporations, *see*, *e.g.*, Sarbanes Oxley Act of 2002, 15 U.S.C. §§ 7201-7266, many

companies have instituted controls that strictly monitor regulatory compliance, and they have

adopted policies of voluntarily reporting possible violations.[16]  Unlike Exemption 4 — which

provides substantially more protection to voluntarily submitted information than to information

that is produced under compulsion, *see Critical Mass Energy Project v. Nuclear Regulatory

Comm'n,* 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc) — Exemption 7 affords no special

protection to voluntarily submitted information.  As a result, absent a categorical rule, companies

that are inclined to voluntarily report possible violations to the government may be less willing

to do so if the information provided — either in the voluntary submission itself or in an ensuing

investigation — could be subject to public disclosure.

**b.**     Even if the Court were to conclude that a categorical rule does not apply here, the

Court would be required to "balance" the public interest in disclosure against the "privacy

interests that are at stake."  *Computer Prof'ls for Soc. Responsibility v. United States Secret*

---

[16] *See, e.g.*, Christopher A. Wray & Robert K. Hur, *Corporate Criminal Prosecution in a Post-Enron World:  The Thompson Memo in Theory and Practice*, 43 Am. Crim. L. Rev. 1095, 1135 (2006) (finding that companies are increasingly "provid[ing] more prompt and aggressive cooperation with government investigations, both in response to requests from prosecutors and in advance of them (through voluntary disclosures)").

*Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996); *see also Rojem v. Department of Justice*, 775 F. Supp. 6, 11 (D.D.C. 1991) ("[i]n determining whether the agency properly invoked Exemption 7(C), the Court must balance the privacy interests of the law enforcement agents against the public interest in learning the identities of those who participated in the investigation").  Here, the privacy interests at stake far outweigh the public interest in disclosure.

*First*, there is no possible public-interest justification in disclosure in this case.  The Supreme Court is clear that "[Exemption 7(C)] requires the person requesting . . . information to establish a sufficient reason for the disclosure." *Favish*, 541 U.S. at 172.  "[T]he citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake" and that "the information is likely to advance that interest." *Id.*  "Otherwise," the Court held, "the invasion of privacy is unwarranted." *Id.*

As suggested above, the only plausible public-interest justification that CompTel could assert is an interest in exposing impropriety on the part of the FCC.  But CompTel has made no allegation of agency impropriety here, much less has it bolstered such an allegation with evidence.  "[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure." *Id.* at 174.  Instead, "the requester must *produce evidence* that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Id.* (emphasis added); *see also Carpenter*, 470 F.3d at 442 (requester's "bare suspicion does not amount to evidence sufficient to allow a reasonable person to believe that government impropriety occurred").

CompTel cannot carry this burden. Indeed, in view of the precedents on this issue, the absence of any allegation or evidence of impropriety on the part of the FCC alone makes disclosure of AT&T's documents manifestly inappropriate. *See National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) ("something . . . outweighs nothing every time").

*Second*, even if this Court were to proceed to define the scope of AT&T's privacy interests with particularity, it is evident that those interests outweigh any conceivable interest in disclosure.

For one thing, all of the documents requested by CompTel pertain in some way to conduct by AT&T as a corporation and by individual employees of AT&T that may have violated FCC regulations. *See* Rotatori Decl. ¶ 9. Many of the documents contain names and other identifying information of individuals involved in alleged violations of FCC rules. *See id.* Such information could be used to embarrass, harass, or stigmatize AT&T as a corporation or those employees as individuals. *See id.*; *see also KTVY-TV v. United States*, 919 F.2d 1465, 1469 (10th Cir. 1990) (recognizing privacy interest in names and "anything identifying" participating party "to avoid harassment and embarrassment"). There is therefore a substantial privacy interest in that information. *See SafeCard Servs.*, 926 F.2d at 1205 ("There is little question that disclosing the identity of targets of law-enforcement investigations can subject those identified to embarrassment and potentially more serious reputational harm.") (internal citations, alterations, and quotation marks omitted).

Beyond the details regarding the individuals involved in the underlying FCC investigation, the requested documents contain facts and descriptions that reveal the what, when, where, why, and how of the allegations in that FCC investigation. *See* Rotatori Decl. ¶ 10.

These documents, taken together, show the decisionmaking processes that led to the alleged violations of the FCC rules, the period of time over which those alleged violations occurred, and AT&T's internal responses to the arguable misconduct. *See id.* With those details of supposed corporate wrongdoing in hand, CompTel could piece together basic time lines and theories of how and why the arguable violations of FCC rules came about. *See id.* Such information could then be used to embarrass, harass, and stigmatize AT&T by, for example, citing such information in press releases, public comments to the FCC, advertisements, or news reports. *See id.*

Indeed, CompTel's previous attacks on AT&T's integrity illustrate the risk of disclosure here. CompTel has an established history of seeking to further the interests of its members by maligning AT&T before the FCC. In one case, CompTel recklessly charged AT&T with "flout[ing]" FCC rules and "thumb[ing] its nose at [FCC] orders."[17] In that case, CompTel claimed, incorrectly, that AT&T had failed to implement internal controls, and it asserted that this supposed failure "constitute[d] a willful omission that should be subject to criminal penalties, including a fine or imprisonment."[18] In another case — one in which, as here, AT&T *voluntarily* reported to the FCC a concern that it might have violated FCC rules — CompTel asserted that AT&T is willing to "say whatever is needed," had "been caught red handed," and should be "swiftly and severely punish[ed]."[19] Particularly in light of this history, it is difficult

---

[17] Letter from Maureen Flood, Director, Regulatory & State Affairs, CompTel, to Magalie Roman Salas, Secretary, FCC, CC Docket No. 98-141, at 7 (Jan. 24, 2002), *available at* http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6512980842.

[18] *Id.*

[19] Letter from H. Russell Frisby, Jr., President, CompTel, to Michael K. Powell, Chairman, FCC, CC Docket No. 01-194, at 1-2 (Aug. 31, 2001), *available at* http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6512765282; *see also* Letter from H. Russell Frisby, Jr., President, CompTel, to David Solomon, Chief, Enforcement Bureau, FCC, at 1, 3, 7 (May 21, 2001) (falsely charging that AT&T "is more than willing to falsify information," had engaged in "egregious conduct," had "'cheated'" the FCC,

to fathom why CompTel would be interested in the documents at issue, if not to attempt to embarrass, harass, and stigmatize AT&T. At the very least, the possibility of that result creates a significant privacy interest that outweighs any conceivable public interest in disclosure.

Nor is this privacy interest undermined by the fact that the existence of the FCC's investigation of AT&T is itself public knowledge. It is the details here that matter. In *Reporters Committee*, the Supreme Court explained that simply because "an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." 489 U.S. at 770 (internal quotation marks omitted). That reasoning applies here. Although the fact of the FCC's investigation is public, the specific contents of the requested documents are not public, and those contents provide far more insight into the issues that gave rise to that investigation. For the reasons set forth above, the disclosure of those details would harm AT&T's privacy interests.

Finally, the requested documents contain internal information about AT&T's operational and billing processes and practices, AT&T's standards of corporate conduct, and other information that, even if not conventional competitive information within the meaning of Exemption 4, could be used by competitors to target AT&T in the marketplace. Competitors could, for example, hold up supposed evidence of improper invoices to potential customers as a basis for embarrassing AT&T and undermining the credibility of AT&T's operational and billing processes and practices as whole. Similarly, competitors could point to AT&T's own characterizations in interrogatories as to how the alleged conduct allegedly violated AT&T's own standards of internal corporate conduct, suggesting (wrongly) that those standards are

---

and deserved "severe sanctions"), *available at* http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6512567860.

toothless or not enforced.  In addition, competitors, with details of AT&T's alleged wrongdoing in hand, could challenge the effectiveness of AT&T's internal mechanisms for preventing and responding to allegedly unlawful billing practices.

In sum, each of these privacy interests — taken individually and together — outweigh CompTel's nominal (at most) interest in disclosure.  *Cf. Department of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 500 (1994) ("Because a very slight privacy interest would suffice to outweigh the relevant public interest, we need not be exact in our quantification of the privacy interest.  It is enough for present purposes to observe that the employees' interest in nondisclosure is not insubstantial.").  Even assuming a balancing approach is appropriate here, AT&T's documents should accordingly receive the protection of Exemption 7(C).

### B. Because the Documents Are Protected by Exemption 7(C), the FCC May Not Disclose Them

Although the FOIA does not itself prohibit an agency from disclosing documents that fall within a statutory exemption, disclosure of protected documents is unlawful when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Campaign for Family Farms v. Glickman*, 200 F.3d 1180, 1184 (8th Cir. 2000).  Under that standard, "an agency has discretion to disclose information within a FOIA exemption, unless something independent of the FOIA prohibits disclosure."  *Campaign for Family Farms*, 200 F.3d at 1185.  Importantly, agency regulations that establish standards for the disclosure of documents constitute such an independent source of law prohibiting disclosure in appropriate circumstances.  *See id.*

Such circumstances exist here.  The FCC regulations relevant here incorporate the protections of Exemption 7(C).  The FCC's regulations state that "[i]nvestigatory records compiled for law enforcement purposes," to the extent disclosure would "[c]onstitute an

unwarranted invasion of personal privacy," 47 C.F.R. § 0.457(g), are records that "are not routinely available for public inspection," *id.* § 0.457. Records that are not routinely available for public inspection, in turn, may not be disclosed unless the FCC first determines that "the policy considerations favoring non-disclosure" outweigh "the reasons cited for permitting inspection in light of the facts of the particular case." *Id.* § 0.457.

Because the Bureau decided that AT&T, as a corporation, was excluded from the protection of Exemption 7(C), the agency has not performed the balancing contemplated in Rule 0.457. But because Exemption 7(C) does apply here, such balancing is a prerequisite to disclosure. *See id.* Disclosure of the documents at this juncture would accordingly violate FCC regulations and would thus be unlawful. *See Campaign for Family Farms*, 200 F.3d at 1185.

Beyond that, because the FCC's balancing test tracks, in all material respects, the standard for determining whether the requested documents fall within Exemption 7(C) in the first instance, *see supra* pp. 15-21 (describing why Exemption 7(C) protects the requested documents), a determination by this Court that the requested documents fit within the scope of Exemption 7(C) is, in effect, also a determination that disclosure of the records would violate the FCC's rules. For this reason as well, AT&T's documents may not be disclosed. *See Campaign for Family Farms*, 200 F.3d at 1185 (because agency regulations imposed essentially the same balancing test as under Exemption 6, a determination that Exemption 6 was met prevents disclosure under agency rules); *see also American Fed'n of Labor v. FEC*, 177 F. Supp. 2d 48, 61-63 (D.D.C. 2001) (holding, under rationale of *Campaign for Family Farms*, that agency's "refusal to apply Exemption 7(C) to bar release of the names and other identifying information of third-party individuals referred to in its investigative files is arbitrary, capricious and contrary to law."), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003).

## II.     IN THE ALTERNATIVE, THE FCC PROPERLY REDACTED INFORMATION THAT IS EXEMPT FROM DISCLOSURE UNDER EXEMPTION 4

In the alternative, and at a minimum, the FCC properly redacted information from the documents at issue pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4).  As this Court recently explained, Exemption 4 "protects from public disclosure information that is '(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential.'"  *Gilda*, 457 F. Supp. 2d at 9 (quoting *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  The information redacted by the FCC satisfies each of these requirements, which warrants summary judgment in favor of the FCC and AT&T.

### A.     The Records Sought are Commercial

The terms "commercial or financial" are to be given their "ordinary meanings":  records are commercial so long as the submitter has a "commercial or trade interest" in them.  *Public Citizen Health*, 704 F.2d at 1290 (internal citations and quotations omitted).  As described above and explained in the attached Rotatori declaration, the documents sought by CompTel includes information such as cost and pricing data, billing and payment dates, names and job descriptions of AT&T employees, the identity of contractors used by AT&T, and customer contact information.  There can be no question that this information is "commercial" for purposes of Exemption 4.  *See, e.g., Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) (finding export-insurance applications containing detailed information on goods and customers to be "commercial or financial").

### B.     The Records Sought Were Obtained from a "Person"

As explained above, Congress defined "person" for purposes of the FOIA to include "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2).  Information submitted to an agency by a corporation, including the

information AT&T submitted in response to the FCC's investigation, is therefore "obtained from a[] person" for purposes of Exemption 4.  *See, e.g., Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 425 F.2d 578, 582 (D.C. Cir. 1970).

> ### C.    The Records Sought are "Confidential"

Under the D.C. Circuit's decision in *National Parks and Conservation Association v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), as clarified by the *en banc* decision in *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992) (en banc), information provided to the government under compulsion — as in the case of information submitted pursuant to an Enforcement Bureau Letter of Inquiry — qualifies for protection under Exemption 4 if disclosure is likely "to cause substantial harm to the competitive position of the person from whom the information was obtained."  *Id.* at 878 (quoting *National Parks*, 498 F.2d at 770).  This test, in turn, is satisfied when there is "'both a showing of actual competition and a likelihood of substantial competitive injury.'"  *Gilda,* 457 F. Supp. 2d at 9 (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1152 (D.C. Cir. 1987)).

With respect to the first requirement, "actual competition" pervades the communications industry, and that is particularly so in the market to provide services to enterprise customers, including schools and libraries.[20]  Educational customers typically have sophisticated transmission and networking needs.  *See* Rotatori Decl. ¶ 14.  Beyond that, the federal and state

---

[20] *See generally, e.g.*, Memorandum Opinion and Order, *SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, 20 FCC Rcd 18290, ¶ 73 n.223 (2005) ("competition in the enterprise market is robust"); Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd 16978, 17063, ¶¶ 128, 129 (2003) (describing small, medium, and large enterprise customers and noting that "[t]he higher profit margins and greater emphasis on quality of service" associated with these customers ensure competition), *vacated in part and remanded*, *USTA v. FCC*, 359 F.3d 554 (D.C. Cir.), *cert. denied*, 543 U.S. 925 (2004).

subsidies available to enable educational customers to meet those needs make them particularly attractive customers, and the marketplace for winning their business is therefore extremely competitive. *See id.*

In this competitive context, disclosure of the information AT&T submitted to the FCC would create a likelihood of substantial competitive injury. As noted at the outset, that information includes detailed pricing and cost data relating to the services that AT&T supplies to schools. It also explains the specific equipment AT&T uses to provide specific services, how it configures that equipment, and how much it pays for it. And it further identifies not only AT&T personnel responsible for managing particular customer accounts, but also the names of customer contacts.

As the FCC recognized, this data is confidential and competitively sensitive and is therefore protected from disclosure under Exemption 4. With access to this information, competitors could tailor their competitive strategies to compete unfairly against AT&T. For example, the cost data included in this information could provide competitors an indication of AT&T's ability to compete on price. *See* Rotatori Decl. ¶ 16. Likewise, the pricing data could permit competitors to underbid AT&T for particular services. *See id.* And the names of contractors and vendors that AT&T uses for particular projects and services — as well as the names of its own personnel as well as those of customer representatives — represent valuable know-how that provides AT&T a competitive advantage in the marketplace and is closely guarded for that reason. *See id.*

The information at issue, in short, represents "valuable knowledge regarding . . . [AT&T's] business operations — information that [AT&T] consider[s] confidential." *Gilda*, 457 F. Supp. 2d at 11. Because "a competitor could use the information to gain a competitive

advantage," its disclosure "would likely cause substantial competitive injury to the companies

that submitted the information," rendering it subject to the protection of Exemption 4.  *Id.*

Indeed, courts have consistently characterized comparable information as competitively

sensitive and therefore subject to Exemption 4.  The D.C. Circuit has long held, for example, that

information that would allow a competitor "to estimate, and undercut," a firm's bids is

competitively sensitive and therefore protected from disclosure.  *Gulf & W. Indus. v. United

States*, 615 F.2d 527, 530 (D.C. Cir. 1979); *see McDonnell Douglas Corp. v. United States Dep't

of the Air Force*, 375 F.3d 1182, 1189-90 (D.C. Cir. 2004).  This Court has similarly recognized

that Exemption 4 protects confidential information that could enable competitors to "make

projections of [a rival's] current and future cost and prices," *Timken Co. v. United States

Customs Serv.*, 491 F. Supp. 557, 559 (D.D.C. 1980), even where the information in question

represents a limited portion of the firm's business, *see Allnet Communication Servs., Inc. v. FCC*,

800 F. Supp. 984, 989 (D.D.C. 1992).  And other courts have likewise found that any

confidential information that would assist competitors in "raiding" a firm's existing customers is

protected under Exemption 4.  *See*, *e.g.*, *Westinghouse Elec. Corp. v. Brown*, 443 F. Supp. 1225,

1230 (E.D. Va. 1977) (information regarding research budget); *Burke Energy Corp. v.

Department of Energy*, 583 F. Supp. 507, 512 (D. Kan. 1984) (pricing and other information that

"would enable competitors to solicit [a rival's] customers with competitive arrangements").

The same analysis applies here.  For the reasons explained above and in the attached

declaration, CompTel's request encompasses confidential information that, if disclosed to

CompTel's members or other competing providers in the marketplace, would give these

competitors a leg up in the marketplace.  It is therefore protected from disclosure under

Exemption 4.

## **CONCLUSION**

The Court should grant AT&T's motion for summary judgment.

Respectfully submitted,

/s/ Colin S. Stretch

_____

| | |
|---|---|
| Gary L. Phillips (D.C. Bar No. 334037) | Colin S. Stretch (D.C. Bar No. 470193) |
| James P. Lamoureux (D.C. Bar No. 431631) | Kelly P. Dunbar (D.C. Bar No. 500038) |
| AT&T INC. | KELLOGG, HUBER, HANSEN, TODD, |
| 1120 20th Street, N.W. | EVANS & FIGEL, P.L.L.C. |
| Washington, D.C. 20036 | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | Tel.: (202) 326-7900 |
| | Fax: (202) 326-7999 |

*Counsel for AT&T Inc.*

February 12, 2007

27

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMPTEL,

      Plaintiff,

      v.

FEDERAL COMMUNICATIONS
COMMISSION,

      Defendant.

Civil Action No. 06-01718 (HHK)

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the Memorandum Opinion filed separately and contemporaneously herewith, it is hereby

ORDERED that the Motion for Summary Judgment filed by Intervenor-Defendant AT&T Inc. is GRANTED. The documents at issue in the case are protected from disclosure pursuant to Exemption 7(C) of the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(C), and applicable regulations of the Federal Communications Commission. In addition, the Federal Communications Commission's Enforcement Bureau properly redacted material from the documents at issue that is confidential and competitively sensitive, and that accordingly is protected from disclosure under Exemption 4 of the Freedom of Information Act, *id.* § 552(b)(4).

IT IS FURTHER ORDERED that this case is dismissed from the docket of the Court. This is a final appealable order. *See* Fed. R. App. P. 4(a).

SO ORDERED.

SIGNED this _____ day of _____, 2007.


_____
HENRY H. KENNEDY, JR.
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| COMPTEL, |
|      Plaintiff, |
|      v. |
| FEDERAL COMMUNICATIONS COMMISSION, |
|      Defendant. |

Civil Action No. 06-01718 (HHK)

**PROPOSED STATEMENT OF UNDISPUTED MATERIAL FACTS OF
INTERVENOR-DEFENDANT AT&T INC.**

Intervenor-Defendant AT&T Inc. ("AT&T") hereby offers the following proposed undisputed material facts:

1.      The FCC's "E-Rate," or "Education-Rate," Program is the universal service fund mechanism designed to assist eligible schools and libraries in gaining access to telecommunications and advanced services.  *See* 47 C.F.R. §§ 54.500-54.521.

2.      In August 2004, AT&T, then known as SBC Communications Inc., informed the Federal Communications Commission ("FCC") that it had discovered that a wholly owned subsidiary, Southern New England Telephone, had submitted invoices to the universal service fund administrator that were possibly inconsistent with the FCC's E-Rate rules and orders.  The invoices in question related to work performed for public schools in New London, Connecticut. *See* Rotatori Decl. ¶ 1.  AT&T's disclosure of this information to the FCC was in connection with an FCC investigation initiated when AT&T voluntarily reported concerns relating to E-Rate funding to the FCC.

3.      AT&T voluntarily refunded to the universal service fund administrator all amounts collected in connection with the arguably improper invoices, and it withdrew all outstanding invoices that raised similar concerns.  *See id.* ¶ 18.

4.      On August 24, 2004, the Investigations and Hearings Division of the FCC's Enforcement Bureau sent AT&T a Letter of Inquiry notifying AT&T that the FCC was investigating AT&T for possible violations of FCC rules.  *See id.* ¶ 3.  That Letter of Inquiry sought detailed information relating to the various projects for which AT&T had arguably submitted invoices in violation of the FCC's rules.  For each such project, the FCC asked for, among other things, dates on which AT&T invoiced the universal fund administrator, dates on which AT&T refunded the universal fund administrator, the names of all AT&T personnel involved in deciding how to bill under the E-Rate program, and the names of all AT&T personnel aware of decisions regarding billing under the E-Rate program.  *See id.* ¶ 5.  The Letter of Inquiry also instructed AT&T to provide its Code of Business Conduct, and to state which sections of the Code, if any, were violated by the billing in question.  *See id.*  The FCC also requested documents relating to the projects and invoices that had triggered AT&T's concerns. *See id.*

5.      In response to the FCC's letter, AT&T provided the FCC with detailed interrogatory responses, and it produced over two-hundred and fifty pages of documents.  *See id.* ¶¶ 6-7.  The documents include, among other things, internal AT&T email communications, AT&T job descriptions, completed universal service invoice forms, funding committee reports provided by the universal service fund administrator, AT&T billing invoices (many of which include hand written notes by AT&T personnel) containing product, project, and pricing

information, confidential AT&T engagement forms, quotation forms, vendor information sheets, and AT&T's Code of Business Conduct.  *See id.* ¶ 7.

6.      The FCC and AT&T settled the FCC's investigation by a consent decree, effective December 16, 2004, that involved no admission of wrongdoing by AT&T.  *See id.* ¶ 17; Order and Consent Decree, *SBC Communications Inc.*, 19 FCC Rcd 24014 (Enf. Bur. 2004).

7.      On April 4, 2005, CompTel submitted a one-sentence FOIA request seeking the Enforcement Bureau's investigative file for the FCC's investigation of AT&T's E-Rate compliance.  *See* Dunbar Decl. Exh. A (Email from Mary C. Albert, CompTel to FOIA FCC (Apr. 4, 2005)).  CompTel sought "[a]ll pleadings and correspondence contained in File No. EB-04-IH-0342."  *Id.*

8.      On May 27, 2004, AT&T submitted a letter opposing disclosure of the documents requested by CompTel.  *See* Dunbar Decl. Exh. B (Letter from Jim Lamoureux, SBC Services, Inc., to Judy Lancaster, Enforcement Bureau, FCC, FOIA Control No. 2005-333 (May 27, 2005)).  AT&T opposed disclosure on the grounds that the documents were protected from disclosure under Exemptions 4 and 7 of the FOIA.  *Id.*

9.      CompTel responded to AT&T's letter approximately a month later with a letter filing in which it disputed AT&T's reliance on both exemptions.  *See* Dunbar Decl. Exh. C (Letter from Mary Albert, CompTel, to Judy Lancaster, Enforcement Bureau, FCC, FOIA Control No. 2005-333 (June 28, 2005)).

10.     On August 5, 2005, the FCC's Enforcement Bureau issued a letter ruling resolving CompTel's request.  *See* Dunbar Decl. Exh. D (Letter from William H. Davenport, Enforcement Bureau, FCC, to Jim Lamoureux, SBC Services, Inc., and Mary Albert, CompTel, FOIA Control No. 2005-333 (Aug. 5, 2005)).  The Bureau rejected AT&T's reliance on FOIA's

law-enforcement exemption (Exemption 7(C)) based on the statement that, "[g]enerally, businesses do not possess 'personal privacy' interests as required for application" of that exemption. *Id.* at 6. The Bureau also found that portions of AT&T's documents — including documents revealing AT&T's "pricing information" as well as "costs and pricing data, . . . billing and payment dates, and identifying information of [AT&T's] staff, contractors, and the representatives of its contractors and customers" — were exempt from disclosure as confidential commercial information under FOIA Exemption 4. *Id.* at 5. As a result of this finding, the Bureau redacted this information from the documents requested by CompTel. *See id.*; Rotatori Decl. ¶ 12. Finally, the Bureau concluded that certain documents encompassed in CompTel's request were protected by FOIA's deliberative privilege exemption (Exemption 5). *See* Dunbar Decl. Exh. D at 6.

11.    AT&T and CompTel each filed applications asking the FCC to review the Enforcement Bureau's decision.

12.    AT&T challenged the Bureau's decision that the law-enforcement exemption (Exemption 7(C)) is by definition inapplicable to corporations. *See* Dunbar Decl. Exh. E (Letter from Jim Lamoureux, SBC Services, Inc., to Samuel Feder, Acting General Counsel, FCC, FOIA Control No. 2005-333 (Aug. 19, 2005)).

13.    CompTel challenged the Bureau's application of the confidential commercial information exemption (Exemption 4) and the deliberative privilege exemption (Exemption 5); CompTel raised these challenges as a protective measure because CompTel had yet to see the redacted documents. *See* Dunbar Decl. Exh. F (Letter from Mary Albert, CompTel, to Samuel Feder, Acting General Counsel, FCC, FOIA Control No. 2005-333 (Sept. 6, 2005)).

14.    Those applications for review remain pending before the FCC.

15.    The documents requested by CompTel were compiled by the FCC for law enforcement purposes — *i.e.*, in connection with an investigation into possible violations of FCC regulations.

16.    As a corporation, AT&T is a "person" for the purposes of FOIA and is therefore entitled to the protection of "personal privacy" provided in FOIA Exemption 7(C).

17.    If the information in the requested documents were disclosed, AT&T as a corporation and AT&T employees would face public embarrassment, harassment, and stigma. *See* Rotatori Decl. ¶¶ 8-13.  CompTel, for example, could use the documents to make representations regarding how and why AT&T came to submit the arguably improper invoices, and it could further rely on them to make representations regarding the adequacy of AT&T's internal controls.

18.    There is no evidence that the documents CompTel seeks would shed any light on alleged impropriety by the FCC or any other government agency.

19.    The requested documents contain information that is "commercial or financial" for purposes of FOIA.  *See id.*  ¶ 14.

20.    The requested documents contain information relating to the cost and pricing of AT&T's services, AT&T's billing and invoices procedures and practices, and names and identifying information of customers, vendors, and representatives of customers and vendors. *See id.* ¶¶ 14-16.

21.    CompTel is a trade association with members that are competitors of AT&T.

22.    The market for providing telecommunications and data services to educational institutions is vibrantly competitive.  *See id.* ¶ 14.  Numerous companies compete aggressively in the marketplace for educational customers.  *See id.*

23.     If the information contained in the requested documents is disclosed, it would give AT&T's competitors an unfair advantage in the marketplace, by permitting those competitors access to internal pricing and cost information, as well as the names and contact information for AT&T's own employees and its vendors and customers.  Using this information, customers could, for example, target specific customer accounts using specific knowledge of AT&T's costs, and they could underbid AT&T using knowledge of the company's pricing decisions.  These actions, in turn, would be likely to result in substantial competitive harm to AT&T.  *See id.* ¶¶ 15-16.

Respectfully submitted,

/s/ Colin S. Stretch

_____

| | |
|---|---|
| Gary L. Phillips (D.C. Bar No. 334037) | Colin S. Stretch (D.C. Bar No. 470193) |
| James P. Lamoureux (D.C. Bar No. 431631) | Kelly P. Dunbar (D.C. Bar No. 500038) |
| AT&T INC. | KELLOGG, HUBER, HANSEN, TODD, |
| 1120 20th Street, N.W. | EVANS & FIGEL, P.L.L.C. |
| Washington, D.C. 20036 | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | Tel.: (202) 326-7900 |
| | Fax: (202) 326-7999 |

*Counsel for AT&T Inc.*

February 12, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMPTEL,

      Plaintiff,

      v.

FEDERAL COMMUNICATIONS
COMMISSION,

      Defendant,

Civil Action No. 06-01718 (HHK)

**DECLARATION OF ANN ROTATORI**

1.   My name is Ann Rotatori.  My business address is 6 Devine Street, North Haven, Connecticut.  I hold the title of Vice President — Business Sales & Service in The Southern New England Telephone Company, a subsidiary of AT&T Inc.  In this position, I am responsible for managing a team of sales and customer service professionals who meet the needs of small, medium government, education and medical accounts throughout Connecticut.

2.   The purpose of my declaration is threefold.  First, I describe the documents provided by AT&T to the Federal Communications Commission ("FCC") in connection with the FCC's investigation of certain invoices AT&T submitted to the universal service fund administrator related to projects AT&T performed for the New London Public Schools (FCC file No. EB-04-IH-0342).  Second, I describe the harm that would result from disclosure of those documents, both in terms of harassment, embarrassment, and stigmatization, and with respect to AT&T's ability to compete in the marketplace.  Third, I briefly describe how, as a result of the extensive internal review AT&T undertook upon learning of the questionable invoices and disclosing the matter to the FCC, AT&T has made substantial improvements to AT&T's internal regulatory compliance controls.

**Background**

3.   In 2004, AT&T (then known as SBC Communications Inc.) informed the FCC that AT&T had discovered concerns regarding certain invoices related to the FCC's "Education Rate," or "E-Rate," universal service program.  AT&T explained that its Connecticut subsidiary, The Southern New England Telephone Company, had submitted arguably improper invoices to the universal service fund administrator relating to services performed for public schools in the New London, Connecticut school district ("New London Public Schools").

4.   The FCC subsequently ordered AT&T to produce a wide range of documents as a part of its investigation into possible violations of FCC rules, 47 C.F.R. §§ 54.500-54.521, and FCC orders pertaining to universal service.

5.   The documents that are the subject of CompTel's FOIA request were produced in response to a Letter of Inquiry that the FCC served on AT&T on August 24, 2004.  That Letter of Inquiry sought detailed information relating to various projects in Connecticut for which AT&T had arguably billed in violation of the FCC's rules.  For each such project, the FCC asked for, among other things, dates on which AT&T invoiced the universal fund administrator, dates on which AT&T refunded the universal fund administrator, the names of all AT&T personnel involved in deciding how to bill under the E-Rate program, and the names of all AT&T personnel aware of decisions regarding billing under the E-Rate program.  The Letter of Inquiry also instructed AT&T to provide its Code of Business Conduct, and to state which sections of the Code, if any, were violated by the billing in question.

6.   AT&T responded to the Letter of Inquiry with a declaration, answers to interrogatories, and documents.  The documents include, among other things, internal AT&T email communications, AT&T job descriptions, completed universal service invoice forms,

funding committee reports provided by the universal service fund administrator, AT&T billing

invoices (many of which include hand written notes by AT&T personnel) containing product,

project, and pricing information, confidential AT&T engagement forms, quotation forms, vendor

information sheets, and AT&T's Code of Business Conduct.

      7.   More specifically, the document set, which includes more than 150 documents

comprising over 250 pages, includes, among other things:

- A one-page cover letter from AT&T to the FCC describing its response to the Letter of Inquiry.

- A one-page declaration of an AT&T employee describing generally AT&T's discovery of the arguably improper billing.

- A fifteen-page written response to interrogatories by the FCC.  This document provides detailed information regarding when AT&T invoiced the universal service fund administrator for each New London Public School project at issue, the dates on which the universal service fund administrator paid the invoices, the dates on which AT&T refunded the universal service fund administrator, amounts that AT&T billed for each project in various years of the E-Rate program, and the names and job titles of employees who decided whether and when AT&T could bill the universal service fund administrator for the projects at issue.  This response also contains written descriptions of how AT&T employees arrived at their arguably incorrect understanding of FCC rules, and it identifies provisions of AT&T's Code of Business Conduct that the named employees arguably violated.

- Nine pages of job descriptions of AT&T personnel involved in the arguably improper billing of the universal service fund administrator for work performed for the New London Public Schools.

- Eighteen pages of completed universal service fund administrator invoice forms completed by AT&T.  These include, among other things, AT&T's service provider identification number, the amounts that AT&T invoiced to the universal service fund administrator, contact information for AT&T, the dates on which AT&T submitted the service provider invoices, and the dates on which AT&T billed its customers.

- Three pages of universal service funding committee reports containing, among other information, names of customers receiving the services provided by AT&T, the dates on which contracts were awarded, and the dates of funding decisions by the funding committee.

- More than seventy-five pages of internal AT&T emails (including documents attached to emails). These describe, among other things, cost and pricing information in connection with services provided to New London Public Schools, details of AT&T's discussions with representatives of New London Public Schools, descriptions of AT&T's billing and invoice procedures, work sheets detailing pricing information used for billing the universal service fund administrator, an original bill of materials (including list price and unit price) for equipment installed in connection with projects for the New London Public Schools, discussions of proper billing under the E-Rate program, discussions of invoice procedures with respect to the universal service fund administrator, confidential engagement forms for New London Public Schools, E-Rate billing information for a particular year, and charts summarizing services and universal service fund decisions for New London Public Schools.

- Over thirty pages of AT&T billing invoices and maintenance orders describing charges for work performed by AT&T for New London School customers. These invoices include, among other things, descriptions of the services provided and work performed, pricing information, AT&T's customers' names, dates on which the billing occurred, and handwritten notations by AT&T employees, including payment calculations.

- Twelve pages of commitment adjustment letters (some with handwritten notations by AT&T employees) from the universal service fund administrator to AT&T and New London Public Schools, including funding commitment reports in connection with applications for universal service funding.

- Over ten pages of billing invoices provided by vendors to AT&T, including price and billing information, as well as descriptions of the work performed.

- Eighteen pages of AT&T price quotations to New London Public Schools, which include unit price and extended price information, as well as descriptions of the services to be performed.

- Handwritten notes describing price and cost information for materials and labor in connection with New London Public School projects.

- Accounts payable authorization forms relating to AT&T's refund of the universal service fund administrator.

- A five-page description of hardware sold to New London Public Schools provided by an AT&T vendor.

- AT&T's twenty-three page Code of Business Conduct.

## Potential Harm Resulting from Disclosure

8.   The documents that AT&T provided in response to the FCC's Letter of Inquiry include information that, if released, could be used to attempt to embarrass, harass, and stigmatize AT&T as a corporation, as well as individual AT&T employees.

9.   These documents are confidential internal documents of AT&T and are responsive to the FCC's request for information relating to possible violations of FCC rules.  The documents contain the names, and other identifying information, of individuals involved in the arguable violations of FCC rules.  Such information could be used to attempt to embarrass, harass, or stigmatize AT&T as a corporation or those employees as individuals by making public that those individuals were identified as involved in arguable violations of FCC rules.

10. Aside from the names and other identifying information of individual AT&T employees, the requested documents contain facts and descriptions that reveal the what, when, where, why, and how of AT&T's alleged violations of FCC rules.  These documents, taken together, show the decisionmaking processes that led to the alleged violations of the FCC rules, the period of time over which the arguable billing errors occurred, and AT&T's internal responses to the arguable misconduct.  With those details of supposed corporate wrongdoing in hand, CompTel and others could piece together basic time lines and theories of how and why the arguable violations of FCC rules came about.  Such information could then be used by competitors or others to attempt to embarrass, harass, and stigmatize AT&T publicly by, for example, citing such information in press releases, advertisements, or news reports.  Such information could also be used by competitors in regulatory proceedings, in an attempt to prejudice decisionmakers against AT&T's interests.

11. The requested documents also contain internal information about AT&T's operational and billing processes and practices, AT&T's standards of corporate conduct, and other confidential information.  Because these documents were collected pursuant to the FCC's investigation — and are compiled in an investigatory file — their disclosure in this context would enable competitors and others, among other things, to attempt to disparage the reliability of AT&T's operational and billing processes and practices, criticize publicly the effectiveness of AT&T's standards of corporate conduct, and otherwise target AT&T by making public currently private commercial facts pertaining to alleged violations of FCC rules.

12. The redactions made by the FCC, pursuant to FOIA Exemption 4, do not materially diminish the likelihood that the disclosure of the documents would result in the embarrassment, harassment, and stigmatization of AT&T.  The FCC redacted from the requested documents (i) cost and pricing data in connection with services and hardware used in connection with the New London Public School projects; (ii) amounts for which AT&T invoiced the universal service fund administrator; (iii) dates on which AT&T invoiced the universal service fund administrator, the universal service fund administrator paid the invoice, and AT&T refunded the payment; and (iv) names and identifying information of AT&T's staff, contractors, and representatives of its contractors and customers.

13. For the reasons stated above, the redacted documents still reveal important confidential facts, including important details about how AT&T employees arrived at an arguably incorrect understanding of FCC rules, the level of corporate decisionmaking involved in the billing decisions, AT&T's internal response to those arguable billing violations, as well as AT&T's own assessment of whether and to what extent to which its employees violated the company's code of conduct.

14. The requested documents also include information that, if released, would result in substantial competitive harm. As a threshold matter, it is important to recognize that the marketplace for services sold to educational institutions — including the New London Public Schools and other similar entities — is vibrantly competitive. Such customers typically require significant data transmission and networking capabilities, and they often devote significant funds to meeting those needs. Furthermore, federal and state subsidy programs often allow these customers to purchase sophisticated services to further their educational mission. As a result of the sophisticated needs of these customers — and the funds available to meet these needs — numerous companies compete aggressively in the marketplace for educational customers.

15. In this highly competitive context, disclosure of the confidential information included in the documents at issue in this proceeding would pose a serious competitive threat to AT&T. The commercially sensitive and confidential data in the documents includes AT&T's costs and pricing data, its billing and payment dates and practices, descriptions of AT&T's systems, processes, and operations, and identifying information for AT&T's staff, contractors, and customers.

16. By utilizing such data, competitors could tailor their competitive strategies to compete unfairly against AT&T. Competitors could use such information, for example, to assist in targeting their service offerings to schools and other enterprise customers and replicating confidential internal procedures used by AT&T. In addition, with unfairly gained knowledge of the prices that AT&T charges its customers for particular services, competitors could easily attempt to underbid AT&T in competing for future projects. Beyond that, knowledge of the contractors and vendors that AT&T uses for particular projects and services could allow competitors to duplicate AT&T's business strategies. In the same way, access to internal

information about when and how AT&T bills customers for services — including information regarding AT&T's price quotes — would allow competitors to undercut AT&T's efforts to service new customers.

### The Results of the FCC's Investigation

17. An additional reason that disclosure would be inappropriate here is that the documents at issue reflect an inaccurate picture of AT&T's current regulatory controls. As a result of the issues that gave rise to the FCC's investigation of the invoices related to the New London Public Schools, AT&T undertook a top-to-bottom review of its policies for ensuring compliance with universal service requirements, and it significantly revised those policies to better ensure ongoing compliance. Furthermore, AT&T negotiated a consent decree with the FCC that instituted those policies, as well as others recommended by the agency, and it continues to adhere to the terms of that decree today.

18. It bears repeating, moreover, that these beneficial changes came about as an investigation that resulted from AT&T's *voluntary* disclosure to the FCC, which was accompanied by AT&T's decision to refund all funds in question and cancel any questionable invoices, and which was followed by review and improvement of internal regulatory compliance controls. It would be ironic indeed if these events — AT&T's voluntary disclosure, its refund of funds for services it performed, and the improvements to its internal controls — were to result in the disclosure of documents that AT&T's competitors could use to attempt to stigmatize or harass the company or to gain an unfair advantage in the marketplace.

19. This concludes my declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

February 2, 2007

Ann Rotatori

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMPTEL,

      Plaintiff,

      v.

FEDERAL COMMUNICATIONS
COMMISSION,

      Defendant.

Civil Action No. 06-01718 (HHK)

## <u>DECLARATION OF KELLY P. DUNBAR</u>

1.      My name is Kelly P. Dunbar.  I am over the age of 21 years and have personal knowledge of the facts contained herein.

2.      I am an attorney with the law firm of Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.  I am submitting this declaration in support of Intervenor-Defendant AT&T Inc.'s ("AT&T") Motion for Summary Judgment.

3.      Exhibit A to this declaration is a true and correct copy of an email from Mary C. Albert, CompTel, to FOIA FCC (Apr. 4, 2005) referred to on page 4 of AT&T's memorandum of law in support of motion for summary judgment.

4.      Exhibit B to this declaration is a true and correct copy of a letter from Jim Lamoureux, SBC Services, Inc., to Judy Lancaster, Enforcement Bureau, FCC, FOIA Control No. 2005-333 (May 27, 2005) referred to on page 4 of AT&T's memorandum of law in support of motion for summary judgment.

5.      Exhibit C to this declaration is a true and correct copy of a letter from Mary C. Albert, CompTel, to Judy Lancaster, Enforcement Bureau, FCC, FOIA Control No. 2005-333

(June 28, 2005) referred to on page 4 of AT&T's memorandum of law in support of motion for summary judgment.

6.      Exhibit D to this declaration is a true and correct copy of a letter from William H. Davenport, Enforcement Bureau, FCC, to Jim Lamoureux, SBC Services, Inc., and Mary Albert, CompTel, FOIA Control No. 2005-333 (Aug. 5, 2005) referred to on page 5 of AT&T's memorandum of law in support of motion for summary judgment.

7.      Exhibit E to this declaration is a true and correct copy of a letter from Jim Lamoureux, SBC Services, Inc., to Samuel Feder, Acting General Counsel, FCC, FOIA Control No. 2005-333 (Aug. 19, 2005) referred to on page 6 of AT&T's memorandum of law in support of motion for summary judgment.

8.      Exhibit F to this declaration is a true and correct copy of a letter from Mary Albert, CompTel, to Samuel Feder, Acting General Counsel, FCC, FOIA Control No. 2005-333 (Sept. 6, 2005) referred to on page 6 of AT&T's memorandum of law in support of motion for summary judgment.

I declare under penalty of perjury that the foregoing is true and correct.


Date:  February 12, 2007

<div align="right">
/s/ Kelly P. Dunbar

Kelly P. Dunbar
</div>

# Exhibit A

**Patricia Quartey**                                    FOIA #2005-333

| From: | Mary C. Albert [malbert@comptelascent.org] |
|-------|--------------------------------------------|
| Sent: | Monday, April 04, 2005 10:52 AM |
| To: | FOIA |
| Subject: | Electronic FOIA (E-FOIA) Request Form |

Mary C. Albert
CompTel/ALTS, 1900 M Street N.W.
800
Washington, DC
20036

Phone Number: (202)296-6650
Fax Number:(202)296-7585
Email Address: malbert@comptelascent.org

Date of Request: 04/04/2005

Mary C. Albert Requests:
All pleadings and correspondence contained in File No. EB-04-IH-0342.
------------------------------------------------------------
Subject:  Enforcement Bureau investigation into SBC Communications, Inc. compliance with
47 USC Section 254 and 47 CFR Part 54.

Maximum Fee: $50.00

Listed In CFR 47:
If Yes Give Reasons for Inspection:

Is the requester entitled to a restricted fee assessment? No
If Yes Give Reasons for Inspection:

Any Additional Information and/or Comments:

Server protocol: HTTP/1.1
Remote host: 208.178.77.162
Remote IP address: 208.178.77.162

CONTROL 2005-333    2005 APR -4  P 1:00    FOIA CONTROL STAFF

1

# Exhibit B



**Jim Lamoureux**
Senior Counsel

SBC Services, Inc.
1401 I Street NW, Suite 400
Washington, D.C. 20005
Phone 202 326-8895
Fax 202 408-8745

May 27, 2005

## BY ELECTRONIC AND U.S. MAIL

Judy Lancaster
Enforcement Bureau
Investigations and Hearings Division
Federal Communications Commission
445 12th Street SW
Washington DC 20554

> Re:    **Freedom of Information Act Request, Control No. 2005-333
> (CompTel/ALTS, April 4, 2005)**

Dear Ms. Lancaster:

SBC Communications Inc. ("SBC"), on behalf of itself and its affiliates, opposes release of
the records sought by CompTel/ALTS in the above-referenced Freedom of Information Act
("FOIA") request. In its request, CompTel/ALTS seeks release of "[a]ll pleadings and
correspondence contained in File No. EB-04-IH-0342." Included within the scope of the
CompTel/ALTS request are records that SBC submitted to the Commission in response to a Letter of
Inquiry issued by the Enforcement Bureau, as well as the Letter of Inquiry itself.[1] All of the records
responsive to the CompTel/ALTS request were issued and obtained by the Commission as part of an
Enforcement Bureau investigation, and thus, pursuant to 47 C.F.R. § 0.457, are not routinely
available for public inspection.[2] Moreover, all responsive documents plainly fall within the "law
enforcement-privacy" and "confidential commercial information" exemptions to the FOIA's
disclosure requirements. *See* 5 U.S.C. § 552(b)(7)(C) and 5 U.S.C. § 552(b)(4). Accordingly,
pursuant to the FOIA and Commission Rule 0.459, all of the requested records should be maintained
by the Commission as confidential and should not be made available for public inspection or
disclosure.

All of the records requested by CompTel/ALTS fall within 5 U.S.C. 552(b)(7)(C), which
exempts from public disclosure "records or information compiled for law enforcement purposes, but
only to the extent that the production of such law enforcement records or information could
reasonably be expected to constitute an unwarranted invasion of personal privacy." All of the
records responsive to the CompTel/ALTS request were clearly "compiled for law enforcement

---

[1] If the Commission determines that other records are responsive to the CompTel/ALTS request,
SBC reserves the right to object to disclosure of any such additional records.

[2] Contrary to FCC Rule 0.461(c) pertaining to material not routinely available for public
inspection, the CompTel/ALTS request does not "contain a statement of the reasons for
inspection and the facts in support thereof."

purposes." The Letter of Inquiry itself was issued as part of an Enforcement Bureau investigation, and the documents provided to the Enforcement Bureau by SBC were all in response to the Letter of Inquiry. The stated purpose of the Enforcement Bureau's Letter of Inquiry, as well as the overall purpose of the Enforcement Bureau's investigation was to determine whether SBC had violated Commission rules. It is thus plain that the records in question were compiled by the Enforcement Bureau for law enforcement purposes. The courts have made clear that all agency enforcement proceedings, including civil enforcement proceedings generally, and FCC Enforcement Bureau investigations in particular, fall within the ambit of Exemption 7. *See, e.g., Aspin v. Dept. of Defense,* 348 F. Supp. 1081 (D.D.C.), *aff'd* 491 F.2d 24 (D.C. Cir. 1972); *Windels, Marx, Davies & Ives. v. Dept. of Commerce,* 576 F. Supp. 405 (D.D.C. 1983); *Kay v. FCC,* 867 F. Supp. 11 (D.D.C. 1994). There is thus no doubt that all of the records responsive to the CompTel/ALTS request were compiled for law enforcement purposes under Exemption 7 of the FOIA.

Moreover, disclosure of the records requested by CompTel/ALTS would cause an unwarranted invasion of personal privacy, and thus, pursuant to Exemption 7(C), should not be disclosed. The purpose of Exemption 7(C) is to protect third parties from embarrassment, reprisal or harassment, and other invasions of privacy associated with the stigma of law enforcement investigations. *See Voinche v. F.B.I,* 940 F. Supp. 323 (D.D.C. 1996); *Foster v. U.S. Dept. of Justice,* 933 F. Supp. 687 (E.D. Mi 1996). Moreover, because of the intense privacy interests in information compiled by law enforcement agencies, Exemption 7(C) "affords broad[] privacy rights to suspects, witnesses, and investigators." *Bast v. Dep't of Justice,* 665 F.2d 1251, 1254 (D.C. Cir. 1981). The question of whether disclosure of such information is warranted turns on whether "the privacy interest at stake outweighs the public interest in disclosure." *Nation Magazine, Washington Bureau v. U.S. Customs Svc.,* 71 F.3d 885, 893 (D.C. Cir. 1995). In this instance, there is no public interest in disclosure that could possibly offset the invasion of privacy that would result from disclosure.

The Supreme Court has made clear that, for purposes of Exemption 7(C), "whether an invasion of privacy is *warranted* cannot turn on the purposes for which the request for information is made." *United States Dept. of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 771 (1989). Rather, "whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny rather than on the particular purpose for which the document is being requested." *Id. (Internal quotation marks and citations omitted.).*[3] In *Reporters Committee,* several journalists sought disclosure under the FOIA of the FBI "rap sheet" of a reputed mob boss. In holding that disclosure was prohibited by Exemption 7(C), the Court held that the core purpose of the FOIA,

> . . . is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about

---

[3] *See also Wichlacz v. U.S. Dept. of Interior,* 938 F. Supp. 325 (E.D. Va. 1996)(only possible public interest to weigh against privacy interest is extent to which disclosure would shed light on agency's performance of its statutory duties or otherwise let citizens know what their government is up to).

> an agency's own conduct. In this case—and presumably in the typical case in
> which one private citizen is seeking information about another—the requester
> does not intend to discover anything about the conduct of the agency that has
> possession of the requested records. Indeed, response to this request would not
> shed light on the conduct of any Government agency or official.

*Reporters Committee,* 489 U.S. at 773. More specifically, with respect to documents compiled by
agencies during the course of law enforcement investigations, the Court further held that,

> . . . although there is undoubtedly some public interest in anyone's criminal
> history, especially if the history is in some way related to the subject's dealing
> with a public official or agency, the FOIA's central purpose is to ensure that the
> *Government's* activities be opened to the sharp eye of public scrutiny, not that
> information about *private citizens* that happens to be in the warehouse of the
> Government be so disclosed.

*Id.* at 774.[4] The Court thus concluded that the public interest in disclosure of the rap sheet sought by
the journalists "is not the type of interest protected by the FOIA." *Id.* at 775. As a general
proposition, moreover, the Court held,

> . . . *as a categorical matter* that a third party's request for law enforcement
> records or information about a private citizen can reasonably be expected to
> invade that citizen's privacy, and [] when the request seeks no "official
> information" about a Government agency, but merely records that the
> Government happens to be storing, the invasion of privacy is "unwarranted."

*Id.* at 780.[5] (Emphasis added.) The Court's holding in *Reporters Committee,* as well as the D.C.
Circuit's holding in *SafeCard Services* apply with equal force in this instance.

---

[4] *See also SafeCard Services, Inc. v. Securities and Exchange Commission,* 926 F.2d 1197, 1205
(D.C. Cir. 1991)("the type of information sought is simply not very probative of an agency's
behavior or performance."); *Nation Magazine,* 71 F.3d at 895 ("In some, perhaps many,
instances where a third party asks if an agency has information regarding a named individual in
its law enforcement files, the cognizable public interest in that information will be negligible; the
requester will be seeking records about a private citizen, not agency conduct."); *Alexander &
Alexander Svcs., Inc. v. Securities and Exchange Commission,* Civ.A. No. 92-1112 (JHG), 1993
WL 439799 (D.D.C. Oct. 19, 1993)("when a private citizen seeks information regarding another
private citizen or corporation, the requester is not seeking information regarding the conduct of
the agency in possession of the information.").

[5] *See also SafeCard,* 926 F.2d at 1205-1206 ("Indeed, unless there is compelling evidence that
the agency denying the FOIA request is engaged in illegal activity, and access to the names of
private individuals appearing in the agency's law enforcement files is necessary in order to
confirm or refute that evidence, there is no reason to believe that the incremental public interest
in such information would ever be significant."); *see also id.* at 1205 ("The public interest in
disclosure is not just less substantial, it is insubstantial.")

The only records responsive to the CompTel/ALTS request are internal documents of a private party that were submitted to and compiled by the Commission pursuant to investigative demands issued by the Enforcement Bureau. None of the records in question contain "official information" about the Commission; nor do any of the records pertain to the conduct of the Commission or any Commission official. The only ostensible interest on the part of CompTel/ALTS in disclosure of the requested documents is to try to embarrass SBC with the information compiled by the Enforcement Bureau. There is thus no public policy interest in disclosure of the requested documents. Conversely, there are substantial privacy interests in such documents. As with information compiled by the FBI in rap sheets, the requested records are no more than documents that "happen to be in the warehouse" of the Commission because they were gathered during the course of a law enforcement investigation. Indeed, the privacy interest in the particular information at issue here is stronger than that in *Reporters Committee*. The discrete informational components of rap sheets are frequently publicly available through various court records; it was thus the compilation of such information in which the Court found a cognizable privacy interest. *See Reporters Committee*, 489 U.S. at 763-764.[6] Here, in contrast, none of the information is generally publicly available. Indeed, but for the investigative demand of the Enforcement Bureau, the information would remain in SBC's possession. Moreover, the information would remain in SBC's possession as discrete documents and information scattered throughout SBC's offices and files. But for the Enforcement Bureau's investigative demand, there would be no compilation of those records as there is now in the Enforcement Bureau's files. Accordingly, given the strong privacy interest in the records at issue here, and the complete lack of any public interest in disclosure of those records, *Reporters Committee* and *SafeCard Services* make clear the Exemption 7(C) compels the Commission not to publicly disclose any of the records responsive to the CompTel/ALTS request.

Exemption 4 also requires that the Commission not publicly disclose any of the records responsive to the CompTel/ALTS request. 5 U.S.C. § 552(b)(4). Exemption 4 applies to "trade secrets and commercial or financial information obtained from a person and privileged and confidential." *Id.* The phrase "commercial or financial information" has a broad meaning under the FOIA, and includes anything pertaining to or relating to commerce. *American Airlines, Inc. v. National Mediation Bd.*, 588 F.2d 863, 870 2d Cir. 1978); *see also Public Citizen Health research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)(documents are commercial if a submitter has a commercial interest in them). The records at issue here clearly pertain to SBC's business dealings with one of its customers and are thus undoubtedly commercial information under the FOIA.

Those records, moreover, are confidential under Exemption 4. Two lines of cases have evolved for determining whether agency records fall within this component of Exemption 4. Under *Critical Mass*, commercial information that is voluntarily submitted to the Commission must be

---

[6] *Reporters Committee* thus disposes of any notion that SBC has no privacy interest in the records in question merely because the investigation is a matter of public record as a result of the Order issued by the Commission approving the Consent Decree between SBC and the Enforcement Bureau. *See, e.g., Reporters Committee*, 489 U.S. at 1480 ("In sum, the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." (Internal quotation marks and citations omitted.))

withheld from public disclosure if such information is not customarily disclosed to the public by the submitter. *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992). All of the information at issue here is maintained on a confidential basis within SBC and would not ordinarily be disclosed to parties outside the company. Company practices instruct employees not to disclose such information outside the company and restrict access to this information on a need-to-know basis. In short, none of the information at issue here is customarily disclosed to the public, and should, therefore, be withheld under Exemption 4.

For materials not subject to *Critical Mass, National Parks* establishes a two part test for determining if information qualifies for withholding under Exemption 4. *National Parks & Conservation Assoc. v. Morton*, 498 F.2d 765 D.C. Cir. (1974). The first prong asks whether disclosing the information would impair the government's ability to obtain necessary information in the future. The second prong asks whether the competitive position of the person from whom the information was obtained would be impaired or substantially harmed. If the information meets the requirements of either prong, it is exempted from disclosure under Exemption 4. Here, the first prong of *National Prongs* compels the Commission not to publicly disclose the records requested by CompTel/ALTS. The subject matter of the investigation at issue here was voluntarily brought to the Enforcement Bureau's attention by SBC as a result of an ongoing internal review conducted by SBC. SBC, moreover, voluntarily refunded all amounts that might have been at issue, and it entered into a consent decree to make a voluntary contribution to the United States Treasury. Compelled public disclosure of the records compiled by the Enforcement Bureau in this instance would plainly impair the Enforcement Bureau's ability to obtain similar information in the future. It would chill industry incentives to conduct internal investigations and to bring the results of those investigations to the attention of the Commission. It would thus hamper the general ability of the Commission to conduct investigations and enforcement proceedings and to rely on the cooperation of parties involved in those proceedings, which would necessarily impair the Commission's ability to obtain documents and information in investigations and enforcement proceedings. It would, in short, undermine the agency's "effective execution of its statutory responsibilities." *9 to 5 Org. for Women Office Workers v. Board of Governors*, 721 F2.s 1, 11 (1st Cir. 1983). *See also Africa Fund v. Mosbacher*, No. 92-289, 1993 WL 183736 at *7 (S.D.N.Y. May 26, 1993)(disclosure would impinge upon agency's receipt of substantial information that potential exporters voluntarily submit when seeking export licenses and that the agency finds invaluable in making policy and maintaining effective export controls.) Accordingly, in addition to Exemption 7(C), Exemption 4 also compels the Commission not to publicly disclose any of the records responsive to the CompTel/ALTS request.

If the Commission determines that Exemptions 7(C) and 4 do not compel it to withhold all of the requested records from public disclosure, at a minimum, specific records and information responsive to the CompTel/ALTS requests fall within the scope of Exemptions 7(C) and 4 and should be withheld from public disclosure. First, the requested records contain information identifying SBC employee names, titles and job functions, phone numbers, email addresses, and physical addresses, which are highly sensitive not only in terms of SBC confidential commercial information, but also from a personal privacy perspective. Indeed, the DC Circuit holds "categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."

*SafeCard,* 926 F.2d at 1206. Accordingly, the Commission should withhold from disclosure all such information pertaining to individuals identified in the records responsive to the CompTel/ALTS request.

In addition, the documents in question contain competitively sensitive information which should not be made available for public disclosure. Telecommunications is a highly competitive industry. The presence of such competition and the likelihood of competitive injury threatened by release of the information provided to the Commission by SBC should compel the Commission to withhold the information from public disclosure. *CNA Financial Corp. v. Donovan,* 830 F.2d 1132, 1152 (D.C. Cir. 1987); *Frazee v. U.S. Forest Service,* 97 F.3d 367, 371 (9th Cir. 1996); *Gulf & Western Indus. v. U.S.,* 615 F.2d 527, 530 (D.C. Cir. 1979).[7]

The requested records contain information pertaining to SBC's systems, processes, and operations, and thus represent confidential commercial information that should not be released under the FOIA. The records also contain cost, pricing information that clearly falls within the scope of Exemption 4. Attachment A identifies the records that contain such information. Competitors could use such confidential information to assist in targeting their service offerings and enhancing their competitive positions, to the detriment of SBC's competitive position. *See, e.g., GC Micro Corp. v. Defense Logistics Agency,* 33 F.3d 1109 (9th Cir. 1994). Commission precedent has clearly found this type of information to be competitively sensitive and withholdable under Exemption 4.[8] The Commission has recognized that competitive harm can result from the disclosure of confidential business information that gives competitors insight into a company's costs, pricing plans, market strategies, and customer identities. *See In re Pan American Satellite Corporation,* FOIA Control Nos. 85-219, 86-38, 86-41, (May 2, 1986).[9] Accordingly, the Commission should withhold all of the records identified in Attachment A.

---

[7] It is worth noting that the request in question comes from a trade association representing many of SBC's competitors in the marketplace.

[8] *See e.g. In Matter of Pacific Bell Telephone Company Petition for Pricing Flexibility for Special Access and Dedicated Transport Services,* CCB/CPD No. 00-23, DA 00-2618, November 20, 2000 (supporting confidentiality for collocation data); *Local Exchange Carrier's Rates, Terms and Conditions for Expanded Interconnection Through Virtual Collocation for Special Access and Switched Transport; Southwestern Bell Telephone Company,* 13 FCC Rcd 13615 (1998)(keeping administrative operating expenses confidential because it would provide insight into business strategies); *AT&T/McCaw Merger Applications* 9 FCC Rcd 2610 (1994)(keeping confidential accounting records showing account balance information); *NAACP Legal Defense Fund on Request for Inspection of Records* 45 RR 2d 1705 (1979)(keeping confidential records that contained employee salary information); *Mercury PCS II, LLC (Request for Inspection of Records) Omnipoint Corporation (Request for Confidential Treatment of Documents),* FCC 00-241 (July 17, 2000)(keeping confidential marketing plans and strategy information).

[9] Further, the Commission has ruled that not only should such information be protected, but also that information must be protected through which the competitively sensitive information can be determined. *Allnet Communications Services, Inc. Freedom of Information Act Request,* FOIA Control No. 92-149, Memorandum Opinion and Order (released August 17, 1993) at p. 3. The

For the above reasons, SBC opposes the CompTel/ALTS request for the records described in its April 4, 2005, email. If you have any questions, please do not hesitate to contact me at (202) 326-8895.

Sincerely,

Jim Lamoureux
Senior Counsel
SBC Services, Inc.

cc:    William Davenport

---

Commission's decision was upheld in a memorandum opinion of the U.S. Court of Appeals for the D.C. Circuit, which affirmed a U.S. District Court decision protecting the information. *Allnet Communications Services, Inc. v. FCC*, Case No. 92-5351 (memorandum opinion issued May 27, 1994, D.C. Cir.).

# ATTACHMENT A

<u>LOI</u>

Document Reference                              Information that is confidential commercial

| Pages 4-8 | Identification of SBC's customers, contracts, projects, and invoice amounts |
| --- | --- |

<u>SBC Response to LOI</u>

Document Reference                              Information that is confidential commercial

| SBC's Responses to the Enforcement Bureau's interrogatories (pages 1-15) | Identification of SBC's customers, contracts, projects, invoice amounts and subcontractors |
| --- | --- |
| Attachment A, Job Responsibilities (pages 1-9) | Identification of SBC job functions, responsibilities and priorities |
| SBCNL000022–27 | Identification of SBC vendors and subcontractors, cost and pricing detail, and general customer bid strategies and operational processes |
| SBCNL000029 | Identification of SBC cost and pricing detail |
| SBCNL000042–55 | Identification of SBC cost and pricing detail |
| SBCNL000056-59 | Identification of SBC vendors and subcontractors, and general customer bid strategies and operational processes |
| SBCNL000060 | Identification of SBC cost and pricing detail and vendor and subcontractor information |
| SBCNL000061 | Identification of SBC cost and pricing detail |
| SBCNL000062-65 | Identification of SBC cost and pricing detail and general customer bid strategies and operational processes |
| SBCNL000067 | Identification of SBC cost and pricing detail and vendor and subcontractor information |
| SBCNL000068-72 | Identification of SBC vendors and subcontractors, cost and pricing detail, and general customer bid strategies and operational processes |
| SBCNL000074-80 | Identification of SBC general customer bid strategies and operational processes |
| SBCNL000081-100 | Identification of SBC operational processes, vendor and subcontractor information, cost and pricing detail and billing information |
| SBCNL000101-102 | Identification of SBC billing information |
| SBCNL000103 – 142 | Identification of SBC cost and pricing detail and billing information |
| SBCNL00143-152 | Identification of SBC cost and pricing detail |
| SBCNL00163 – 166 | Identification of SBC cost and pricing detail and billing information |
| SBCNL00167 | Identification of SBC vendor and subcontract information |
| SBCNL000169 | Identification of SBC billing information |
| SBCNL000170 – 174 | Identification of SBC vendor and subcontract information |
| SBCNL000175 – 178 | Identification of SBC cost and pricing detail and billing information |

**Letter to Judy Lancaster**
**Re:  Freedom of Information Act Request, Control No. 2005-333**
**May 27, 2005**
**Attachment A**
**Page 2 of 2**

| | |
|---|---|
| SBCNL000179 – 182 | Identification of SBC cost and pricing detail and billing information and vendor and subcontract information |
| SBCNL000183 | Identification of SBC cost and pricing detail and billing information |
| SBCNL000184 – 185 | Identification of SBC cost and pricing detail and billing information |
| SBCNL000186-190 | Identification of SBC billing information and operational processes |
| SBCNL000196-218 | Identification of SBC internal documentation and operational processes |

# Exhibit C

 

**1900 M St. NW • Suite 800 • Washington, DC 20036**
**P (202) 296-6650    F (202) 296-7585**

June 28, 2005

Ms. Judy Lancaster
Enforcement Bureau
Federal Communications Commission
445 12th Street S.W.
Washington, D.C. 20554

Re:  Freedom of Information Act Request, Control No. 2005-333

Dear Ms. Lancaster:

CompTel/ALTS hereby responds to SBC Communications, Inc.'s ("SBC") objection to the release of documents to CompTel/ALTS pursuant to the above-captioned Freedom of Information Act ("FOIA") request.

On April 4, 2005, CompTel/ALTS submitted an FOIA request to the Commission for documents contained in File No. EB-04-IH-0342. These documents relate to the Enforcement Bureau's investigation of SBC for violations of the Commission's rules in connection with the receipt of universal service support for the New London Connecticut Public Schools. The Commission terminated the investigation upon issuing an Order adopting a Consent Decree. *In the Matter of SBC Communications, Inc.*, File No. EB-04-IH-0342, Order, DA 04-3893 (released December 16, 2004).

By letter dated May 27, 2005, SBC objected to disclosure of the documents requested on the grounds that they were exempt from disclosure pursuant to FOIA Exemptions 7(C) and 4.[1]  5 U.S.C. §§ 552(b)(7)(C), 552(b)(4). SBC is wrong on both counts. As demonstrated below, neither Exemption is applicable and the Commission is obligated to grant CompTel/ALTS' request without further delay.[2]

---

[1]       See Letter from Jim Lamoureux, SBC, to Judy Lancaster dated May 27, 2005. SBC's letter was provided to CompTel/ALTS on June 23, 2005.

[2]       CompTel/ALTS notes for the record that the Commission has not met the statutory deadline for notifying CompTel/ALTS whether it will comply with the request for documents nor provided written notice to extend the deadline. See 5 U.S.C. §552(a)(6).

Ms. Judy Lancaster
June 28, 2005
Page 2

The FOIA embodies a policy authorizing liberal disclosure of government documents and records. Government documents must be produced upon request unless they are specifically exempted from disclosure by statute. FOIA Exemption 7 authorizes disclosure of law enforcement[3] records unless the government can demonstrate one of six specific harms. Although SBC correctly notes that pursuant to Exemption 7(C), the Commission has the discretion to exempt from disclosure investigatory records compiled for law enforcement purposes only to the extent that the production of such records "could reasonably be expected to constitute an unwarranted invasion of personal privacy," it has failed to demonstrate that the documents requested are covered by that Exemption.

SBC asserts that disclosure of the records requested by CompTel/ALTS would cause an unwarranted invasion of its personal privacy. (SBC Objection at 2)  SBC is mistaken. As a large, publicly traded corporation, it is well settled that SBC possesses no protectable "personal privacy" interest as that term is used in the FOIA. *The Washington Post Company v. United States Department of Agriculture*, 943 F.Supp. 31, 35 n. 4 (D.D.C. 1996); *Ivanhoe Citrus Association v. Handley*, 612 F. Supp. 1560, 1567 (D.D.C. 1985); *National Parks and Conservation Association v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976). *See also, The Washington Post Company v. United States Department of Justice*, 863 F. 2d 96, 100 (D.C. Cir. 1988) (investigation and assessment of business decisions of corporate employees during the development and marketing of a commercial product do not qualify for exemption from disclosure under Exemption 7(C)). Thus, the Commission cannot withhold the documents under Exemption 7(C) on the grounds that their release may invade SBC's "personal privacy."

To the extent that any of the responsive documents contain the names, telephone numbers, email addresses and physical addresses of SBC employees, CompTel/ALTS has no objection to the redaction of such information before the documents are released. *See Safecard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197 (D.C. Cir. 1991) (upholding SEC's deletion of names and addresses of third parties mentioned in investigatory file).

SBC's reliance on Exemption 4 is similarly unavailing. Exemption 4 gives the Commission discretion to withhold privileged and confidential "commercial or financial information." SBC asserts that all records responsive to the CompTel/ALTS request meet the test of confidentiality under Exemption 4 and must be withheld. (SBC Objection at 4).  The test for determining whether information is confidential within the meaning of Exemption 4 differs depending on whether the information was provided to the government voluntarily or under compulsion. *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F. 2d 871 (D.C. Cir. 1992).  Financial or commercial information voluntarily provided to the government is exempt from disclosure if it is of a kind that would not customarily be released to the public. *Id.* In contrast, information that is provided to the government under compulsion will be treated

---

[3]    CompTel/ALTS also notes for the record that it does not concede SBC's characterization of the records requested as being compiled for law enforcement purposes.

Ms. Judy Lancaster
June 28, 2005
Page 3

as confidential where its disclosure would (1) impair the government's ability to obtain necessary information in the future or (2) cause substantial harm to the competitive position of the person from whom information was obtained. *National Parks and Conservation Association v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976).

SBC's argument that all responsive documents are confidential is entitled to little weight given the conflicting positions it takes with respect to whether the information was provided voluntarily or under compulsion. SBC first asserts that the responsive documents were produced under compulsion. "The only records responsive to CompTel/ALTS request are internal documents of a private party that were submitted to and compiled by the Commission pursuant to investigative demands issued by the Enforcement Bureau"; "but for the investigative demand of the Enforcement Bureau, the information would remain in SBC's possession"; "[b]ut for the Enforcement Bureau's investigative demand, there would be no compilation of those records as there is now in the Enforcement Bureau's files"; "the documents provided to the Enforcement Bureau by SBC were all in response to the Letter of Inquiry." (SBC Objection at 2, 4) If the Enforcement Bureau compelled SBC to submit the documents to the Commission, the first prong of the *National Parks* test cannot be satisfied. In *National Parks*, the Court held that where entities are required to submit commercial information to the government, there is no danger that public disclosure of the information will impair the ability of the government to obtain such information in the future. 547 F. 2d at 678. *See also, CNA Financial Corporation v. Donovan*, 830 F. 2d 1132, 1153 (D.C. Cir. 1987) (where government requires submission of information, first prong of *National Parks* test is not implicated).

Nor has SBC satisfied the second prong of the *National Parks* test which requires a showing that disclosure of the information will cause substantial harm to SBC's competitive position. *Id.* at 677. SBC merely asserts that the requested records "contain information pertaining to SBC's systems, processes and operations" and also "contain cost, pricing information" that could be used by competitors "to assist in targeting their service offerings and enhancing their competitive positions, to the detriment of SBC's competitive position." (SBC Objection at 6) Such conclusory and generalized allegations are insufficient to demonstrate the likelihood of substantial competitive injury necessary to sustain the burden of nondisclosure under Exemption 4. *Id.* at 680. In any event, Exemption 4 cannot be used to justify withholding any of the cost and pricing information contained in the responsive documents identified on SBC's Attachment A because such data is already in the public domain. Section 54.501(d)(3) of the Commission's rules clearly requires that e-rate service providers, such as SBC, make records of rates charged and discounts allowed to participating schools available for public inspection. That rule reads as follows:

> Service providers shall keep and retain records of rates charged to and discounts allowed for eligible schools and libraries – on their own or as part of a consortium. **Such records shall be made available for public inspection.**

47 C.F.R. §54.501(d)(3) (emphasis added). Records that are required to be made available for public inspection are not confidential within the meaning of Exemption 4. *See CNA Financial Corporation v. Donovan*, 830 F. 2d 1132, 1154 (D.C. Cir. 1987) (a claim of confidentiality cannot be made for any data in the public domain).

Ms. Judy Lancaster
June 28, 2005
Page 4

In the alternative, SBC argues that the responsive documents were voluntarily provided to the Commission and are protected from disclosure because they are of a kind that SBC would not ordinarily disclose to parties outside the company. (SBC Objection at 5)   SBC has failed, however, to identify any financial or commercial information that was voluntarily provided to the Commission.   On the contrary, SBC concedes that only "the subject matter of the investigation at issue" was "voluntarily brought to the enforcement Bureau's attention by SBC." (SBC Objection at 5)  The "subject matter" of the investigation is not entitled to exemption from disclosure under Exemption 4 because the Commission has already made the "subject matter" of the investigation a matter of public record by virtue of its release of the Order and Consent Decree.  SBC's voluntary act of notifying the Commission of possible rule violations cannot shield the subsequent investigatory record nor any documents SBC provided to the Commission under regulatory compulsion from disclosure.

SBC has failed to demonstrate that the information requested is protected from disclosure under either Exemption 7(C) or Exemption 4 of the FOIA.  As a result, the FOIA mandates release of the requested files to CompTel/ALTS immediately.

Respectfully submitted,

Mary C. Albert
Vice President, Regulatory Policy

cc:  William Davenport
     Jim Lamoureux, SBC

# Exhibit D



**FEDERAL COMMUNICATIONS COMMISSION**
Enforcement Bureau, Investigations and Hearings Division
445 12th Street, S.W., Room 4-C320
Washington, D.C. 20554

August 5, 2005

**Via Certified Mail, Return Receipt Requested,**
**Facsimile and E-Mail**

Mr. Jim Lamoureux
SBC Services, Inc.
1401 I Street N.W., Suite 400
Washington, D.C. 20005

Ms. Mary C. Albert
Vice President, Regulatory Policy
CompTel / ALTS
1900 M Street, N.W.
Washington, D.C. 20036

Re:    Freedom of Information Act Request
       FOIA Control No. 2005-333

Dear Mr. Lamoureux and Ms. Albert:

## I.    INTRODUCTION

This letter concerns a Freedom of Information Act ("FOIA") request from Comptel/ALTS ("Comptel") for information submitted by SBC Communications, Inc. ("SBC") in response to a Letter of Inquiry ("LOI") from the Enforcement Bureau. SBC has requested confidential treatment of its submissions. As explained below, we grant SBC's request in part and deny it in part. Therefore, we will release to Comptel SBC's responses as described herein unless we receive an application for review from SBC within ten working days from the date of this letter. If Comptel believes that any portion of this decision is in error, it may file an application for review of this action with the Commission's Office of General Counsel within 30 days of the date of this letter.

## II.    BACKGROUND

On August 24, 2004, the Investigations and Hearings Division of the Enforcement Bureau (the "Bureau") sent SBC an LOI notifying the company that the Bureau was investigating whether it violated Part 54, Subpart F, of the Commission's rules, 47 C.F.R. §§ 54.500-54.521, and the Commission's orders regarding universal service funding.[1] SBC responded to this LOI on September 13, 2004.[2]

---

[1] Letter to Michelle A. Thomas, Executive Director, Federal Regulatory, SBC Communications, Inc., and Christopher Heimann, General Attorney, SBC Telecommunications Inc. from Hillary S. DeNigro, Deputy Chief,

Mr. Jim Lamoureux
Ms. Mary C. Albert
August 5, 2005
Page 2

On December 16, 2004, the Bureau terminated its investigation by adopting a Consent Decree in which SBC agreed to make a voluntary contribution to the United States Treasury in the amount of $500,000 and to institute a compliance plan, as specified therein, "to ensure SBC's wholly-owned subsidiaries' future compliance with the Commission's rules governing the E-Rate program."[3] The Consent Decree specifies that "it does not constitute an admission, denial, adjudication on the merits, or a factual or legal determination regarding any compliance or noncompliance with the requirements of section 254 of the Act or Part 54 of the Commission's rules."[4]

On April 4, 2005, the Bureau received Comptel's FOIA request for copies of "all pleadings and correspondence contained in file number EB-04-IH-0342,"[5] the investigative file for the investigation referenced in the December 16, 2004, Consent Decree. On May 27, 2005, SBC filed its response to the FOIA request, opposing release of the requested documents and seeking confidentiality for the materials.[6] SBC argues in its Opposition that the requested documents were "compiled for law enforcement purposes," and, thus, are exempt from disclosure under FOIA Exemption 7. Specifically SBC argues that disclosure is prohibited by FOIA Exemption 7(C) because it would cause an unwarranted invasion of personal privacy. SBC also contends that FOIA Exemption 4 prohibits release of the requested documents because the documents "clearly pertain to SBC's business dealings with one of its customers" and because many of the documents contain information pertaining to SBC's systems, processes and operations, and include cost, pricing and other "commercially sensitive" information.[7]

By letter dated June 28, 2005, Comptel replied to SBC's Opposition.[8] Comptel challenges SBC's claims that FOIA Exemptions 7(C) and 4 prohibit disclosure of the requested

---

Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission, dated August 24, 2004 (" LOI").

[2] Letter to David Janas, Special Counsel, Investigations and Hearings Division, Enforcement Bureau from Christopher Heimann, General Attorney, SBC Telecommunications Inc., dated September 13, 2004 ("LOI Response").

[3] *SBC Communications Inc.*, Order and Consent Decree, 19 FCC Rcd 24014 (Enf. Bur. 2004).

[4] *Id* at 24019, ¶13.

[5] *See* Electronic FOIA (E-FOIA) request form from Mary C. Albert ("Requester"), Comptel / ALTS, dated April 4, 2005 ("FOIA 2005-333"). In a telephone conversation with IHD staff on April 12, 2005, the Requester modified and clarified her FOIA request to seek only pleadings filed by SBC and correspondence between SBC and the Commission.

[6] *See* Letter from Jim Lamoureux, Senior Counsel, SBC Services, Inc., to Judy Lancaster, Investigations and Hearings Division, Enforcement Bureau, dated May 27, 2005 ("Opposition").

[7] Opposition at 6.

[8] Letter from Mary C. Albert, Vice President Regulatory Policy, CompTel/Ascent/ALTS to Judy Lancaster, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission, dated June 28, 2005 ("Reply")

Mr. Jim Lamoureux
Ms. Mary C. Albert
August 5, 2005
Page 3

documents. Although Comptel does not object to redaction from the requested documents of the names, telephone numbers, and home and email addresses of SBC employees, it argues that Exemption 7(C) is inapplicable to SBC because it is "a large, publicly traded corporation . . . that . . . possesses no protectable personal privacy interest."[9] Comptel also asserts that SBC's "conflicting positions" regarding whether its submissions were provided to the Bureau voluntarily or under compulsion do not support SBC's reliance upon Exemption 4 to prohibit disclosure of the requested documents, that SBC's "conclusory and generalized" characterizations of the records as confidential commercial information are "insufficient to demonstrate the likelihood of substantial competitive injury" as required by Exemption 4, and that the cost and pricing information that SBC wishes to withhold from disclosure is already in the public domain because E-Rate service providers are required under section 54.501(d)(3) of the Commission's rules[10] to make those records available for public inspection.[11]

## III.    DISCUSSION

### A.    SBC's Requests To Keep Its Responses Confidential In Their Entirety Are Deficient

Section 0.459 of the Commission's rules establishes a procedure by which parties may request that information or materials that they have submitted to the Commission not be made routinely available for public inspection. *See* 47 C.F.R. § 0.459. This rule requires that a party seeking confidentiality provide a statement of the reasons for withholding the materials in question from public inspection and set forth specific categories of materials for which such treatment is appropriate. A request for confidentiality "shall include," *inter alia*, an "explanation of the degree to which the information is commercial or financial, or contains a trade secret or is privileged;"[12] an "[e]xplanation of how disclosure of the information could result in substantial competitive harm;"[13] and "[i]dentification of whether the information is available to the public and the extent of any previous disclosure of the information to third parties."[14]

We find that SBC's requests for confidential treatment of its submissions substantially fail to comply with the standards set forth in section 0.459(b) of the Commission's rules. The rules clearly state that casual requests for confidentiality that do not comply with the requirements set forth in sections 0.459(a) and (b) will not be considered.[15] Further, the LOI

---

[9] *Id* at 2.

[10] 47 C.F.R. § 54.501(d)(3).

[11] Reply at 3.

[12] *See* 47 C.F.R. § 0.459(b)(3).

[13] See 47 C.F.R. § 0.459(b)(5).

[14] See 47 C.F.R § 0.459(b)(7).

[15] *See* 47 C.F.R. § 0.459(c).

Mr. Jim Lamoureux
Ms. Mary C. Albert
August 5, 2005
Page 4

issued to SBC by the Bureau explicitly warns SBC that requests for confidential treatment must comply with the requirements specifically mandated by section 0.459(b), and that the Bureau will not consider confidentiality requests that do not so comply.

Nevertheless, SBC has failed to provide a statement of specific reasons for withholding its responses in their entirety. While generally categorizing the information contained in its submissions, SBC does not, as required by section 0.459(b)(3), explain the degree to which specific information is commercial or financial or contains a trade secret. Nor does it explain, as required by section 0.459(b)(5), how disclosure of such information could result in substantial competitive harm. SBC also fails to state whether any of the information for which it seeks protection is already available to the public.[16]

We find SBC's request for the confidential treatment of all its submissions to be overly broad. Portions of the documents submitted by SBC appear to contain commercial or financial information, the disclosure of which could result in substantial competitive harm to SBC. But most of those pages also contain information that is not confidential, such as FRN numbers, lists of equipment, and references to ordinary administrative matters. Some of that information is already within the public domain.[17] Release of such information appears unlikely to result in competitive harm to SBC and SBC offers no justification for withholding such information as commercial, financial or trade secret information. Consequently, that information will be disclosed.

Accordingly, we conclude that SBC has failed to demonstrate by a preponderance of the evidence a case for nondisclosure of all of its submissions. We therefore deny SBC's requests that we grant confidential treatment of the entirety of its submissions.

### B. Portions of SBC's Submissions Are Subject To Protection From Disclosure As "Commercially Sensitive Information"

We base confidentiality determinations under section 0.459 of the Commission's rules relating to commercial or financial materials on Exemption 4 of the FOIA which permits us to withhold "trade secrets and commercial or financial information obtained from a person and [that is] privileged or confidential."[18] Exemption 4 protects "any financial or commercial information provided to the Government on a *voluntary* basis if it is of a kind that the provider would not customarily release to the public."(emphasis added)[19] However, under Exemption 4 commercial or financial materials that are part of *required* submissions are held to be confidential only when

---

[16] See 47 C.F.R. § 0.459 (b)(7).

[17] Federal Registration Numbers ("FRN"s), including those of SBC, are available to the public on the Commission Registration System ("CORES") database which is located on the Commission's internet web page. *See also* 47 C.F.R. 54.501(d)(3).

[18] 5 U.S.C. § 552(b)(4).

[19] *See Critical Mass Energy Project v. NRC*, 975 F.2d 871, 880 (D.C. Cir. 1992) ("*Critical Mass*").

Mr. Jim Lamoureux
Ms. Mary C. Albert
August 5, 2005
Page 5

disclosure would either impair the government's ability to obtain necessary information in the future or would be likely to substantially harm the competitive position of the submitter.[20]

SBC's LOI responses were *required* submissions for the purposes of our FOIA analysis.[21] An LOI is an administrative order that compels the production of information. Failure to respond properly to an LOI may subject an entity to forfeiture action.[22] Because we directed SBC to submit its written responses to the Bureau's LOI, its responses were required.

We find that certain information in SBC's submissions constitutes commercial or financial information, the disclosure of which could result in substantial competitive harm to SBC. Such commercially sensitive information includes, but is not limited to, SBC's costs and pricing data, its billing and payment dates, and identifying information of SBC's staff, contractors, and the representatives of its contractors and customers. Accordingly, such information is exempt from disclosure under FOIA Exemption 4.[23]

Although section 54.501(d)(3) of the Commission's rules requires telecommunications service providers such as SBC to allow public inspections of the rates it charges and the discounts it allows to schools and libraries eligible for universal service support,[24] SBC can comply with the rule's requirements by maintaining a "public inspection file" containing the required rate information. The rule does not mandate disclosure here of all of the pricing data contained in SBC's submissions. In this instance, disclosure of SBC's invoice and discount amounts could disclose the total value of its contract, information that would not otherwise be publicly available. That information is not in the public domain and its release is not required by the rule. Because release of SBC pricing information in this case is likely to substantially harm SBC's competitive position, such information is exempt from disclosure under FOIA Exemption 4.

### C. Names of SBC Employees And Customers Are Protected From Disclosure Due To Personal Privacy Concerns

The FOIA statute, 47 U.S.C. § 552(b)(7)(C), provides that records or information compiled for law enforcement purposes are exempt from disclosure to the extent that the

---

[20] *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks*"); *Critical Mass*, 795 F.2d at 878 (citing *National Parks*).

[21] *See Critical Mass* (establishing separate tests for confidential treatment of voluntary submissions and required submissions). See also

[22] *See SBC Communications, Inc.*, Order of Forfeiture, 17 FCC Rcd 7589 (2002) (forfeiture paid); *Globcom Inc.*, Notice of Apparent Liability for Forfeiture and Order, 18 FCC Rcd 19893, n. 36 (2003), *response pending*.

[23] *See, e.g., In Re The Lakin Law Firm, P.C.*, Memorandum Opinion and Order, 19 FCC Rcd 12727 (2004).

[24] 47 C.F.R. § 54.501(d)(3) provides that "[Telecommunications] Service providers shall keep and retain records of rates charged to and discounts allowed for eligible schools and libraries – on their own or as part of a consortium. Such records shall be available for public inspection."

Mr. Jim Lamoureux
Ms. Mary C. Albert
August 5, 2005
Page 6

production of such records could reasonably be expected to "constitute an unwarranted invasion of personal privacy" are exempt from disclosure.[25]  Generally, businesses do not possess "personal privacy" interests as required for application of FOIA Exemption 7(C).[26]  However, the individuals identified in SBC's submissions do have such privacy rights and, pursuant to this provision, portions of SBC's submissions will be redacted to withhold the names and identifying information of those individuals to prevent unwarranted invasions of their personal privacy.

### D.    Documents Which Disclose an Agency's Deliberative Process Are Protected From Disclosure

Exemption 5 of the FOIA protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."[27]  Pursuant to this exemption we will withhold from public disclosure drafts of Bureau pleadings and correspondence, and memoranda and emails, distributed among Commission staff, which discuss the issues and investigation related to this matter.

## IV.    CONCLUSION

For the reasons stated above, we grant in part and deny in part SBC's request for confidentiality.  If SBC believes that this decision is in error, it must file an application for review of this action with the Commission's Office of General Counsel within ten working days of the date of this letter.  *See* 47 C.F.R. § 0.461(i).  We will produce the documents requested as noted above if no such application for review is filed.  We will assess copying charges, if any, at that time.  If Comptel believes that this decision is in error, it may file an application for review of this action with the Commission's Office of General Counsel within 30 days of the date of this letter.  *See* 47 C.F.R. § 0.461(j).

We are providing SBC's counsel with a copy of the documents as redacted pursuant to this decision.

Sincerely,

William H. Davenport
Chief, Investigations and Hearings Division
Enforcement Bureau

---

[25] 5 U.S.C. § 552(b)(7)(C).  *See also* 5 U.S.C. § 552(b)(6); *In re William McConnell, Broadcasting and Cable*, Order, 18 FCC Rcd 26371 (2003).

[26] *See, e.g., Chadmore Communications, Inc.*, Memorandum Opinion and Order, 13 FCC Rcd  23943 (1998)

[27] 5 U.S.C. § 552(b)(5).

# Exhibit E



**Jim Lamoureux**
Senior Counsel

SBC Services, Inc.
1401 I Street NW, Suite 400
Washington, D.C. 20005
Phone 202 326-8895
Fax 202 408-8745

August 19, 2005

## VIA FACSIMILE, HAND DELIVERY AND U.S. MAIL

Samuel Feder
Acting General Counsel
Office of General Counsel
Federal Communications Commission
445 12th Street SW
Washington DC 20554

> **Re:    Application for Review of Freedom of Information Action;
> FOIA Control No. 2005-333**

Dear Mr. Feder:

Pursuant to 47 C.F.R. § 0.461(i), SBC Communications Inc. ("SBC") hereby files an application for review of the Enforcement Bureau's August 5, 2005, determination to deny in part confidential treatment of records responsive to a Freedom of Information Act ("FOIA") request submitted by CompTel/ALTS. SBC does not object to the specific redactions proposed by the Enforcement Bureau under FOIA Exemptions 4 and 7(C) or its determination to withhold documents under Exemption 5. However, SBC seeks review of the Bureau's rejection of SBC's assertion of the application of Exemption 7(C), *in toto*, to the responsive records.

### Background

In its FOIA request, CompTel/ALTS sought release of "[a]ll pleadings and correspondence contained in File No. EB-04-IH-0342." Included within the scope of the CompTel/ALTS request are records that SBC submitted to the Commission in response to a Letter of Inquiry issued by the Enforcement Bureau, as well as the Letter of Inquiry itself. All such records responsive to the CompTel/ALTS request were obtained by the Commission as part of an Enforcement Bureau investigation. Accordingly, SBC asserted that all such responsive documents fell within the "law enforcement-privacy" exemption to the FOIA's disclosure requirements. *See* 5 U.S.C. § 552(b)(7)(C).[1] Pursuant to the FOIA and Commission Rule 0.459, SBC requested that all of the requested records should be maintained by the Commission as confidential and should not be made available for public inspection or disclosure.

---

[1] *See* Letter from Jim Lamoureux, Senior Counsel, SBC Services Inc. to Judy Lancaster, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission (May 27, 2005)("*Lamoureux Letter*").

On August 5, 2005, the Enforcement Bureau denied SBC's request that the documents be withheld from disclosure under FOIA Exemption 7(C).[2]  Although the Enforcement Bureau agreed to redact the names of individuals contained in the responsive records, the Enforcement Bureau otherwise denied SBC's claim that the records should be withheld pursuant to Exemption 7(C).[3]  Its rationale for doing so was contained in a single sentence: "Generally businesses do not possess 'personal privacy' interests as required for application of FOIA Exemption 7(C)."  In effect, with a single sweeping statement, the Enforcement Bureau held, as a categorical matter, that corporations have no rights under FOIA Exemption 7(C).  Thus, according to the Enforcement Bureau, a corporation's basis for requesting non-disclosure of records compiled for law enforcement purposes is limited to an assertion that the records fall within some other specific FOIA exemption, such as Exemption 4 pertaining to confidential commercial information.  That holding is inconsistent with and contrary to the purpose underlying Exemption 7(C), cases addressing the scope of Exemption 7(C), and the actual language of Exemption 7(C).  Accordingly, SBC respectfully requests that the Enforcement Bureau's rejection of SBC's request for confidentiality be reversed, and that the documents requested by CompTel/ALTS be withheld from disclosure.

### Exemption 7(C) Compels Withholding of the Responsive Documents

Exemption 7(C) applies to all "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  The purpose of Exemption 7(C) is to protect parties who had been the subject of law enforcement proceedings from embarrassment, reprisal or harassment, and other invasions of privacy associated with the stigma of law enforcement investigations.  *See Voinche v. F.B.I,* 940 F. Supp. 323 (D.D.C. 1996); *Foster v. U.S. Dept. of Justice,* 933 F. Supp. 687 (E.D. Mi 1996).  Because of the intense privacy interests in information compiled by law enforcement agencies, Exemption 7(C) "affords broad[] privacy rights to suspects, witnesses, and investigators."  *Bast v. Dep't of Justice,* 665 F.2d 1251, 1254 (D.C. Cir. 1981).  With respect to the records at issue here, there is no question, and the Enforcement Bureau does not challenge, that the records were "compiled for law enforcement purposes."[4]  Thus, the only question is

---

[2] *See* Letter from William H. Davenport, Chief, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission to Jim Lamoureux, SBC Services Inc. at 5-6 (August 5, 2005)("Davenport Letter").

[3] The Enforcement Bureau also agreed to redact specific information in the responsive records pursuant to Exemption 4, and it withheld certain records pursuant to Exemption 5.  SBC does not seek review of those determinations.

[4] The Letter of Inquiry was issued as part of an Enforcement Bureau investigation, and the documents provided to the Enforcement Bureau by SBC were all in response to the Letter of Inquiry.  The stated purpose of the Enforcement Bureau's Letter of Inquiry, as well as the overall purpose of the Enforcement Bureau's investigation was to determine whether SBC had violated Commission rules.  It is thus plain that the records in question were compiled by the Enforcement Bureau for law enforcement purposes.  The courts have made clear that all agency enforcement proceedings, including civil enforcement

Samuel Feder
**August 19, 2005**
**Page 3 of 8**

whether disclosure of such documents would constitute an unwarranted invasion of SBC's
personal privacy.

The question of whether disclosure of records compiled for law enforcement purposes
is warranted turns on whether "the privacy interest at stake outweighs the public interest in
disclosure." *Nation Magazine, Washington Bureau v. U.S. Customs Svc.,* 71 F.3d 885, 893 (D.C.
Cir. 1995). In this instance, there is no public interest in disclosure that could possibly offset the
invasion of privacy that would result from disclosure. The Supreme Court has made clear that,
for purposes of Exemption 7(C), "whether an invasion of privacy is *warranted* cannot turn on the
purposes for which the request for information is made." *United States Dept. of Justice v.
Reporters Committee for Freedom of the Press,* 489 U.S. 749, 771 (1989). Rather, "whether
disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of
the requested document and its relationship to the basic purpose of the Freedom of Information
Act to open agency action to the light of public scrutiny rather than on the particular purpose for
which the document is being requested." *Id.* (*Internal quotation marks and citations omitted.*).[5]
The Supreme Court's *Reporters Committee* decision is dispositive in this instance.

In *Reporters Committee*, several journalists sought disclosure under the FOIA of the FBI
"rap sheet" of a reputed mob boss. In holding that disclosure was prohibited by Exemption 7(C),
the Court held that the core purpose of the FOIA,

> . . . is not fostered by disclosure of information about private citizens that is
> accumulated in various governmental files but that reveals little or nothing about
> an agency's own conduct. In this case—and presumably in the typical case in
> which one private citizen is seeking information about another—the requester
> does not intend to discover anything about the conduct of the agency that has
> possession of the requested records. Indeed, response to this request would not
> shed light on the conduct of any Government agency or official.

*Reporters Committee,* 489 U.S. at 773. More specifically, with respect to documents compiled by
agencies during the course of law enforcement investigations, the Court further held that,

---

proceedings generally, and FCC Enforcement Bureau investigations in particular, fall within the ambit of
Exemption 7. *See, e.g., Aspin v. Dept. of Defense,* 348 F. Supp. 1081 (D.D.C.), *aff'd* 491 F.2d 24 (D.C.
Cir. 1972); *Windels, Marx, Davies & Ives. v. Dept. of Commerce,* 576 F. Supp. 405 (D.D.C. 1983); *Kay v.
FCC,* 867 F. Supp. 11 (D.D.C. 1994).

[5] *See also United States Dep't of Defense v. Federal Labor Relations Bd.,* 114 S.Ct. 1006, 1012
(1994)("the only relevant 'public interest in disclosure to be weighed in this balance is the extent to which
disclosure would serve the 'core purpose of the FOIA,'" which is 'contribut[ing] significantly to public
understanding *of the operations or activities of the government.*'")(*quoting Reporters Committee*);
*Wichlacz v. U.S. Dept. of Interior,* 938 F. Supp. 325 (E.D. Va. 1996)(only possible public interest to
weigh against privacy interest is extent to which disclosure would shed light on agency's performance of
its statutory duties or otherwise let citizens know what their government is up to).

. . . although there is undoubtedly some public interest in anyone's criminal history, especially if the history is in some way related to the subject's dealing with a public official or agency, the FOIA's central purpose is to ensure that the *Government's* activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed.

*Id.* at 774.[6]  The Court thus concluded that the public interest in disclosure of the rap sheet sought by the journalists "is not the type of interest protected by the FOIA." *Id.* at 775.  As a general proposition, moreover, the Court held,

. . . *as a categorical matter* that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and [] when the request seeks no "official information" about a Government agency, but merely *records that the Government happens to be storing*, the invasion of privacy is "unwarranted."

*Id.* at 780 (emphasis added).[7]  (Emphasis added.) notably, nowhere in its decision did the Court limit its holding to the disclosure of documents pertaining to *individuals*.  The Court's holding in *Reporters Committee*, as well as the D.C. Circuit's subsequent application of that holding in *SafeCard Services* and *Nation Magazine* thus apply with equal force in this instance.

The only records responsive to the CompTel/ALTS request are internal documents of a private corporate citizen that were submitted to and compiled by the Commission pursuant to investigative demands issued by the Enforcement Bureau.  None of the records in question contain "official information" about the Commission; nor do any of the records pertain to the conduct of the Commission or any Commission official.  The only ostensible interest on the part of CompTel/ALTS in disclosure of the requested documents is to try to embarrass SBC with the *information compiled*

_____

[6] *See also SafeCard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1205 (D.C. Cir. 1991)("the type of information sought is simply not very probative of an agency's behavior or performance."); *Nation Magazine,* 71 F.3d at 895 ("In some, perhaps many, instances where a third party asks if an agency has information regarding a named individual in its law enforcement files, the cognizable public interest in that information will be negligible; the requester will be seeking records about a private citizen, not agency conduct."); *Alexander & Alexander Svcs., Inc. v. Securities and Exchange Commission,* Civ.A. No. 92-1112 (JHG), 1993 WL 439799 (D.D.C. Oct. 19, 1993)("when a private citizen seeks information regarding another private citizen or corporation, the requester is not seeking information regarding the conduct of the agency in possession of the information.").

[7] *See also SafeCard*, 926 F.2d at 1205-1206 ("Indeed, unless there is compelling evidence that the agency denying the FOIA request is engaged in illegal activity, and access to the names of private individuals appearing in the agency's law enforcement files is necessary in order to confirm or refute that evidence, there is no reason to believe that the incremental public interest in such information would ever be significant."); *see also id.* at 1205 ("The public interest in disclosure is not just less substantial, it is insubstantial.")

by the Enforcement Bureau. There is thus no public policy interest in disclosure of the requested documents.

Conversely, there are substantial privacy interests in such documents. As with information compiled by the FBI in rap sheets, the requested records are no more than documents that "happen to be in the warehouse" of the Commission because they were gathered during the course of a law enforcement investigation. Indeed, the privacy interest in the particular information at issue here is stronger than that in *Reporters Committee*. The discrete informational components of rap sheets are frequently publicly available through various court records; it was thus the compilation of such information in which the Court found a cognizable privacy interest. *See Reporters Committee*, 489 U.S. at 763-764.[8] Here, in contrast, the records are SBC's private possessions; none of the information in those records is generally publicly available. Indeed, but for the investigative demand of the Enforcement Bureau, the records would remain in SBC's possession. Moreover, the information would remain in SBC's possession as discrete documents and information scattered throughout SBC's offices and files. But for the Enforcement Bureau's investigative demand, there would be no compilation of those records as there is now in the Enforcement Bureau's files. Accordingly, given the strong privacy interest in the records at issue here, and the complete lack of any public interest in disclosure of those records, *Reporters Committee* is clear that Exemption 7(C) compels the Commission not to publicly disclose the records responsive to the CompTel/ALTS request.

The Enforcement Bureau's sole response to this argument is that "Generally, businesses do not posses 'personal privacy' interests as required for application of FOIA Exemption 7(C)."[9] That statement is inaccurate as a general proposition as well as in the application of Exemption 7(C) to compilations of records contained in law enforcement files.

First, there is no support for any general proposition that corporations do not have privacy rights in their documents. In an analogous setting in which a corporation sought to keep sealed documents that had been produced in discovery in civil litigation, the D.C. Circuit held that "a corporation possesses legitimate constitutional expectations of confidentiality in internal commercial information." *Tavoulares v. Washington Post Company*, 724 F.2d 1010, 1022 (D.C. Cir. 1983), *rev'd en banc on other grounds*, 737 F.2d 1170 (1984). The only qualification of a corporation's right to nondisclosure is to allow "adequate policing of corporate conduct." *Id.*[10]

---

[8] *Reporters Committee* thus disposes of any notion that SBC has no privacy interest in the records in question merely because the investigation is a matter of public record as a result of the Order issued by the Commission approving the Consent Decree between SBC and the Enforcement Bureau. *See, e.g., Reporters Committee*, 489 U.S. at 1480 ("In sum, the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information.")(*internal quotation marks and citations omitted*).

[9] *Davenport Letter* at 6.

[10] Which, of course, goes to the authority and power of the Commission to obtain documents from SBC in the first instance, not to subsequent disclosure of those documents to the public.

Samuel Feder
**August 19, 2005**
**Page 6 of 8**

Similarly, and even closer to the situation at hand, in a case in which a corporation sought to keep sealed documents that had been gathered by law enforcement officials during searches of a corporation, the D.C. Circuit held that "The public attributes of corporations may reduce pro tanto the reasonableness of their expectation of privacy, but the nature and purpose of the corporate entity and the nature of the interest sought to be protected will determine the question whether under given facts the corporation per se has a protectible interest." *U.S. v. Hubbard*, 650 F.2d 293, 306 (D.C. Cir. 1980). There is thus no question that corporations generally have privacy interests in their own documents.

There also is no merit to the argument that the protections of Exemption 7(C) do not apply to corporations. On its face, Exemption 7(C) is not limited to protecting the personal privacy of individuals. Nor has SBC been able to discover any legislative history that would suggest that Exemption 7(C)'s protections are limited to individuals. Indeed, there is no reason that corporations should not be protected from the embarrassment, reprisal or harassment, and other invasions of privacy associated with the stigma of law enforcement investigations that Exemption 7(C) was designed to prevent.

The Enforcement Bureau's holding effectively conflates the protections afforded by Exemptions 6 and 7(C). Both Exemption 6 and Exemption 7(C) involve personal privacy concerns, but the specific language of Exemption 6 is fundamentally different than the language of Exemption 7(C). Specifically, Exemption 6 only protects from disclosure "personnel and medical files and similar files." 47 U.S.C. § 552(B)(6). Thus, by its own terms, Exemption 6 protects information that could only pertain to an individual and which might reveal personal private information pertaining to that individual. A personnel file is something that is compiled only with respect to an individual as an employee, and a medical file is something that is compiled only with respect to an individual's medical health. Corporations, in their own capacity, do not have personnel or medical files. It thus makes plain sense to conclude that Exemption 6 implicates only individual privacy concerns and does not apply to corporations. In contrast, there are no restrictive adjectives with respect to the files subject to Exemption 7(C). Rather, Exemption 7(C)'s protections against invasions of privacy applies to all records or information compiled for law enforcement purposes.

The Commission's holding also flies in the face of the language in Exemption 7(B), which immediately precedes Exemption 7(C). Exemption 7(B) applies to documents that would deprive "a person"—not an individual—of a right to a fair trial or an impartial adjudication. 47 U.S.C. § 552(b)(7)(B). Corporations are generally presumed "persons" for purposes of statutory construction. *See, e.g., Cook County, Illinois v. U.S.*, 123 S.Ct. 1239, 1244 (2003)("There is no doubt that the term [person] [extends] to corporations, the Court in 1826 having expressly recognized the presumption that the statutory term 'person' extends as well to persons politic and incorporate, as to natural persons whatsoever.")(*internal quotation marks and citations omitted*). It is thus reasonable to attach the same presumption to Exemption 7(C)'s use of the term "personal," which is merely the adjectival form of the noun "person" used in Exemption 7(B). The language and structure of Exemptions 6, 7(B) and 7(C) thus compel rejection of the Commission's holding that Exemption 7(C) does not apply to corporations.

Nor is there case support for the Enforcement Bureau's holding. The Enforcement Bureau's sweeping pronouncement that corporations have no rights to non-disclosure under Exemption 7(C) was supported by a citation to a single prior Commission decision: Chadmore Communications, Inc. *Memorandum Opinion and Order*, 13 FCC Rcd. 23943 (1998). That decision rejected a non-disclosure claim on the ground that the information in question pertained to the interests of individuals "in their status as holders of commercial radio licenses, a capacity in which they have neither a personal privacy interest nor an expectation of privacy." *Id.* ¶ 7. As support for its holding in *Chadmore*, the Commission relied upon three cases, all of which involved application of Exemption 6, and none of which involved application of Exemption 7(C). *Sims v. CIA*, 642 F.2d 562 (D.C. Cir. 1980); *National Parks and Conservation Ass'n v. Kleppe*, 547 F.2d 673 (D.C. Cir. 1976); *Ivanhoe Citrus Ass'n v. Handley*, 612 F. Supp. 1560 (D.D.C. 1985).[11] None of the cases relied upon by the Commission thus actually stand for the proposition that Exemption 7(C) does not apply to corporations.[12]

Moreover, all three cases pre-date the Supreme Court's decision in *Reporters Committee*. That decision fundamentally altered the calculus of balancing public and private interests in determining whether to disclose documents in response to FOIA requests. Thus, all of the cases relied on by the Commission in *Chadmore*, and, by extension in this instance, to restrict the scope of Exemption 7(C) are supplanted by the Court's pronouncement in *Reporters Committee* that the core purpose of the FOIA is not served by disclosure of information that merely resides in agency files but reveals nothing about the agency's own conduct, and its *categorical* pronouncement that a third party request that seeks no "official information" about an agency,

---

[11] The *Chadmore* decision apparently understood the tenuousness of its conclusion, because it went on to find, "Even assuming these commercial licensees have a privacy interest, it is at most de minimis and is far outweighed by the public interest in publicly disclosing information about commercial licensees who have been granted rule waivers in Commission proceedings." *Chadmore* ¶ 7. In this instance, *Reporters Committee* firmly and categorically establishes that there is *no* public interest in granting disclosure to a third party of law enforcement records that happen to be stored in agency files. Accordingly, any slight privacy interest is sufficient to compel nondisclosure.

[12] One D.C. Circuit decision, *Washington Post Co. v. United States Dep't of Justice*, 863 F.2d 96, 100 (D.C. Cir. 1988)("Information relating to business judgments does not qualify for exemption."), and one decision from the United States District Court for D.C., *Cohen v. EPA*, 575 F. Supp. 425, 429 (D.D.C. 1983)("The privacy exemption does not apply to information regarding professional or business activities.") contain language suggesting that Exemption 7(C) protects only individual privacy interests. However, as with the Commission's decision in *Chadmore*, both *Washington Post* and *Cohen* support their statements as to the applicability of Exemption 7(C) with citations to prior cases that involved only the application of Exemption 6. Thus, the *Cohen* decision relies on *Rural Housing alliance v. Untied States Dep't of Agriculture*, 498 F.2d 73 (D.C. Cir. 1974) and *Kurzon v. Dep't Of Health and Human Svcs.*, 649 F.2d 65 (1st Cir. 1981), both of which involved only the application of Exemption 6, and the *Washington Post* decision relies on *Sims v. CIA*, 642 F.2d 562 (D.C. Cir. 1980), which also involved only the application of Exemption 6. Thus, as with the Commission's *Chadmore* decision, neither *Washington Post* or *Cohen* are supported by prior decisions concerning the scope of Exemption 7(C). Moreover, as with the cases relied on by the Commission in *Chadmore*, both *Washington Post* and *Cohen* pre-date the Supreme Court's *Reporters Committee* decision.

but merely seeks files accumulated and stored by the agency is an invasion of privacy. The holding in *Reporters Committee* is not limited to privacy interests of individuals. Rather, the comparison of the core purpose of the FOIA—shedding light on agency conduct—and the potential invasion of privacy occasioned by disclosure of law enforcement records an agency happens to be storing, applies with equal force to individuals and corporations. Indeed, the United States District Court for D.C. has indicated its understanding that the Court's holding in *Reporters Committee* applies "when a private citizen seeks information regarding another private citizen *or corporation.*" *Alexander & Alexander* at *10 (emphasis added). In that case, the district court rejected the SEC's proposed disclosure of information dealing only with individuals in their professional capacities. *Id.* It held that under *Reporters Committee*

> personal information is exempt from disclosure to a FOIA requester in the
> absence of compelling evidence that the agency was involved in illegal activity.
> The fact that the information may or may not injure these individuals' reputations
> is irrelevant to the inquiry whether the information sheds any light on what the
> SEC "was up to." *Id.*

That application of the balancing required under *Reporters Committee* is directly on point here. None of the documents requested by CompTel/ALTS reveal anything about the official conduct of the Commission. They are all SBC's personal business documents. Accordingly, given the complete lack of any public interest that would be served by disclosure, the documents should be withheld.[13]

The Enforcement Bureau's sweeping pronouncement that Exemption 7(C) does not apply to corporations is thus belied by the purpose of Exemption 7(C), cases addressing the scope of Exemption 7(C), and the actual language of Exemption 7(C). Accordingly, SBC respectfully requests that the Enforcement Bureau's rejection of SBC's request for confidentiality be reversed, and that the documents requested by CompTel/ALTS be withheld from disclosure.

If you have any questions, please do not hesitate to contact me at (202) 326-8895.

Sincerely,

Jim Lamoureux
Senior Counsel
SBC Services, Inc.

cc:    Judy Lancaster
        Mary C. Albert

---

[13] *See United States Dep't of Defense v. Federal Labor Relations Authority*, 114 S.Ct. 1006, (1994)("Because a very slight privacy interest would suffice to outweigh the relevant public interest, we need not be exact in our quantification of the privacy interest. It is enough for present purposes to observe that the employees' interest in nondisclosure is not insubstantial.")

# Exhibit F

COMPETITIVE
TELECOMMUNICATIONS
ASSOCIATION

ADVANCING
GLOBAL
COMMUNICATIONS
THROUGH
COMPETITION

1900 M STREET, NW, SUITE 800
WASHINGTON, DC 20036-3508
PH: 202.296.6650
FX: 202.296.7585
www.comptel.org



September 6, 2005

**By Facsimile, U.S. Mail and E-Mail**

Samuel Feder, Esq.
Acting General Counsel
Federal Communications Commission
445 12th Street S.W.
Washington, D.C. 20554


Re:    CompTel's Application for Review of Freedom of
       Information Act Action, FOIA Control No. 2005-333


Dear Mr. Feder:

Pursuant to Section 0.461(j) of the Commission's rules, 47 C.F.R. §0.461(j), CompTel hereby submits its Application for Review of the Enforcement Bureau's August 5, 2005[1] letter denying in part CompTel's Freedom of Information Act Request ("FOIA") on the grounds that FOIA Exemptions 4 and 5 protect certain documents from disclosure.

**Background**

On April 4, 2005, CompTel filed with the Commission an FOIA request for documents contained in File No. EB-04-IH-0342. These documents relate to the Enforcement Bureau's investigation of SBC for violations of the Commission's rules in connection with the receipt of universal service support for the New London, Connecticut Public Schools. The Commission terminated the investigation in December 2004 upon issuing an Order adopting a Consent Decree. *SBC Communications, Inc.* Order and Consent Decree, 19 FCC Rcd 24014 (released December 16, 2004).

Apparently SBC did not seek confidential treatment for its documents at the time it provided them to the Commission in connection with the investigation. Upon being

---

[1]    August 5, 2005 Letter from William Davenport to Jim Lamoureux and Mary C. Albert.

Samuel Feder, Esq.
September 6, 2005
Page 2

notified of CompTel's FOIA request, however, SBC objected to the disclosure of the documents requested, claiming that they were exempt from disclosure pursuant to FOIA Exemptions 7(C) and 4, 5 U.S.C. §§552(b)(7)(C) and 552(b)(4).[2]  CompTel responded to SBC's objections and the Bureau issued its decision on August 5, 2005.[3]  The Bureau rejected SBC's Exemption 7(C) claims, but stated that it would withhold certain documents pursuant to Exemption 4 and certain other documents pursuant to Exemption 5 of the FOIA.  CompTel is at an extreme disadvantage in making a case for review of the Enforcement Bureau's decision because the Bureau has not provided CompTel with a Vaughn index[4] identifying the documents it proposes to withhold and the particular Exemption(s) that applies to each document.  Nonetheless, out of an abundance of caution and in order to protect its rights on appeal, CompTel requests that the Commission review the Bureau's determinations to withhold documents pursuant to Exemptions 5 and 4 for the following reasons.

**The Bureau Has Not Identified With Particularity The Documents Withheld Under Exemption 5 Or Demonstrated That The Exemption Applies**

Exemption 5 of the FOIA, 47 U.S.C. §552(b)(5), permits the Commission to withhold inter-agency or intra-agency memorandums that would not be available to a private party in litigation with the agency through discovery.  In invoking this exemption, the Bureau has stated that it "will withhold from public disclosure drafts of pleadings and correspondence, and memoranda and emails, distributed among Commission staff which discuss the issues and investigation related to this matter."[5]  The burden is on the Bureau to prove that Exemption 5 protects all of these materials.  *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973), *cert. denied,* 415 U.S. 977 (1974).  The conclusory and generalized allegation that Exemption 5 applies to all of the withheld material is insufficient to meet the Bureau's burden.  In order to carry its burden, the Bureau must describe both the contents of each of the withheld documents and enough about their context to establish that Exemption 5 applies.  *SafeCard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1204 (D.C. Cir. 1991); *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974) (withheld documents must be described and indexed).  Because the materials the Bureau intends to withhold are not otherwise identified or indexed, it is impossible for CompTel to challenge with any specificity the Bureau's decision to withhold any or all of the documents.  Based on the information that is available to CompTel, however, there are at least two aspects of the Bureau's Exemption 5 determination that warrant review.

---

[2]      May 27, 2005 Letter from Jim Lamoureux to Judy Lancaster.

[3]      August 5, 2005 Letter from William Davenport to Jim Lamoureux and Mary C. Albert.

[4]      *See e.g., Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974) (withheld documents must be described and indexed).

[5]      August 5, 2005 Letter from William Davenport to Jim Lamoureux and Mary C. Albert at 6.

Samuel Feder, Esq.
September 6, 2005
Page 3

First, intra-agency memoranda that explain decisions not to file a complaint are final opinions made in the adjudication of a case that fall outside the scope of Exemption 5. *National Labor Relations Board v. Sear Roebuck & Co.,* 421 U.S. 132 (1975); *SafeCard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1204 (D.C. Cir. 1991) (agency's decision not to file injunctive action against a particular entity is final agency action in the adjudication of a case). The Bureau's investigation into SBC's violations of the Commission's universal service rules was terminated upon the adoption of a Consent Decree. *SBC Communications, Inc.* Order and Consent Decree, 19 FCC Rcd 24014. A complaint was never filed. To the extent that any of the documents withheld pursuant to Exemption 5 reflect an explanation of the Bureau's or the Commission's decision not to pursue a complaint against SBC, they must be produced.

Secondly, Exemption 5 does not protect any purely factual material appearing in the intra-agency documents in a form that is severable without compromising the deliberative or policy making material contained therein. *Environmental Protection Agency v. Mink*, 410 U.S. 73 (1973) (agency must demonstrate by surrounding circumstances that particular documents are purely advisory or deliberative and contain no separate factual information); *Sterling Drug v. Federal Trade Commission,* 450 F.2d 698 (D.C. Cir. 1971) (while communications of thoughts and opinions are to be protected, statements of fact are subject to disclosure). To the extent that any of the documents withheld contain statements of fact, those documents, or the portions thereof that contain the statements of fact, must be produced.

### Exemption 4 Does Not Protect From Disclosure All of The Financial Information The Bureau Intends To Withhold

The Bureau warned SBC in the Letter of Inquiry ("LOI") pursuant to which SBC submitted the documents requested by CompTel that requests for confidential treatment must comply with the requirements specifically mandated by Section 0.459(b), and that the Bureau would not consider confidentiality requests that did not so comply.[6] SBC apparently did not heed the warning or request confidential treatment at the time it submitted the documents. Indeed, it did not request confidential treatment until 8 months after the documents were originally produced to the Commission, 5 months after the investigation was terminated and then only in response to CompTel's FOIA request.[7]

The Bureau correctly found that SBC's belated request for confidential treatment was woefully inadequate:

---

[6]     August 5, 2005 Letter from William Davenport to Jim Lamoureux and Mary C. Albert at 3-4.

[7]     May 27, 2005 Letter from Jim Lamoureux to Judy Lancaster.

Samuel Feder, Esq.
September 6, 2005
Page 4

We find that SBC's requests for confidential treatment of its submissions substantially fail to comply with the standards set forth in section 0.459(b) of the Commission's rules.[8]

SBC has failed to provide a statement of specific reasons for withholding its responses in their entirety.  While generally categorizing the information contained in its submissions, SBC does not, as required by section 0.459(b)(3) explain the degree to which specific information is commercial or financial or contains a trade secret.  Nor does it explain, as required by section 0.459(b)(5), how disclosure of such information could result in substantial competitive harm.  SBC also fails to state whether any of the information for which it seeks protection is already available to the public.[9]

Despite these findings, the Bureau determined on its own that disclosure of certain information "could result in competitive harm to SBC."   As a result, the Bureau stated its intent to withhold certain documents, including, but not limited to, SBC's costs and pricing data, invoice and discount amounts, and its billing and payment dates[10] pursuant to Exemption 4 of FOIA, 5 U.S.C. §552(b)(4).

Exemption 4 gives the Commission discretion to withhold from disclosure confidential commercial and financial information.  In order to prevail on a claim under Exemption 4, a party must demonstrate that disclosure of the requested information is likely to cause substantial harm to the competitive position of the entity from whom the information was obtained.  *National Parks and Conservation Association v. Kleppe*, 547 F.2d 673, 677-678 (D.C. Cir. 1976).   The Bureau determined that SBC had failed to show how disclosure of any of the information could result in substantial competitive harm.  The Bureau's own conclusory and generalized allegation of substantial competitive harm is unacceptable and cannot support its decision to withhold the requested documents.  *Public Citizen Health Research Group v. Food and Drug Administration*, 704 F.2d 1280, 1291 (D.C. Cir. 1983).  It is difficult to imagine, for example, how the disclosure of  billing and payment dates could cause substantial harm to SBC's competitive position.  Moreover, the fact that SBC was unable to demonstrate substantial harm to its competitive position from disclosure of the documents should weigh heavily against withholding any of the documents.

---

[8]        August 5, 2005 Letter from William Davenport to Jim Lamoureux and Mary C. Albert at 1.

[9]        *Id.* at 4.  SBC did not challenge these findings in its Application for Review of the Bureau's decision.

[10]        *Id.* at 5.

Samuel Feder, Esq.
September 6, 2005
Page 5

The Bureau's determination that Exemption 4 protects from disclosure SBC's invoice and discount amounts is similarly wanting. Exemption 4 does not protect from disclosure the rates SBC charged or the discounts it provided to any participating schools and libraries because that information already is (or should be) in the public domain. Section 54.501(d)(3) of the Commission's rules requires e-rate service providers, such as SBC, to make records of rates charged and discounts allowed to participating schools available for public inspection.[11]

While acknowledging the applicability of the rule, the Bureau stated that SBC can comply with its requirements "by maintaining a 'public inspection' file containing the required rate information" and that the rule does not mandate disclosure of the SBC invoice and discount information pursuant to CompTel's FOIA request because disclosure of such amounts "could disclose the total value of [SBC's] contract, information that would not otherwise be publicly available.[12]    There are at least two flaws in the Bureau's reasoning. First, a claim to confidentiality cannot be sustained under Exemption 4 for any data that is already in the public domain. *CNA Financial Corporation v. Donovan,* 830 F. 2d 1132,1154 (D.C. Cir. 1987). To the extent that any of the requested documents show the rates SBC charged or the discounts it allowed – i.e., the information required to be maintained in its "public inspection" file -- the documents must be produced. Secondly, the inquiry that must be made in determining whether Exemption 4 applies is not whether or not the information would otherwise be publicly available, but whether disclosure would cause substantial competitive harm to SBC. *CNA Financial Corporation v. Donovan,* 830 F. 2d at 1153 (rejecting appellant's invitation to adopt an Exemption 4 test that "focuses solely on whether the material is 'customarily kept confidential' by the submitter"). The Bureau did not explain exactly how disclosure of the total value of SBC's contract to provide publicly funded e-rate services to the New London, Connecticut schools could cause SBC competitive harm. Moreover, although the Bureau found that SBC had failed "to state whether any of the information for which it seeks protection is already available to the public,"[13] the Bureau determined apparently on its own that the total value of SBC's contract "is not in the public domain" without revealing the factual basis for that determination.

The exemptions in the Freedom of Information Act must be construed narrowly in such a way as to provide maximum access to the material requested. The Commission cannot sustain the Bureau's determination to withhold materials pursuant to Exemptions 5 and 4 withhold further explanation and justification.

---

[11]    Section 54.501(d)(3) requires service providers to "keep and retain records of rates charged to and discounts allowed for eligible schools and libraries – on their own or as part of a consortium. Such records shall be made available for public inspection."

[12]    August 5, 2005 Letter from William Davenport to Jim Lamoureux and Mary C. Albert at 5.

[13]    *Id.* at 4.

Samuel Feder, Esq.
September 6, 2005
Page 6

       For the foregoing reasons, CompTel respectfully requests that the Commission grant this Application for Review and at the very least direct the Enforcement Bureau to provide a *Vaughn* index of the documents it proposes to withhold.

                  Respectfully submitted,

                      /s/

                  Mary C. Albert

cc:  William Davenport
      Jim Lamoureux