## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COMPTEL,** | ) |
| | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 06CV01718 (HHK) |
| | ) |
| v. | ) |
| | ) |
| **Federal Communications Commission,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF COMPTEL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FEDERAL COMMUNICATIONS COMMISSION'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. Pro. 56 and LCvR 7, Plaintiff COMPTEL hereby submits its Memorandum of Points and Authorities in opposition to Defendant Federal Communications Commission's ("FCC") Motion For Summary Judgment. The FCC asks the Court to grant its motion for summary judgment and dismiss COMPTEL's complaint with prejudice. The FCC's motion must be denied. The FCC has failed to demonstrate that no material facts are in dispute and that it is entitled to judgment as a matter of law. On the contrary, the FCC has not come close to meeting its burden of proof under the Freedom of Information Act ("FOIA"), declining to provide either a *Vaughn* Index or other particularized description of the documents it has unlawfully withheld, or, even more troubling, an explanation as to why each withheld document is protected from disclosure by an Exemption. Because the FCC failed to provide sufficient information to enable the Court to rule on the applicability of any of the

Exemptions it claims, COMPTEL is entitled to an order from the Court directing the FCC to release all documents that it has improperly withheld.

I.    **There Is A Genuine Issue Of Material Fact With Respect To The Volume Of Documents Responsive To COMPTEL's Request**

On July 20, 2005, William J. Davenport, Chief, Investigations and Hearings Division of the FCC's Enforcement Bureau informed COMPTEL by electronic mail that there were approximately 3200 pages of documents "potentially responsive" to COMPTEL's FOIA request for all pleadings and correspondence in File No. EB04IH0342.[1] Mr. Davenport did not revise that estimate in his August 5, 2005 decision on COMPTEL's FOIA request.[2] In its Motion For Summary Judgment, however, the FCC now claims that there are only 544 pages of responsive documents in File No. EB04IH0342.[3] This substantial discrepancy in the FCC's representations with respect to the volume of documents responsive to COMPTEL's request has created a genuine dispute with respect to a material fact.

Fed. R. Civ. Pro. 56 provides that summary judgment may be rendered in a party's favor only where the pleadings and affidavits show that there is no genuine issue as to any material fact. The FCC has failed to make such a showing. The electronic mail message sent to COMPTEL by the Chief of the Investigations and Hearings Division of the FCC's Enforcement Bureau with respect to the volume of pages responsive to

---

[1]    Exhibit F to Plaintiff COMPTEL's Statement of Material Facts As To Which There Is No Genuine Dispute.

[2]    *Id.* at Exhibit C.

[3]    Declaration of Judy Lancaster, attorney in the Investigations and Hearings Division of the FCC's Enforcement Bureau in support of Defendant's Motion For Summary Judgment at ¶7; Defendant's Statement of Material Facts As To Which There Is No Genuine Issue at ¶5.

COMPTEL's request directly conflicts with the Declaration of the attorney in the Investigations and Hearings Division submitted in support of the FCC's Motion for Summary Judgment.   Only disputes over facts that might affect the outcome of the suit under governing law preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Clearly, the discrepancy in the FCC's own representations with respect to the volume of materials responsive to COMPTEL's request is both genuine and material, thereby precluding the entry of summary judgment for the Defendant FCC.

## II.    Defendant Has Failed to Demonstrate That It Has Not Improperly Withheld Agency Records

In addition to the disputed factual issue, the FCC is not entitled to summary judgment as a matter of law.  There are two distinct categories of records that are the subject of this litigation through which COMPTEL seeks an order compelling the FCC to produce documents that have been wrongfully withheld under FOIA.  The first category consists of the records for which the FCC has claimed no Exemption, but has not produced to COMPTEL.   The second category consists of the records that the FCC contends are subject to an Exemption from disclosure under FOIA, either in whole or in part.  The FCC has failed to meet its burden of demonstrating that it has properly withheld either category of documents and for this reason, its request for summary judgment must be denied.

In the Memorandum of Points and Authorities In Support of its Motion For Summary Judgment, the FCC correctly identifies the standard it must meet in order to obtain summary judgment in a FOIA action – "an agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and that *each*

3

*document that falls within the class requested either has been produced, not withheld,* is

unidentifiable, or is exempt from disclosure."[4]  The FCC also candidly concedes that

FOIA (1) requires the federal government to release records to the public upon request,

(2) that it has determined that some of the records requested by COMPTEL "should be

released," (3) that it "has not yet released any records to plaintiff," and (4) that

COMPTEL "has constructively exhausted its administrative remedies."[5]  Moroever, the

FCC has stated its intent to continuing flouting its legal obligations under FOIA by not

releasing any records to COMPTEL unless and until the Court orders it to do so.[6]  By its

own admission, therefore, the FCC has failed to demonstrate that each document that

falls within the class requested has either been produced or is exempt from disclosure.

Although the FCC asks the Court to dismiss COMPTEL's complaint with

prejudice,[7] it has offered absolutely no legal justification for its improper withholding of

the documents that it has determined must be produced under FOIA or otherwise shown

that it is entitled to summary judgment.  An agency may refuse to make available

documents within its control only if it proves that the documents or portions thereof fall

within one of FOIA's nine exemptions.  *United States Department of Justice v. Tax*

*Analysts*, 492 U.S.136, 141 (1989).  The FCC has not even contended, let alone proven,

that the documents which it has already determined must be produced to COMPTEL fall

within one of FOIA's nine exemptions.  Nor has it released to COMPTEL one document

---

[4]    Memorandum of Points and Authorities in Support of Defendant's Motion for
Summary Judgment at 8 (emphasis added).

[5]    *Id.* at 1, 2, 4, 5, 6.

[6]    Stipulated Scheduling Order at n. 1.

[7]    *Id.* at 27.

or any portion of a document. It has now been more than two years since COMPTEL submitted its FOIA request. The FCC's conduct in continuing to withhold those documents is grossly improper and unlawful and precludes entry of summary judgment in favor of the FCC. *United States Department of Justice v. Tax Analysts*, 492 U.S. at 151 ("agency records which do not fall within one of the exemptions are 'improperly' withheld" if not produced); *Gilmore v. United States Department of Energy*, 33 F. Supp. 2d 1184, 1187 (N.D. CA. 1998) (agency's failure to comply with FOIA's time limits is by itself a violation of the statute and an improper withholding of the requested documents). Not only should the Court deny the FCC's Motion for Summary Judgment, it should also enter an order declaring that the FCC has violated FOIA and directing the FCC to produce the documents to COMPTEL without further delay.[8]

### III.    The Defendant Has Failed To Meet Its Burden Of Proving That Any Exemptions Properly Apply

The FCC has the burden of demonstrating that the balance of the documents responsive to COMPTEL's FOIA request are exempt from disclosure pursuant to one or more of the nine statutory Exemptions. *Sterling Drug Inc. v. Federal Trade Commission*, 450 F.2d 698, 703 (D.C. Cir. 1971). To carry this burden, the FCC must submit a *Vaughn* index that adequately describes each document it proposes to withhold, the exemption claimed for each withheld document and an explanation as to why the exemption is relevant. *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied, 415 U.S. 977 (1974); Summers v. United States Department of Justice,* 140 F.3d 1077, 1080 (D.C. Cir. 1998); *Bristol-Myers Co. v. Federal Trade Commission*, 424 F.2d 935.

---

[8]    Section 552(a)(4)(B) of FOIA confers jurisdiction on this Court to enjoin the FCC from withholding agency records and to order the production of records improperly withheld.

938, 939 (D.C. Cir. 1970). The FCC has not even come close to meeting its burden of proof.

The FCC argues that it has properly withheld certain documents pursuant to Exemptions 4, 5, 6 and 7 of FOIA,[9] but it produced no *Vaughn* index or other particularized description of the documents it has withheld, nor any justification as to how each withheld document fits within the Exemption claimed. The Declaration it submitted in support of its Motion for Summary Judgment contains only the type of generalized and conclusory allegations that the D.C. Circuit has repeatedly rejected as being insufficient to satisfy the government's burden of proof. The paucity of the information the FCC has produced makes it impossible for the Court to assess the validity of any of the Exemptions the FCC has claimed or to determine whether any documents have been properly withheld. The FCC appears to believe that it is above the law and that it is not required to comply with its obligations under FOIA. The Court must disabuse the FCC of any idea that it is free to flout its legal obligations.

### A. The FCC Has Failed To Prove That Exemption 4 Shields Any Documents

In claiming the applicability of Exemption 4 to withhold certain material submitted by AT&T in response to the Enforcement Bureau's Letter of Inquiry ("LOI"), the FCC argues both that disclosure of the information is "likely either '(1) to impair the Government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained." [10] It further argues that "[d]isclosure of the confidential financial and

---

[9]      5 U.S.C.§§552(b)(4),(5), (6), (7).

[10]     Defendant's Memorandum of Points and Authorities at 11-13.

commercial information in IHD case file no. EB-04-IH-0342 would impair the ability of

the FCC to fulfill its statutory mandate under the Telecommunications Act of 1996" to

oversee the E-rate program.[11]   All of these arguments are without merit.

### 1. The FCC Has Failed To Show Impairment

The FCC's argument on impairment is entitled to no weight because it is not only

inconsistent with the Enforcement Bureau's August 5, 2005 decision granting in part and

denying in part COMPTEL's FOIA request, but it is also wrong on the law.

The Enforcement Bureau's decision made no finding that disclosure of any of the

material withheld pursuant to Exemption 4 would impair the government's ability to

obtain necessary information in the future.[12]  Quite the opposite, the Enforcement Bureau

determined that AT&T's failure to produce the materials requested in the Letter of

Inquiry ("LOI") would subject AT&T to sanctions:

> [U]nder Exemption 4 commercial or financial materials that are part of
> *required* submissions are to be held confidential only when disclosure
> would either impair the government's ability to obtain necessary
> information in the future or would be likely to substantially harm the
> competitive position of the submitter.
>
> SBC's LOI responses were *required* submissions for the purpose of our
> FOIA analysis.  An LOI is an administrative order that compels the
> production of information.  Failure to respond properly to an LOI may
> subject an entity to forfeiture action.[13]

---

[11]    Defendant's Memorandum of Points and Authorities at 11.

[12]    Declaration of Judy Lancaster filed in support of Defendant's Motion for
Summary Judgment at Attachment D, page5.

[13]    *Id.* at 4-5 (emphasis in original, citations omitted).  Significantly, in support of its
statement that parties failing to properly respond to an LOI are subject to sanctions, the
Enforcement Bureau cited an Order of Forfeiture previously entered against AT&T
(formerly known as SBC Communications) itself. *Id.* at n. 22.

Because the Enforcement Bureau declined to find that the FCC's ability to obtain

necessary information in the future would be compromised by disclosure of the AT&T

information, the FCC cannot argue a contrary position before this Court.

The Enforcement Bureau's assessment that the government's ability to obtain

necessary information in the future is not a relevant consideration when a party produces

information to the government under compulsion, as AT&T did here, is consistent with

the D.C. Circuit's interpretation of Exemption 4. The D. C. Circuit has determined

repeatedly that there is no danger that public disclosure will impair the ability of the

Government to obtain information in the future where entities are *required* to provide

commercial or financial information to the government. *See e.g., National Parks and*

*Conservation Association v. Morton*, 498 F. 2d 765, 770 (D.C.Cir. 1974); *see also,*

*National Parks and Conservation Association v. Kleppe*, 547 F. 2d 673(D.C. Cir. 1976)

(where information required to be submitted by statute, government's ability to obtain

information in the future would not be impaired by disclosure); *CNA Financial*

*Corporation v. Donovan,* 830 F, 2d 1132, 1153, n. 143 (D.C. Cir. 1987) (where

submission of material to government is compulsory, it is unnecessary to determine

whether disclosure would impair the government's ability to obtain such information in

the future).

In weighing the FCC's allegations that the AT&T documents are "confidential"

commercial materials shielded from disclosure under Exemption 4, the Court must also

bear in mind that AT&T did not seek confidential treatment for the materials until the

FCC notified it of COMPTEL's FOIA request, which was not made until more than 6

months after AT&T submitted the documents to the FCC and almost four months after

the investigation into AT&T's conduct was terminated. The FCC's August 24, 2004 LOI

notifying AT&T that the Enforcement Bureau was investigating whether AT&T had

violated the FCC's universal service rules and orders explicitly warned AT&T that

requests for confidential treatment of any materials AT&T submitted to the FCC must

comply with the requirements mandated by Section 0.459 of the FCC's rules, 47 C.F.R.

§0.459, and that the Bureau would not consider confidentiality requests that did not so

comply.[14]    Despite this warning, AT&T did not ask for confidential treatment of any of

the materials at issue when they were submitted to the FCC. It made no request for

confidentiality until the investigation was terminated and the FCC alerted it to

COMPTEL's FOIA request. Even then, the Enforcement Bureau determined that

AT&T's belated request for confidentiality was deficient:

> SBC has failed to provide a statement of specific reasons for withholding its
> responses in their entirety. While generally categorizing the information
> contained in its submissions, SBC does not, as required by section 0.459(b)(3),
> explain the degree to which specific information is commercial or financial or
> contains a trade secret. Nor does it explain, as required by section 0.459(b)(5),
> how disclosure of such information could result in substantial competitive harm.[15]

There is absolutely no merit to the FCC's contention that release of the documents

would discourage other licensees from "voluntarily" reporting to the FCC internal

compliance problems and thereby hinder the FCC's ability to fulfill its statutory

directives.[16]    The FBI commenced an investigation into the misuse of E-rate funds with

respect to the New London, Connecticut school district in early 2004 and learned of the

---

[14]    Declaration of Judy Lancaster at Attachment D.

[15]    *Id.* at 4.

[16]    Defendant's Memorandum of Points and Authorities at 12-13.

involvement of AT&T employees in the scheme no later than May 2004.[17] Nonetheless, AT&T did not alert the FCC to its apparent violations of the E-rate statute and rules until August 2004.[18] If the FCC was not already aware of the possible statutory and rule violations at the time AT&T came forward in August 2004, it was only a matter of time before it would learn of those violations from a source other than AT&T, such as the FBI.

Similarly without merit is the FCC's contention that disclosure of the information "would make it difficult for the FCC to obtain reliable financial and commercial information from other telecommunications companies."[19] Section 218 of the Communications Act, 47 U.S.C. §218, authorizes the FCC to obtain from carriers such as AT&T "full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created." Indeed, the FCC itself has previously ruled that it "has statutory authority to require its regulatees to attest to the veracity and accuracy of answers to written questions that we pose during the course of an investigation into potential violations of the Act or the Commission's rules."[20] According to the FCC, the LOI warned AT&T that knowingly and willfully making any false statement or concealing any material fact in response to the inquiry was punishable by fine or imprisonment pursuant to 18 U.S.C. §1001 and 47 C.F.R. §1.17.[21] The FCC's

---

[17]    See Memorandum in Support of Government's Motion For A Downward Departure Pursuant to U.S.S.G. §5K1.1 filed at 7, filed December 12, 2006 in *U.S. v. Federowicz*, Docket No. 3:06CR222(RNC) (D.CT.), attached hereto as Exhibit A.

[18]    Declaration of Judy Lancaster at ¶5.

[19]    Defendant's Memorandum of Points and Authorities at 13.

[20]    *In the Matter of SBC Communications, Inc. Apparent Liability for Forfeiture*, 17 FCC Rcd 7589 (2002), attached hereto as Exhibit B.

[21]    Declaration of Judy Lancaster at ¶28.

power to punish its regulatees for failure to produce reliable financial and commercial information in response to an Enforcement Bureau request alleviates any concern that disclosure would result in the diminution of the reliability or quality of the information submitted. *See Washington Post Co. v. U.S. Department of Health and Human Services*, 690 F. 2d 252, 268 (D.C. Cir. 1982) (if the government can enforce the disclosure obligation and if the resultant disclosure is likely to be accurate, impairment could be prevented).

The FCC's reliance on *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 19 (D.D.C. 2000) to support its position is misplaced. In that case, the information at issue was submitted to the government in confidence to obtain a bank loan. *Id.* at 30. In contrast, AT&T did not request confidential treatment for its documents at the time they were submitted to the FCC despite the FCC's express invitation to do so. Moreover, the materials were submitted to the FCC in response to an investigative demand. For the FCC now to claim that disclosure of information that was not submitted to it in confidence, when a full opportunity to request confidentiality was presented and declined, would result in the diminution of the reliability or quality of information submitted in the future borders on the specious. In addition, it is more than a little disturbing that the FCC would suggest that if it were to enforce its own rules regarding requests for confidentiality, its ability to collect accurate information in the future would be adversely impacted. What is more likely is that future submitters will take the FCC's rules, and their obligations thereunder, more seriously.

2. **The Government Has Failed To Show Substantial Competitive Harm**

In denying AT&T's request for confidential treatment, the FCC found that AT&T had failed to explain how disclosure of any of the information "could result in substantial competitive harm."[22] Nonetheless, the FCC has redacted from responsive records AT&T's "pricing and cost data, and billing and payment dates" because it has determined on its own motion that there is a likelihood of competitive injury that would result from disclosure of this information.[23] In support of its authority to make such redactions, the FCC contends that an "agency can establish the likelihood of substantial competitive injury by demonstrating that disclosure would provide competitors with valuable insights into the company's operations, give competitors pricing advantages over the company, or unfairly advantage competitors in future business operations."[24] The FCC's purported demonstration that substantial competitive injury is likely to result from disclosure is limited to one paragraph in its Declaration:

> Pricing and cost data is among the most sensitive corporate information. Information regarding the timing of billing and payment could give competitors insights into SBC's relationships with its customers and suppliers, including whether the customers are prompt payers. Disclosure of this information would give SBC's competitors an overview of SBC's costs, pricing, schedules, and operations. Such information could enable competitors to craft offerings and proposals that would allow them to compete more effectively against SBC for similar business and/or allow competitors to woo SBC's contractors or contacts. Similarly, disclosure of SBC's invoice and discount amounts could disclose the total value of SBC's contract, which would provide competitors with crucial

---

[22]    Attachment D to Declaration of Judy Lancaster at 4.

[23]    Declaration of Judy Lancaster at ¶18.

[24]    Defendant's Memorandum of Points and Authorities at 14.

information that could be used to underbid SBC in future contract negotiations for this and similar contracts.[25]

This conclusory showing, unsupported by specific factual or evidentiary material, is insufficient to sustain the FCC's claim that the information in question is protected from disclosure by Exemption 4. As the D.C. Circuit held in *Pacific Architects and Engineers Incorporated v. The Renegotiation Board,* 505 F. 2d 383, 385 (D.C. Cir. 1974), an agency resisting disclosure must present a "detailed justification" for application of the Exemption to the specific documents in dispute. A "detailed justification" for application of Exemption 4 must include a showing of "the extent to which disclosure of the information will cause substantial harm to the competitive position of the entity from whom the information was obtained, *with specific factual or evidentiary material to support the conclusion reached.*" *Id.* (Emphasis added.) The FCC's one paragraph justification falls far short of this standard, especially after it found that AT&T itself had failed to demonstrate that disclosure would cause competitive injury.

In any event, Exemption 4 cannot be used to justify withholding of SBC pricing, invoice or discount data because that information is already in the public domain. Section 54.501(d)(3) of the FCC's rules, 47 C.F.R. §54.501(d)(3), requires service providers, such as AT&T, to make available for public inspection "rates charged to and discounts allowed for eligible schools and libraries." Records that are required to be made available for public inspection are not confidential within the meaning of Exemption 4. *CNA Financial Corporation v. Donovan*, 830. F.2d 1132, 1154 (D.C. Cir. 1987) (a claim of confidentiality cannot be made for any data in the public domain). The

---

[25]    Declaration of Judy Lancaster at ¶19.

FCC itself has held that "Exemption 4 is not available to protect information already in the public domain." *In the Matter of Liberty Cable Company, Inc.*, 11 FCC Rcd 2475 (1996), *aff'd. sub nom. Bartholdi Cable Company, Inc. v Federal Communications Commission*, 114 F.3d 274 (D.C. Cir. 1997). Thus, to the extent that any of the requested documents show the rates AT&T charged the New London Public Schools or the discounts it allowed those schools – *i.e.*, the material required to be maintained in a public inspection file -- they must be produced without redaction of the pricing or discount information.

The FCC's unsupported allegation that "information regarding the timing of billing and payment could give competitors insights into [AT&T's] relationships with its customers and suppliers, including whether the customers are prompt payers" is also somewhat misleading. At the time of the Enforcement Bureau's decision on COMPTEL's FOIA request, the FCC made available to AT&T a copy of the documents as redacted that it determined would be produced to COMPTEL.[26] According to the Declaration Defendant-Intervenor AT&T submitted in support of its Motion For Summary Judgment, the FCC redacted the "dates on which AT&T invoiced the universal service fund administrator [and] the universal service fund administrator paid the invoice."[27] The universal service fund administrator is neither a customer nor a supplier of AT&T, but rather the administrator of the federal universal service fund that funds the E-rate program.[28] Even under the FCC's theory, disclosure of this information could not

---

[26]    Declaration of Judy Lancaster at Exhibit D, p. 6.

[27]    Declaration of Ann Rotatori submitted in support of Motion For Summary Judgment of Intervenor-Defendant AT&T Inc. at ¶12.

[28]    See Defendant's Memorandum of Points and Authorities at 11, n. 8.

possibly cause substantial competitive harm to AT&T by giving competitors insights into whether AT&T's "customers" are prompt payers.

The Court must reject as absolutely without foundation the FCC's contention that disclosure of the total value of AT&T's contract to provide publicly funded E-rate services to the Connecticut public schools could cause AT&T competitive harm. [29] Although the Enforcement Bureau found that AT&T failed to "state whether any of the information for which it seeks protection is already available to the public,"[30] the FCC apparently determined on its own motion that the total value of AT&T's contract with the Connecticut school districts was not in the public domain. The Court cannot sustain the FCC's finding because the FCC has failed to cite any facts or other evidence demonstrating either that the total value of AT&T's contract was not in the public domain or that disclosure of that value would cause AT&T substantial competitive harm.

Moreover, the subject of the FCC's investigation in File No. EB-04-IH-0342 was the misuse of E-rate funds in connection with services performed for the New London, Connecticut school district. According to a criminal information brought against two former AT&T employees, AT&T served as the prime contractor for telecommunications upgrades to the New London, Hartford, New Haven and Bridgeport, Connecticut school districts. AT&T submitted to the Universal Service Administrative Company at least two types of fraudulent invoices for which it received payment: (1) invoices for work not

---

[29]    Declaration of Judy Lancaster at ¶19.

[30]    Declaration of Judy Lancaster at Exhibit D, p. 4.

performed and (2) inflated invoices for services performed by subcontractors.[31]   The

information the FCC seeks to withhold includes invoices for services and equipment that

AT&T submitted to the school district and the Universal Service Administrative

Company and that it received from suppliers.[32]   It is shocking that the FCC would claim

that disclosure of fraudulent invoices and pricing information could harm AT&T's

competitive position by enabling "competitors to craft offerings and proposals that would

allow them to compete more effectively against SBC for similar business and/or allow

competitors to woo SBC's contractors or contacts."[33]

Based on the foregoing, the Court should deny the FCC's request for summary

judgment on the Exemption 4 claim as unsubstantiated.

### B. The FCC Has Failed To Prove That Exemption 5 Shields Any Documents

FOIA Exemption 5 protects from disclosure inter-agency and intra-agency

memoranda or letters that would not be available by law to a party in litigation with the

agency. 5 U.S.C.§552(b)(5). The FCC asserts that it is withholding 237 pages of

material pursuant to Exemption 5, consisting of e-mails among FCC staff and staff

memoranda, which it alleges are deliberative and predecisional; preliminary drafts of the

consent decree and an agreement tolling the statute of limitations; and "portions of emails

discussing the draft consent decree that involve communications between between FCC

staff and [AT&T]."[34]  Such conclusory allegations of privilege do not suffice to carry the

---

[31]    *U.S. v. Brown*, Information, Docket No. 3:07-CR-00029 RNC (D. CT), attached
hereto as Exhibit C.

[32]    Defendant's Memorandum of Points and Authorities at 15.
[33]    Declaration of Judy Lancaster at ¶19.

[34]    Declaration of Judy Lancaster at ¶¶ 23-26.

government's burden of proof in defending the withholding of documents under FOIA Exemption 5.

In addition to refusing to provide a *Vaughn* index describing the documents withheld and the basis for its claim that Exemption 5 protects each document, the FCC has failed to provide even the most minimal information necessary for the Court to evaluate whether Exemption 5 is properly invoked. *Coastal States Gas Corporation v. Department of Energy*, 617 F. 2d 254 (D.C. Cir. 1980) (rejecting as insufficient to justify withholding under Exemption 5 an index that identified who wrote document, to whom it was addressed, its date and a brief description of document). For that reason, its contention that any documents have been properly withheld under Exemption 5 must be rejected and the Court should order their immediate production.

### 1. The FCC Has Failed To Show That Any Documents Withheld Are Protected By The Deliberative Process Privilege

Exemption 5 protects from disclosure only inter-agency or intra-agency records that would not be available in the discovery context – *i.e.*, documents protected by a privilege under federal law.[35] Exemption 5 must be narrowly construed in recognition of the strong policy behind FOIA that the public is entitled to know what the government is doing and why. *Coastal States Gas Corp* , 617 F. 2d at 868. In its Memorandum of Points and Authorities, the FCC presents a broad discussion of the law relating to the deliberative process privilege, but fails to explain how any of the documents withheld fit

---

[35]      *Vaughn v. Rosen*, 523 F. 2d 1136, 1143 (D.C. Cir. 1975). The three privileges generally recognized under FOIA Exemption 5 are the attorney-client privilege, the work-product privilege and the deliberative process privilege. *Coastal States* 617 F. 2d at 862. The FCC has not asserted that either the attorney-client privilege or the work-product privilege protects any of the documents from disclosure.

within that privilege.[36] The Declaration submitted in support of the FCC's Memorandum is similarly wanting and fails to identify any of the documents at issue, the author or recipient of the records, the dates of the records or a description of the records withheld. Instead, the Declaration contains only conclusory allegations that the records discuss "issues related to the [AT&T] investigation and staff memoranda dealing with these issues" that "reflect FCC staff's opinions and impressions with respect to matters concerning" the investigation, that the staff "opinions and impressions were tentative, and proposed and/or recommended certain courses of action" and are thus deliberative materials.[37] The Declaration also states that some of the records are "pre-decisional inter-agency e-mails,"[38] but does not even identify the other agency that was allegedly either the author or recipient of the e-mails.

The FCC has failed to demonstrate that any of the records have been properly withheld. *Vaughn v. Rosen*, 484 F. 2d 820 (D.C. Cir. 1975) (rejecting as inadequate to prove the applicability of an exemption an agency affidavit that did not illuminate or reveal the contents of the documents withheld, but rather set forth conclusory allegations that documents were not subject to disclosure). As the D.C. Circuit said in *Coastal States,*

> In deciding whether a document should be protected by the [deliberative process] privilege, we look to whether the document is "predecisional," whether it was generated before the adoption of an agency policy and whether the document is "deliberative" whether it reflects the give-and-take of the consultative process. The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions

---

[36]    Defendant's Memorandum of Points and Authorities at 17-20.

[37]    Declaration of Judy Lancaster at ¶24.

[38]    *Id.*

of the writer rather than the policy of the agency. Documents which are protected by the privilege are those which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position. . . . We also ask whether the document is recommendatory in nature or is a draft of what will become a final document, and whether the document is deliberative in nature, weighing the pros and cons of agency adoption of one viewpoint or another.

617 F. 2d 854, 866. This analysis is clearly dependent upon the nature of the individual documents sought to be withheld and the role they play in the administrative decision making process. *Vaughn v. Rosen,* 523 F. 2d at 1144 ("pre-decisional materials are not exempt merely because they are pre-decisional; they must also be a part of the agency give-and-take – of the deliberative process – by which the decision itself is made").

The FCC has consciously chosen not to provide any description of the documents withheld. This deliberate omission makes it impossible for the Court to determine that any of the documents withheld possess any of the characteristics protected by the deliberative process privilege and mandates denial of the FCC's Motion For Summary Judgment that any documents are properly withheld under Exemption 5. *See Safecard Services, Inc. v. Securities and Exchange Commission*, 926 F. 2d 1197, 1204 (D.C. Cir. 1991) (in order to justify withholding records, the agency is required to describe both the contents of each of the withheld documents and enough about their context to establish that Exemption 5 applies); *Bristol-Myers Co. v. Federal Trade Commission*, 424 F.2d 935, 938-939 (D.C. Cir. 1970) (prior to ruling on the applicability of an exemption, the court must determine the validity and extent of the claim and insure that the exemption is strictly construed, which necessarily involves evaluation of the content and status of the documents the agency seeks to withhold). In addition, the Court should order the FCC to produce all documents withheld pursuant to the deliberative process privilege due to its

failure to meet its burden of proof. *Coastal States,* 617 F.2d at 869-870 (affirming

district court's decision ordering release of documents where government failed to meet

its burden of establishing that documents were properly withheld under Exemption 5).

### 2. There Is No Settlement Privilege Under Federal Law

Citing one of its own decisions and a Sixth Circuit case, the FCC contends that

"portions of e-mails discussing the draft consent decree that involve communications

between FCC staff and SBC are properly withheld under the settlement privilege

embraced by Exemption 5."[39] The FCC is wrong. While a minority of federal courts

have recognized a settlement privilege, this Court has repeatedly rejected the argument

that any such settlement privilege is embraced by Exemption 5. In the *Center for Auto

Safety v. Department of Justice*, 576 F. Supp. 739 (D.D.C. 1983), *vacated in part on

other grounds*, 1983 U.S.Dist.Lexis 15611 (D.D.C. 1983), the court found that there was

no clear Congressional intent to include a settlement privilege in Exemption 5. It ordered

the disclosure of communications between Department of Justice staff and Consent

Decree defendants relating to drafts of the Consent Decree, memoranda relating thereto,

and agency employee comments thereon discussing the mental impressions and views of

various agency personnel. The court determined that any protection these documents

would have enjoyed under Exemption 5 was lost when the documents were shown to the

Consent Decree defendants during settlement negotiations. *Id.* at 746-749. *See also*,

*NAACP Legal Defense and Educational Fund, Inc. v. U.S. Department of Justice*, 612 F.

Supp. 1143 (D.D.C. 1985) (rejecting government's assertion that FOIA Exemption 5

embraces a settlement privilege); *Philadelphia Newspapers, Inc. v. Department of Health*

---

[39]     Defendant's Memorandum of Points and Authorities at 20.

*and Human Services,* 69 F. Supp. 2d 63 (D.D.C. 1999) (agency documents shared with targets of investigation during settlement negotiations may not be withheld under Exemption 5); *In re Subpoena Issued To Commodity Futures Trading Commission,* 370 F. Supp. 2d 201 (D.D.C. 2005) (holding that there is no settlement privilege recognized in federal court).

The FCC's withholding of documents that were shared with AT&T during negotiation of the terms of the consent decree or the agreement tolling the statute of limitations is patently improper. The FCC's claim that "[t]hese records reveal FCC's staff's deliberative process and the time line of that process,"[40] and are therefore exempt from disclosure is entitled to no consideration. Even if the records were predecisional at the time they were prepared, they lose that status if they are used by the agency in its dealings with the public. *Center for Auto Safety*, 576 F. Supp. at 746, citing *Coastal States,* 6417 F. 2d at 866. By its own admission, the FCC used these documents in its settlement dealings with AT&T. That use forfeited any protection for the documents under Exemption 5. Because this Court and many other federal courts have determined that there is no "settlement privilege" embraced by Exemption 5, the FCC must be ordered to produce these records without further delay.

### 3. Communications With USAC Are Not Exempt From Disclosure

The FCC contends in its Memorandum of Points and Authorities that communications with USAC, the administrator of the Universal Service Fund, have been withheld as intra-agency communications.[41] This contention also must be rejected. As

---

[40]    Declaration of Judy Lancaster at ¶26.

[41]    Defendant's Memorandum of Points and Authorities at 20, n.10.

an initial matter, the Declaration submitted in support of the FCC's Memorandum of Points and Authorities does not mention that communications with USAC are among the documents withheld. Instead, the Declaration characterizes all material withheld pursuant to the deliberative process privilege as communications among FCC staff.[42] This conflict illustrates yet again how incomplete and insufficient the FCC's showing is. By declining to identify the documents withheld, their authors and recipients, their subject matter and the justification for the application of Exemption 5, the FCC has made it impossible for the Court to accept any of its allegations that the documents are protected from disclosure.

In any event, to qualify for the deliberative process privilege, a document must in the first instance be an inter-agency or intra-agency communication. Communications with USAC are neither. The term agency "includes any executive department, military department, Government corporation, Government controlled corporation or other establishment in the executive branch of the government . . ., or any independent regulatory agency." 5 U.S.C. §552(f). USAC is not a government agency, government corporation or government controlled corporation. It is an independent, not-for-profit corporation that serves as the administrator of the federal universal service fund.[43]

The FCC suggests that communications with USAC are protected under Exemption 5 as intra-agency communications because USAC serves as an outside

---

[42]     Declaration of Judy Lancaster at 24-25.

[43]     See http://www.usac.org/about

consultant to the FCC.[44]  Accepting, *arguendo*, that communications with or documents

prepared by outside consultants may in some circumstances qualify as intra-agency

communications subject to Exemption 5 protection, the FCC has not shown that such

circumstances exist here.  The point of the Exemption is "not to protect Government

secrecy pure and simple," *Department of the Interior and Bureau of Indian Affairs v.*

*Klamath Water Users Protective Association*, 532 U.S. 1, 9 (2001), but rather to

encourage the free exchange of ideas during the process of deliberation and policy-

making.  The deliberative process privilege covers only documents reflecting advisory

opinions, recommendations and deliberations comprising part of a process by which

governmental decisions and policies are formulated.  *Id.*  Communications with outside

consultants have been deemed part of a government agency's deliberative process only

where they played the same role in an agency's deliberations as documents prepared by

agency personnel might have done.  532 U.S. at 10-11.  The FCC has not even alleged,

much less proven, that any of the communications with USAC that it has withheld reflect

advisory opinions, recommendations or deliberations comprising part of the process by

which the FCC formulated its decision or policies in the resolution of its investigation of

AT&T or that they played any role at all.  Having failed to show that any

communications with USAC may properly be withheld under Exemption 5, the FCC

should be directed to produce these documents without further delay.

---

[44]     Defendant's Memorandum of Points and Authorities at n. 10

C.    **Exemptions 6 and 7**

COMPTEL does not object to the FCC's redaction of the names and other identifying information of individuals identified in AT&T's submissions to the FCC.[45]  In its June 28, 2005 letter to the FCC responding to AT&T's belated request for confidential treatment of its submissions, COMPTEL clearly stated that "[t]o the extent any of the responsive documents contain the names, telephone numbers, email addresses and physical addresses" of AT&T employees, COMPTEL had no objection to the redaction of such information before the documents were released.[46]

## CONCLUSION

For the foregoing reasons, the Court should deny the FCC's Motion For Summary Judgment, find that the FCC has improperly withheld agency records in violation of FOIA, and issue an order directing the FCC to produce to COMPTEL all documents in FCC File No. EB-04-IH-0342 (with redaction of the names and other identifying information of individuals identified in AT&T's submissions to the FCC) without further delay.

April 13, 2007                                    Respectfully submitted,

                                                  Mary C. Albert

                                                  Mary C. Albert, DC Bar #347617
                                                  Jonathan D. Lee, D/C/ Bar #435586
                                                  COMPTEL
                                                  900 17th Street N.W., Suite 400
                                                  Washington, D.C. 20006
                                                  (202) 296-6650
                                                  malbert@comptel.org
                                                  jlee@comptel.org

---

[45]    Defendant's Memorandum of Points and Authorities at 24.

[46]    *Id.* at 25 and Attachment C to the Declaration of Judy Davenport at 2.

# Exhibit A

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **DOCKET NO. 3:06CR222(RNC)** |
| | : | |
| -vs- | : | |
| | : | |
| SCOTT A. FEDEROWICZ | : | **DECEMBER 12, 2006** |

MEMORANDUM IN SUPPORT OF
GOVERNMENT'S MOTION FOR A DOWNWARD DEPARTURE
PURSUANT TO U.S.S.G. §5K1.1

This memorandum is submitted in support of the Government's Motion for a Downward

Departure filed herewith. Pursuant to U.S.S.G. § 5K1.1, the Government's motion, if granted,

allows the Court to impose a sentence of imprisonment below Scott A. Federowicz's applicable

guideline range because he has provided substantial assistance to the Government in the

investigation of other persons who have committed criminal offenses. Sentencing is scheduled

for December 18, 2006.

### I.  Summary of Facts and Procedural History

The E-Rate program (the "Program"), which was created by the United States Congress

in the Telecommunications Act of 1996, operates under the auspices of the Federal

Communications Commission ("FCC"). The Program has 2 priorities. Under Priority 1, the

costs for telephone and internet services of qualified school districts are subsidized. Under

Priority 2, the costs of upgrading internet access for qualified school districts are subsidized.

The Program is funded from FCC mandated surcharges by telecommunication companies

throughout the country to the monthly bills of their customers. The FCC designated Universal

Services Administrative Company ("USAC"), a nonprofit corporation, to administer the

Program, including collecting the telecommunication company surcharges, and distributing
Priority 1 and Priority 2 moneys through USAC's Schools and Libraries Division ("SLD").

The E-Rate program was designed to ensure that the neediest school districts nationwide
receive the most financial assistance. All participating school districts are required to fund a
percentage of the cost of the equipment and services acquired under the Program (hereinafter
referred to as "copay"). The amount of the copay is based on the number of students in the
district qualifying for the United States Department of Agriculture's school lunch program, with
the neediest school districts eligible for the highest percentage of funding. However, even the
neediest schools are required to fund at least 10% of the cost of the acquired equipment and
services.

A school district seeking Priority 2 funding first is required to select a contractor to
perform the necessary telecommunication upgrades. In selecting a contractor, a school district is
required to follow state and local procurement regulations. Once a contractor is selected, a
school district applies to SLD for the funding needed to pay for the internet upgrades.
Southwestern Bell Communications ("SBC")/Southern New England Telephone Company
("SNET") was selected as the prime contractor to the FCC/USAC for Priority 2 funded
telecommunication upgrades to the Hartford, New London, New Haven and Bridgeport,
Connecticut school districts.

John Doe I and John Doe II, who as yet have not been charged, were account managers
for SBC. After SBC was selected as the prime contractor to perform Program funded upgrades
for a school district, John Doe I and John Doe II were responsible for customer relations. In
addition, John Doe I and John Doe II participated in the selection of subcontractors to perform

the telecommunication upgrades for the school district, and they were consulted on the progress of the upgrades before payment on the subcontractor invoices was made by SBC/SNET. After subcontractor charges were paid by SBC/SNET, the charges periodically would be invoiced by SBC to the FCC/USAC for reimbursement from Program funds.

American Networks International, Inc. ("ANI"), Bristol, Connecticut, a company that installs telecommunication wiring, was a first-tier subcontractor to SBC. Scott A. Federowicz was ANI's project manger. His duties included soliciting business for ANI, hiring second tier subcontractors, and approving invoices submitted by second tier subcontractors for payment. As the person responsible for soliciting business, Federowicz felt pressure by ANI management to obtain new subcontracts.

In the autumn of 2002, John Doe I and John Doe II approached Federowicz with a proposition. They promised to influence the award to ANI of approximately $2 million worth of subcontracts if Federowicz would approve for payment invoices submitted by a company called MRB, which technically was owned by the father-in-law of John Doe I, but which actually was the creation of John Doe I. MRB maintained a checking account, but otherwise existed in name only.

Federowicz agreed. Before submitting a quote on a phase of a Program funded project to SBC, John Doe I or John Doe II would instruct Federowicz to increase the quote by a specific amount. Thereafter, MRB invoices for work purportedly performed on the project were submitted to ANI in amounts totaling the amount by which Federowicz had raised the ANI quote to SBC, and the majority of those invoices were approved for payment by Federowicz. From December 2002 through February, MRB submitted thirteen invoices totaling $457,703 to ANI.

-3-

Federowicz approved for payment invoices totaling $352,066, and MRB was paid that amount by ANI. The money was shared, although not equally, by John Doe I and John Doe II.

In July 2003, John Doe II established Responsive Communications Services, Inc. ("RCS"). RCS, like MRB, maintained a checking account, but otherwise it too existed in name only. The scheme proceeded as before except that, beginning in 2003, RCS began submitting the fraudulent invoices. From October 2003 through December 2003, RCS submitted three invoices to ANI totaling $100,1237, which were approved for payment by Federowicz and paid to RCS by ANI. The money was shared between John Doe I and John Doe II.

Federowicz entered into the scheme with John Doe I and John Doe II to secure business for ANI. Subsequently, however, he requested payment for his assistance. John Doe I and John Doe II gave him $16,917.

MRB and RCS were paid $452,203 by ANI. ANI was reimbursed by SBC, which, in turn, billed that amount to and was reimbursed by USAC, resulting in a loss to the Program of $452,203.

In addition to the Program scheme, Federowicz also devised a plan to defraud ANI. From November 2002 through October 2003, he ordered laptop computers from two Connecticut businesses for which ANI paid $624,106. He directed the vendors to disguise the fact that they were selling laptop computers to ANI on their invoices by describing the products being sold as "network equipment" or by simply listing a computer part number followed by the phrase "built to customer plans and specs." Federowicz recruited a subordinate at ANI, David Dauphinais, to assist him by receiving the computers from the two vendors, and delivering them to someone to sell for $500 each. Dauphinais did as he was requested. He picked up the computers and

-4-

delivered the majority of them to a friend who sold them, as directed, giving the money to Dauphinais, who then gave it to Federowicz.

Approximately 25% of the computers were kept by Federowicz and sold by him to family and friends. It is not possible to determine how much of the money from the sale of the computers given by Dauphinais to Federowicz was kept by him and how much he returned to Dauphinais.

On February 13, 2006 David Dauphinais waived indictment and pleaded guilty to an information charging one count of making a false statement to the Federal Bureau of Investigation ("FBI") concerning his involvement in the scheme to defraud ANI.

On July 28, 2006, Scott Federowicz waived indictment and pleaded guilty to one count each of causing the use of the mail in furtherance of a scheme to defraud the Program and a scheme to defraud ANI.

### II. The Defendant's Statutory and Guideline Exposure

Based upon his pleas of guilty to two counts of mail fraud the defendant faces penalties of 20 years imprisonment and a $250,000 fine on each count, and three years supervised release and a $100,000 special assessment on each count.

The defendant's Sentencing Guidelines, as calculated in the Presentence Report, provide for a guideline range of 33 - 41 months imprisonment (Total Offense Level 20 pursuant to U.S.S.G. §§ 2B1.1 and 3D1.2 and Criminal History Category I), and a fine of $7,500 to $75,000 pursuant to U.S.S.G. § 5E1.2(c)(3).

### III. Discussion

Section 5K1.1 of the Sentencing Guidelines permits the Court to impose a sentence of

imprisonment below a defendant's applicable Sentencing Guideline range "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. The decision to move for a downward departure rests exclusively with the Government. 18 U.S.C. § 3553(e); U.S.S.G. § 5K1.1; United States v. Garcia, 926 F.2d 125, 128 (2d Cir. 1991)(the decision "to make a § 5K1.1 motion is 'expressly lodged in the prosecutor's discretion'")(quoting United States v. Rexach, 896 F.2d 710, 714 (2d Cir. 1990)); United States v. Huerta, 878 F.2d 89, 92 (2d Cir. 1989). The Court in Huerta observed that the question of "substantial assistance" is "self-evidently a question that the prosecution is uniquely fit to resolve." Id.

The Sentencing Guidelines provide that the appropriate reduction shall be determined by the court based upon, but not limited to, the following considerations:

(1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)    the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)    the nature and extent of the defendant's assistance;

(4)    any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5)    the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Application Note 3 to the commentary of Section 5K1.1 provides that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain."

The purpose of this memorandum is to provide the Court with relevant information to facilitate the Court's evaluation of the defendant's cooperation in view of the above-enumerated considerations.

### A. Nature and Extent of the Defendant's Assistance.

In early 2004, the FBI began its investigation into the defrauding of the Program and the defrauding of ANI. On May 13, 2004, agents approached Scott Federowicz concerning his involvement in each. During that interview, he readily admitted his involvement in the scheme to defraud the Program, and described the involvement of the two by then former SBC employees. In addition, he agreed to record conversations with any potential targets of the investigation as directed by the FBI.

Federowicz recorded a total of six conversations. One was a face-to-face conversation among himself, John Doe I and John Doe II. He also recorded three telephone conversations with John Doe I and two telephone conversations with John Doe II. Federowicz made himself available to elaborate on facts concerning the defrauding of the Program and ANI, and he provided information about another unrelated investigation being conducted by the FBI of which he had knowledge. He also agreed to testify before a grand jury and at trial if called upon to do so. In addition, he readily admitted defrauding ANI by ordering laptop computers and selling and causing them to be sold from which he benefitted financially.

### B. Significance of the Defendant's Assistance

It is anticipated that John Doe I and John Doe II will waive indictment and plead guilty, by the end of December 2006, to defrauding the Program. The recorded conversations provided information which was used by the FBI in obtaining a warrant for the search of John Doe II's

residence. During the search, the FBI confronted John Doe II with the recordings Federowicz had made. The recorded conversations contributed substantially to John Doe II then confessing his involvement in the scheme to defraud the Program, and agreeing to cooperate against John Doe I as well as against other SBC subcontractors who had defrauded the Program.

In addition, Federowicz provided information about David Dauphinais. During the investigation of the fraud involving the laptop computers that Federowicz had ordered through ANI, the FBI interviewed Dauphinais and asked him to name of the person to whom the computers had been delivered for sale. Dauphinais told the interviewing agents that he could not recall the person's name. During the same interview in which Federowicz admitted his role in defrauding the Program, he named the person who sold the computers and described him as a friend of David Dauphinais. That directly resulted in Dauphinais' decision to waive indictment and to plead guilty to a violation of 18 U.S.C. § 1001.

In the Government's view, Scott Federowicz provided substantial assistance in the prosecution of David Dauphinais and in the anticipated prosecutions of John Doe I and John Doe II.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


_/s/_____
CALVIN B. KURIMAI
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. 07223
157 Church Street
NEW HAVEN, CT 06510
Tel: (203) 821-3793
Fax: (203) 773-5373
E-mail: CALVIN.KURIMAI@USDOJ.GOV

**CERTIFICATE OF SERVICE**

-8-

I hereby certify that on December 12, 2006, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


        /s/
    CALVIN B. KURIMAI
    ASSISTANT UNITED STATES ATTORNEY

# Exhibit B

Federal Communications Commission                    FCC 02-112

Before the
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | File No. EB-01-IH-0642 |
| | ) | |
| SBC Communications, Inc. | ) | NAL/Acct. No. 20023208001 |
| | ) | |
| Apparent Liability for Forfeiture | ) | FRN Nos. 0004-3051-24 |
| | ) | 0004-3335-71 |
| | ) | 0005-1937-01 |

**FORFEITURE ORDER**

**Adopted:** April 9, 2002            **Released:** April 15, 2002

By the Commission:[1]

## I.    INTRODUCTION

1.    In this Forfeiture Order, we find that SBC Communications, Inc. ("SBC") violated an Enforcement Bureau ("Bureau") order requiring SBC to provide sworn verification of the truth and accuracy of answers to a letter of inquiry ("LOI") that the Bureau issued pursuant to authority provided by the Communications Act of 1934, as amended ("Act").[2]  Based on the facts and circumstances before us and after considering SBC's response to the Bureau's Notice of Apparent Liability ("NAL") in this matter, we conclude that SBC is liable for a forfeiture of one hundred thousand dollars ($100,000), the amount the Bureau proposed in the NAL.

## II.    FACTS

2.    As described more fully in the NAL,[3] on October 1, 2001, the Enforcement Bureau sent SBC an LOI directing SBC to provide answers to several questions regarding possible discrimination by SBC in its provisioning and maintenance of digital subscriber line

---

[1]    We note that the Enforcement Bureau issued the Notice of Apparent Liability in this case under its delegated authority, but has now referred the matter to the Commission given the significance of the challenge to the Commission's authority.  47 C.F.R. § 0.5(c) ("the staff is at liberty to refer any matter at any stage to the Commission for action, upon concluding that it involves matters warranting the Commission's consideration").

[2]    47 U.S.C. §§ 218, 403, 154(i), 154(j).

[3]    *SBC Communications, Inc.*, Notice of Apparent Liability for Forfeiture, 16 FCC Rcd 19370 (2001) ("NAL").

("DSL") technology and possible misrepresentations by SBC to the Bureau.[4]  The Bureau further directed SBC to verify the veracity of its answers by providing a sworn statement attesting to the truth and accuracy of the responses.[5]  SBC did not object to or challenge the Bureau's order in any manner.  Instead, on October 22, 2001, SBC submitted a response to the LOI that addressed the questions but omitted the requisite sworn statement.[6]  SBC did not identify this omission to the Bureau.

3.        Soon after receiving SBC's response to the LOI, Enforcement Bureau staff discovered the omission and contacted the company to determine the reason for the noncompliance and to provide the company with an opportunity to correct it.  SBC, however, disclosed to Bureau staff that it had intentionally refused to provide the sworn statement and that it did not intend to comply with that aspect of the Bureau's order.[7]  The Bureau informed the company that SBC was in violation of the order.[8]  On November 2, 2001, SBC had still not provided the sworn statement, and the Bureau issued the NAL proposing a forfeiture of $100,000 and again directing SBC to provide a sworn statement.  As with the Bureau's original direction to provide a sworn statement, SBC did not request that the Bureau or the Commission stay the portion of the NAL directing it again to provide a sworn statement.  On November 7, 2001, SBC provided the sworn statement, noting that it did so "under protest."[9]  On December 3, 2001, SBC

---

[4]        *See* Oct. 1, 2001 Letter from Charles W. Kelley, Chief, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission to Sandra L. Wagner, Vice President – Federal Regulatory, SBC Telecommunications, Inc. ("LOI").

[5]        *Id.*

[6]        *See* Oct. 22, 2001 Letter from William A. Brown, Senior Counsel, SBC Telecommunications, Inc. to Elizabeth H. Valinoti, Attorney, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission ("LOI Response").

[7]        *See* Dec. 3, 2001 Response of SBC Communications, Inc. to Notice of Apparent Liability for Forfeiture ("NAL Response"), Attachment F, "Affidavit of Caryn D. Moir" at ¶ 6.  As it turns out, this instance was not the first in which SBC violated a Bureau directive to submit a sworn written response to a Bureau inquiry.  In at least two other Bureau investigations, both of which involved possible misrepresentations by SBC, SBC ignored a Bureau directive that the company submit a sworn written response to a Bureau LOI without identifying the omission to the Bureau and without offering any explanation – legal or otherwise – for its omission.  *Compare* Letter from David H. Solomon, Chief, Federal Communications Commission Enforcement Bureau to Sandra L. Wagner, Vice-President, Federal Regulatory, SBC Telecommunications, Inc., dated July 26, 2001 (LOI directing a "sworn written response") ("July 26, 2001 LOI") *with* Letter from Reid M. Figel, counsel to SBC Communications, Inc. to David H. Solomon, Chief, Federal Communications Commission Enforcement Bureau dated Sept. 7, 2001 (unsworn written response to July 26, 2001 LOI).  *Compare* Letter from Bradford M. Berry, Deputy Chief, Federal Communications Commission Enforcement Bureau to Sandra L. Wagner, Vice-President, Federal Regulatory, SBC Telecommunications, Inc., dated Sept. 14, 2001 (LOI directing a "sworn written response") ("Sept. 14, 2001 LOI") *with* Letter from Reid M. Figel, counsel for SBC Communications, Inc., to Trent Harkrader, Federal Communications Commission Enforcement Bureau dated Sept. 19, 2001 (unsworn written response to Sept. 14, 2001 LOI).

[8]        *See* NAL Response at 5; *see also* NAL Response, Attachment F, "Affidavit of Caryn D. Moir" at ¶ 6.

[9]        In response to the NAL's order that SBC "submit, not later than November 7, 2001, a sworn written response to the Bureau's LOI," NAL at 5, SBC filed an affidavit signed by an officer of the company attesting that the information submitted in response to the Bureau's October 1, 2001 LOI was "true and correct to the best of [the officer's] knowledge."  *See* "Verification to Letter of Inquiry, File No. EB-00-IH-0282" signed by John S. (continued ....)

filed its response to the NAL.[10]

## III. DISCUSSION

4.    Under section 503(b) of the Act, "[a]ny person who is determined by the Commission to have . . . willfully or repeatedly failed to comply with . . . any order issued by the Commission under this Act" shall be liable for a forfeiture penalty.[11]  In order to impose such a forfeiture, the Commission must issue a notice of apparent liability, the notice must be received, and the person against whom the notice has been issued must have an opportunity to show, in writing, why no such forfeiture penalty should be imposed.[12]  The Commission will then issue a forfeiture order if it finds by a preponderance of the evidence that the person has violated the relevant order.[13]  As set forth in detail below, we conclude that, based on this standard, SBC is subject to forfeiture.

5.    The issue presented here is whether SBC violated the Bureau's directive that SBC provide sworn verification of the accuracy and truthfulness of its answers to the Commission's written inquiries.  SBC argues that the Commission has no authority to require it to submit an attestation in the circumstances presented here.  But the order at issue here was squarely within the Commission's authority and, in any event, parties are required to comply with Commission orders even if they believe them to be outside the Commission's authority.  Therefore, based upon our review of the NAL, of SBC's response thereto, and of the record in this matter, we find that SBC willfully violated a Commission order.[14]

---

(Continued from previous page) ——————————————————

Habeeb, Director – Regulatory, SBC Advance Services, Inc., attached to Nov. 7, 2001 Letter from Caryn D. Moir, Vice President – Federal Regulatory, SBC Telecommunications, Inc. to Elizabeth H. Valinoti, Attorney, Investigations and Hearings Division, Enforcement Bureau, Federal Communications Commission ("SBC's Nov. 7, 2001 Letter").  SBC submitted this affidavit "under protest and without prejudice to its contention that the Enforcement Bureau has no authority either to compel sworn testimony absent a subpoena or to attach additional costs to SBC for seeking review of a contested point of law."  *See* SBC's Nov. 7, 2001 Letter at 2.

[10]    *See* NAL Response.

[11]    47 U.S.C. § 503(b); 47 C.F.R. § 1.80(a).

[12]    47 U.S.C. § 503(b); 47 C.F.R. § 1.80(f).

[13]    *See, e.g., Tuscola Broadcasting Co.*, Memorandum Opinion and Order, 76 FCC 2d 367, 371 (1980) (applying preponderance of the evidence standard in reviewing Bureau level forfeiture order)  *Cf.* 47 U.S.C. § 312(d) (assigning burden of proof in hearings to Commission).

[14]    Under the Communications Act, a party "willfully" violates the Communications Act or a Commission rule or order when it knows it is taking the action in question, irrespective of any intent to violate the Commission's rules.  *See* 47 U.S.C. § 312(f); *Southern California Broadcasting Co., Licensee, Radio Station KIEV(AM) Glendale, California,* Memorandum Opinion and Order, 6 FCC Rcd 4387, 4387-88, ¶ 5 (1991) (citing legislative history that definition of willful in section 312(f) applies to section 503(b)); *Liability of Hale Broadcasting Corp., Licensee of Radio Station WMTS Murfreesboro, Tennessee,* Memorandum Opinion and Order, 79 FCC 2d 169, 171, ¶ 5 (1980).

### A.    Congress Authorized The Commission To Require Regulated Entities To Provide Sworn Statements Verifying The Truth And Accuracy Of Information Submitted During A Commission Investigation. [15]

6.    The Commission has statutory authority to require its regulatees to attest to the veracity and accuracy of answers to written questions that we pose during the course of an investigation into potential violations of the Act or Commission rules. In sections 4(i), 4(j), 218, 403, and 208 of the Act, Congress afforded us with broad authority to investigate regulated entities.[16] This broad investigative authority in these sections individually and collectively encompasses the authority to obtain from carriers information supported by attestations to ensure that the information is accurate and truthful.

7.    Section 218 of the Act authorizes us to "obtain from . . . carriers . . . full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created."[17] This provision plainly grants us broad investigative power. SBC's argument that section 218 does not speak to the means by which we may obtain information is misplaced.[18] As we will explain more fully below, in many cases information supported by attestation is "information necessary" to enable us to perform our enforcement function.[19] Therefore, section 218's broad grant of authority covers our action here.

8.    Section 403 also gives the Commission broad authority to "make and enforce orders" relating to the matter under investigation.[20] Moreover, it gives the Commission the same

---

[15]    The Commission has delegated to the Enforcement Bureau broad authority to serve as "the primary Commission entity responsible for enforcement of the Communications Act and other communications statutes, the Commission's rules, Commission orders and Commission authorizations." 47 C.F.R. §§ 0.111(a), 0.311. This delegated authority expressly includes the authority to "[i]ssue or draft orders taking or recommending appropriate action in response to complaints or investigations," and to "issue . . . appropriate interlocutory orders and take appropriate action in the exercise of its responsibilities." 47 C.F.R. § 0.111(a)(14). Where this Forfeiture Order speaks to Commission authority, therefore, it also applies to the delegated authority of the Enforcement Bureau.

[16]    47 U.S.C. §§ 154(i), 154(j), 208, 218, 403. *See also* 47 U.S.C. §308(b) (authority to investigate radio licensees and applicants).

[17]    47 U.S.C. § 218. "The Commission may inquire into the management of the business of all carriers subject to this Act. . . . The Commission may obtain from such carriers, and from persons directly or indirectly controlling or controlled by, or under direct or indirect common control with, such carriers full and complete information necessary to perform the duties and carry out the objects for which it was created." *Id.*

[18]    NAL Response at 18.

[19]    *See infra* ¶ 10.

[20]    47 U.S.C. § 403.

> The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any

(continued . . . )

4

"powers and authority" in conducting an investigation that it would have when investigating a section 208 complaint.[21] In this regard, section 208 says the Commission can investigate such matters "in such manner and such means as it shall deem proper."[22]

9.    The broad authority in sections 4(i) and 4(j) for the Commission to "issue such orders . . . as may be necessary in the execution of its functions" and to "conduct its proceedings in such manner as will best conduce the proper dispatch of business and to the ends of justice" further supports our authority to require attestations.[23] It is well established that sections 4(i) and 4(j) afford us broad general authority and power,[24] and the Bureau's action here falls comfortably within the scope of that authority as well.

10.    We are not persuaded by SBC's argument that sworn verification here was not "necessary" and thus was outside the scope of our authority under section 4(i).[25] When the Commission conducts an investigation, the subject of the investigation may be the exclusive source of information on which the Commission must ultimately rely to determine the subject's compliance. In these situations, the willingness of the subject to attest to the truth and accuracy of the information can be critical. This type of attestation takes on even greater significance when, as in this case, a core question at issue is whether a carrier has engaged in misrepresentation to the Commission.[26] As we have said in another context, we afford greater

(Continued from previous page) ─────────────────────

> provision of this Act, or concerning which any question may arise under any of
> the provisions of this Act, or relating to the enforcement of any of the provisions
> of this Act. The Commission shall have the same powers and authority to
> proceed with any inquiry instituted on its own motion as though it had been
> appealed to by complaint or petition under any of the provisions of this Act,
> including the power to make and enforce any order or orders in the case, or
> relating to the matter or thing concerning which the inquiry is had, excepting
> orders for the payment of money. *Id.*

[21]    *Id.*

[22]    47 U.S.C. § 208(a). "If such carrier or carriers [in response to a complaint] shall not satisfy the complaint within the time specified or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper." *Id*

[23]    "The Commission may perform any and all such acts,  . . and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). "The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j).

[24]    *See, e.g., U.S. v. Southwestern Cable Co.*, 392 U.S. 157 (1968). "Congress declined to 'stereotyp(e) the powers of the Commission to specific details.'" *Id.* at 180 (quoting *NBC v. U.S.*, 319 U.S. 190, 219 (1943)) "Thus, the Commission has been explicitly authorized to issue 'such orders, not inconsistent with this (Act), as may be necessary in the execution of its functions.'" *Id.* (citing section 4(i) of the Communications Act, 47 U.S.C. § 154(i)). *See also FCC v. Schreiber*, 381 U.S. 279, 289 (1965) (section 4(j) "delegates broad discretion" to the Commission to, *inter alia*, "make ad hoc procedural rulings in specific cases "); *Mobile Communications Corp of America v. FCC*, 77 F.3d 1399, 1404 (D.C. Cir. 1990) (and cases cited therein).

[25]    *See* NAL Response at 16.

[26]    *See* NAL 19371 at ¶ 4, 19373 at ¶ 10.

weight to comments and pleadings supported by affidavits or sworn statements than to unsupported contrary pleadings.[27]  Indeed, a party's failure to submit such an attestation in the context of an investigation has led to a higher forfeiture amount for the underlying substantive violation.[28]  These types of verifications can be necessary to the Commission's investigative function,[29] and the requirement of such verification here falls squarely within the category of acts and orders envisioned as necessary under section 4(i).[30]

11.    SBC protests that the requirement that it attest to the veracity of responses to the Bureau's questions is not a "question of procedure" that properly falls within section 4(j).[31]  But this requirement is precisely a procedural means by which the Commission obtains the substantive response it seeks, i.e., answers that bear a unique imprimatur of reliability.  Indeed, this type of requirement is a standard and fundamental procedural tool in the context of both Commission formal complaint proceedings and in civil litigation generally.  As noted above, section 208 of the Act (which is incorporated here through section 403), states that it is the "duty" of the Commission to investigate "in such manner and by such means as it shall deem proper."[32]  Our rules implementing section 208 state that the Commission "may require parties [to a complaint proceeding] to submit any additional information it deems appropriate for a full, fair, and expeditious resolution of the proceeding, *including affidavits and exhibits,*"[33] and they require that interrogatories in complaint proceedings "are to be answered . . . in writing *under oath or affirmation.*"[34]  Similarly, the Federal Rules of Civil Procedure require that parties must provide answers to interrogatories under oath.[35]  The attestation requirement is identical in

---

[27]      *See Application of Ameritech Michigan Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In-Region, InterLATA Services in Michigan*, CC Docket No. 97-137, Memorandum Opinion and Order, 12 FCC Rcd 20543, 20569 (1997).

[28]      *See, e.g., Sound Broadcasting Corp.*, Notice of Apparent Liability for Forfeiture, 7 FCC Rcd 3378, 3379 (Mass Media Bureau 1992) (noting that a forfeiture in the "full amount . . . allowed by law" was to be imposed because the company's reply "included only non-notarized statements . . . although [the Mass Media Bureau] had requested notarized affidavits").

[29]      The fact that 18 U.S.C. § 1001 and 47 C.F.R. § 1.17 require SBC to tell the truth does not, as SBC suggests, render an attestation superfluous.  *See* NAL Response at 16, 28.  Requiring submission of an attestation may elicit a higher level of care and attention than the level that answers unaccompanied by verification may prompt.  Attestations can be necessary to attain the level of reliability that we require to enforce the Act and our orders and rules.  Moreover, to the extent that, as SBC suggests, the standards of accuracy, reliability, and accountability elicited by sections 1001 and 1.17 are truly indistinguishable from those the company must meet when we require it to attest to the accuracy and veracity of written responses, the basis for SBC's objection to such an attestation is unclear.

[30]      Similarly, as we have noted above, information supported by sworn verification may be "necessary" for purposes of 47 U.S.C. § 218.  See supra ¶ 7.

[31]      *See* NAL Response at 16 (citing *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138 (1940)).

[32]      47 U.S.C. § 208(a).

[33]      47 C.F.R. § 1.732(g) (emphasis added).

[34]      47 C.F.R. § 1.729(e) (emphasis added).

[35]      Fed. R. Civ. Pro. 33(b)(1).

function and purpose to these other requirements. Thus, section 4(j) also provides authority for the Bureau's order.

12.    In sum, we find that the Bureau was well within its statutory authority in requiring SBC to provide a sworn written verification of the truth and accuracy of its responses to the LOI. In defying that directive, SBC willfully violated a Commission order.

### B.    The Commission's Subpoena Power Is Not Relevant To This Case.

13.    In section 409 of the Act, Congress afforded the Commission with subpoena power to compel "the *attendance and testimony of witnesses* and the *production* of all books, papers, schedules of charges, contracts, agreements, and documents relating to any matter under investigation."[36]  SBC's primary argument in defense of its defiance of the Bureau's order is that the Commission may only require carriers to attest to the veracity of their LOI responses pursuant to this section 409 subpoena power and all of its accompanying statutory and constitutional procedures and protections. Even assuming, *arguendo*, that section 409 provides the exclusive means for the Commission to obtain information within the ambit of that section,[37] we reject SBC's argument simply because section 409 has no relevance to the requirement that a carrier attest to the veracity and accuracy of its answers to our written inquiries.

14.    By its own terms, section 409 relates only to the "attendance and testimony of witnesses," and the production of documentary evidence.[38]  Section 409 is styled "General Provisions Relating to Proceedings – Witnesses and Depositions," setting forth the limited scope of its applicability. Section 409 itself acknowledges that the Commission has means other than subpoenas to obtain information from parties.[39]  In relevant part, section 409 governs the use of the Commission's subpoena power to compel individuals to appear and testify at hearings or depositions. The Bureau did not seek to compel the appearance of witnesses for testimony. The LOI merely sought a "sworn written response"[40] verifying the truth and accuracy of SBC's answers to the LOI. As noted above, in this respect the LOI followed long-standing Commission practice. We have routinely required affidavits and verifications from regulated entities during the course of various proceedings without asserting subpoena power.[41]  Our orders requiring regulatees to submit affidavits or to swear to the accuracy of responses to our written inquiries

---

[36]      47 U.S.C. § 409(e) (emphasis added).

[37]      *See infra* n 46.

[38]      47 U.S.C. § 409.

[39]      47 U.S.C. § 409(m).

[40]      LOI at 2, 4

[41]      *See, e g , Peninsula Communications, Inc.*, Notice of Apparent Liability for Forfeiture and Order, 16 FCC Rcd 16124 (2001) (ordering broadcast licensee to "submit an affidavit informing [the Commission] whether [it] has ceased operating . . translators and whether it intends to operate those translators at any time in the future absent authorization to do so"); *see also Brindlee Broadcasting Corp.*, Memorandum Opinion and Order, 54 FCC 2d 56, 57 (Rev. Bd. 1975) (ordering president of broadcast license applicant to submit "an explanation . . . under oath as to how he plans to fulfill his full-time commitment to [the license applicant] Brindlee" and his commitments to other organizations in which he holds an interest).

do not trigger the requirements of section 409.

15.    Consequently, we reject SBC's argument that the specific requirements of section 409 supersede the more general provisions of sections 218, 403, 4(i) and 4(j).[42]  Although section 409 may be more detailed in its requirements, those requirements simply do not apply to the circumstances of this case.[43]  Rather, sections 218, 403, 4(i), and 4(j) control here.[44]  Therefore, we also reject SBC's assertion that the Bureau's failure to comply with the procedural requirements of section 409 rendered its order invalid.[45]  Those requirements did not apply to the Bureau's action.

   C.    **SBC's Constitutional Arguments Are Without Merit.**

16.    Our federal constitution affords to subjects of administrative subpoenas or other administrative orders particular rights of access to judicial review.  First, as to administrative subpoenas, SBC invokes the right of a subject of such a subpoena to judicial review before the subject is obliged to suffer penalties for refusing to comply.[46]  Second, as to other administrative orders, SBC refers us to its asserted right to an opportunity to raise a good faith challenge to an order before being sanctioned.[47]  We reject each of these arguments because they depend on fundamental misconstructions of the relevant facts and applicable law in this case.

17.    First, as we concluded above, this case did not involve a subpoena, and SBC is incorrect that the Act required the Bureau to use a subpoena.[48]  Therefore, the constitutional protections that attach to the enforcement of a subpoena are not applicable here.  Even so, Congress provided a carefully constructed protocol for our forfeiture proceedings that allows ample opportunity for judicial review before any subject of a Commission forfeiture order may

---

[42]    *See* NAL Response at 14-18.

[43]    Our conclusion is perfectly consistent with the case law SBC cites in its Response to the NAL.  For example, in *AT&T v. FCC*, the FCC's use of its broad authority conferred in sections 4(i), 4(j), 403 and numerous other sections of the Act conflicted with "precise procedures and limitations" in section 205 of the Act.  *AT&T v. FCC*, 487 F.2d 865, 873 (2d Cir. 1973).  In this case, however, the procedures and limitations of section 409 simply do not apply.  Hence, no conflict exists.

[44]    We also note that the Supreme Court has upheld the Commission's authority to utilize its general section 4(i) authority even when a more specialized provision of the Act is at the Commission's disposal.  *U.S. v. Southwestern Cable Co.*, 392 U.S at 180 n.46 (noting that the Commission need not "issue prohibitory orders only under, and in conformity with . . . section [312(b) of the Communications Act]," and that it appropriately may rely on its general section 4(i) powers to issue such orders).

[45]    NAL Response at 13.  The procedural protections afforded by section 409 include payments to witnesses and deponents, aid to the Commission by federal courts in instances of disobedience to a subpoena, depositions before specified, disinterested officers, and caution to deponents to testify the whole truth.  47 U.S.C. §§ 409(e), (f), (g), (h), (i), (k).  We note that these procedures are for the protection of not only the parties subject to subpoenas, but also for the protection of the Commission.

[46]    NAL Response at 19-22.

[47]    NAL Response at 22-25.

[48]    *See supra* ¶¶ 13-15.

suffer any penalties for refusing to comply with that order. The Act explicitly provides that no one can be forced to pay a Commission-imposed non-hearing forfeiture unless or until the forfeiture order has been subjected to federal judicial review in a trial *de novo*.[49] Thus, SBC will have access to full-blown judicial review before suffering any penalty.[50] For this reason, and more fundamentally because no subpoena was at issue in this case, we find that the Bureau's actions did not violate any constitutional requirements related to pre-enforcement judicial review of subpoenas.

18.    Second, we find SBC's argument that the Bureau improperly sanctioned a constitutionally protected good faith challenge to be misplaced.[51] As an initial matter, an NAL is not itself a sanction; it is a proposed sanction. In addition, contrary to its assertions, SBC did not raise any type of affirmative challenge to the Bureau's sworn statement directive. Rather, it failed even to disclose its noncompliance to the Bureau. Moreover, SBC had conducted itself in this manner on two prior occasions, and never brought its objection to the Bureau's attention.[52]

19.    Far from extinguishing SBC's right to challenge the sworn statement directive, the Bureau virtually invited such a challenge. Before issuing the NAL in this case, the Bureau notified SBC that it had discovered the omission of the sworn statement, gave SBC the opportunity to admit and correct its noncompliance, and informed SBC that it was in violation of a Commission order.[53] At that point in time, and even before, SBC could have raised a good faith challenge to the order. As an initial matter, SBC could have taken the minimal step of alerting the Bureau of its concerns prior to, or simultaneous with, its submission of its October 22, 2001 response to the LOI. In addition, at the same time, or at least upon receiving notice that it was in violation of the order, SBC could have petitioned the Commission or the Bureau for a stay of the portion of the October 1, 2001 order that required the sworn statement.[54] Nonetheless, SBC chose not to avail itself of the opportunity to raise a genuine good faith

---

[49]    47 U.S.C. § 504(a). If a party chooses not to pay a non-hearing forfeiture, the Commission may refer the matter to the U.S. Department of Justice for collection proceedings, in which case the party is entitled to an entirely new trial on the merits in federal court.

[50]    Even assuming that the administrative subpoena cases SBC cites apply here, none of them requires more than that the parties have the right to judicial review of an administrative subpoena before "suffering penalties for refusing to comply." *See See v. City of Seattle*, 387 U.S. 541, 544 (1967), *quoted in*, NAL Response at 19. Indeed, those cases tend to reinforce our finding here that there is ample opportunity for judicial review of the order at issue, and that it is incumbent upon SBC to invoke those protections. *See, e.g., Oklahoma Press Publ'g Co v. Walling*, 327 U.S. 186, 217 (1946) (rejecting petitioners' argument that agency subpoena power would subject them to impermissible inconvenience, expense, and harrassment precisely because "they may make appropriate defense surrounded by every safeguard of judicial restraint.") (internal quotation omitted)

[51]    *See* NAL Response at 22-26.

[52]    *See supra* n 7.

[53]    *See supra* ¶ 3.

[54]    47 C.F.R. §§ 1.43, 1.44.

challenge to the order.[55]

20.    SBC's mere belief that the Bureau's sworn statement directive was unlawful cannot excuse its conduct here, and it certainly cannot amount to a good faith challenge to the order. The Act provides that "[a]ll such orders shall continue in force for the period of time specified in the order or until the Commission or a court of competent jurisdiction issues a superseding order."[56] Moreover, "[i]t shall be the duty of every person, its agents and employees, and any receiver or trustee thereof, to observe and comply with such orders so long as the same shall remain in effect."[57] As we have stated very recently, "a licensee cannot ignore a Commission order simply because it believes such order to be unlawful."[58]

21.    Finally, none of the cases on which SBC bases this argument would support a finding that SBC exercised a good faith challenge in this case.[59] To the contrary, SBC did "'default[] [and] contumaciously refuse[] to comply,'" and our process "'provides full opportunity for judicial review *before* any coercive sanctions may be imposed.'"[60] We reject SBC's argument that the Bureau improperly sanctioned a good faith challenge to the LOI. The Bureau provided ample due process to SBC.

### D.    The Forfeiture Amount Is Lawful and Appropriate.

22.    Section 503(b)(2)(B) of the Act authorizes the Commission to assess a forfeiture of up to $120,000 for each violation, or each day of a continuing violation, up to a statutory maximum of $1,200,000 for a single act or failure to act.[61] In determining the appropriate forfeiture amount, we consider the factors enumerated in section 503(b)(2)(D) of the Act, including "the nature, circumstances, extent and gravity of the violation, and, with respect to the

---

[55]      Moreover, as we discuss above, *see supra* ¶ 17, even after the issuance of this Forfeiture Order, SBC may choose not to pay the forfeiture and to raise a challenge to our findings in a trial *de novo* should the Department of Justice prosecute any collection action we may refer.

[56]      47 U.S.C. § 408.

[57]      47 U.S.C. § 416(c).

[58]      *See Peninsula Communications, Inc.*, Forfeiture Order, FCC 02-31 at ¶ 5 (rel. Feb. 6, 2002).

[59]      *See* NAL Response at 22-26. In these cases, parties subject to various subpoenas or fines actively sought judicial relief to stay and/or enjoin the relevant order. *See, e.g., Oklahoma Operating Co. v. Love.* 252 U.S. 331, 339 (1920) (laundry company sued to enjoin Oklahoma Corporation Commission from entertaining rate complaints against company, and from enforcement related to such complaints); *see also, Reisman v. Caplin*, 375 U.S. 440, 441 (1964) (attorney filed suit seeking declaratory ruling and injunctive relief against IRS to invalidate a subpoena demanding production of work papers ); *see also Belle Fourche Pipeline Co. v. U.S.*, 751 F.2d 332, 333 (10th Cir. 1984) (oil company filed complaint seeking declaratory and injunctive relief against an investigation by the Federal Energy Regulatory Commission).

[60]      *See* NAL Response at 23 (quoting *Reisman v. Caplin*, 375 U.S. 440, 448 n.8, 450 (1964) (emphasis added)). Even under SBC's asserted interpretation that section 503(b) must, as a constitutional matter, permit good faith pre-enforcement challenges, the Bureau's actions were still entirely appropriate.

[61]      47 U.S.C. § 503(b)(2)(B); *see also* 47 C.F.R § 1.80(b)(2); *see also Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Forfeiture Maxima to Reflect Inflation*, Order, 15 FCC Rcd 18221 (2000).

violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[62]

    23.    Section 1.80 of the Commission's rules and the Commission's *Forfeiture Policy Statement* establish a base forfeiture amount of $3,000 for failure to file required forms or information.[63] As noted in the NAL, however, the circumstances of this case justify a substantial increase to this base amount pursuant to upward adjustment criteria contained in the rules and the *Forfeiture Policy Statement*.[64] Specifically, the Bureau found that the adjustment was appropriate because the misconduct was egregious; the violation was intentional; and the forfeiture amount must be high enough to serve a deterrent effect in view of SBC's ability to pay.[65]

    24.    SBC objects to several aspects of the Bureau's reasoning, and it contends that the forfeiture amount proposed in the NAL is inappropriate because: (1) SBC did not intentionally violate the LOI; (2) SBC's conduct did not impede the Bureau's investigation; and (3) SBC and the Bureau still were "negotiating" when the Bureau issued the NAL.[66] None of these points has merit.

    25.    First, SBC explicitly acknowledged to the Bureau that its failure to comply with the LOI was intentional.[67] SBC admittedly had knowledge of its actions and of the fact that those actions violated a Commission order.[68] The company cannot now credibly argue that its conduct was unintentional.

    26.    Second, SBC's refusal to attest to the truth and accuracy of its responses to the Bureau's written questions did impede the Bureau's investigation. As the Bureau properly noted in the NAL, "SBC's decision not to provide the requisite sworn statement here obstructs the Bureau's investigation into discrepancies in SBC's various representations to the Commission. SBC's conduct strikes at the core of the Bureau's ability to perform its function, and rises above the level of a mere omission or failure to file."[69]

    27.    Third, SBC and the Bureau were not "negotiating" at the time the Bureau issued the NAL. Indeed, Bureau staff had made clear to SBC that SBC's obligation to submit a sworn

---

[62]    47 U.S.C. § 503(b)(2)(D); *see also The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, 12 FCC Rcd 17087, 17100 (1997) ("*Forfeiture Policy Statement*"); *recon. denied* 15 FCC Rcd 303 (1999); 47 C.F.R. § 1.80(b)(4).

[63]    47 C.F.R. § 1.80; *Forfeiture Policy Statement*, 12 FCC Rcd at 17114, Appendix A, Section I.

[64]    NAL at 19372-73.

[65]    47 C.F.R. § 1.80; *Forfeiture Policy Statement*, 12 FCC Rcd at 17100.

[66]    *See* NAL Response at 27–29.

[67]    *See* NAL Response, Attachment F, "Affidavit of Caryn D. Moir" at ¶ 6.

[68]    *Id. See also supra* ¶ 3.

[69]    NAL 19373 at ¶ 10. See supra ¶ 10 and n.30 (discussing necessity of attestations to Commission investigations).

written response was not open for negotiation between SBC and the Bureau.[70] In any event, the Bureau was under no obligation even to inform SBC of its noncompliance or to give SBC an opportunity to comply. It did so as a courtesy and was not required to do more.[71] When a carrier deliberately violates a Commission directive, it should not be surprised that the Commission would issue an NAL upon discovering the violation.

28.    For all of the reasons we have discussed above, we find that SBC's conduct justified the forfeiture amount that the Bureau proposed. We therefore affirm the $100,000 forfeiture amount originally proposed by the Bureau.[72]

## IV.    ORDERING CLAUSES

29.    Accordingly, IT IS ORDERED THAT, pursuant to section 503(b) of the Act,[73] and section 1.80 of the Commission's Rules,[74] SBC Communications SHALL FORFEIT to the United States Government the sum of one hundred thousand dollars ($100,000) for violating an Enforcement Bureau order to submit a sworn written response to a Bureau LOI.

30.    IT IS FURTHER ORDERED that payment shall be made in the manner provided for in section 1.80 of the Commission's rules within 30 days of release of this order.[75] If the forfeiture is not paid within the period specified, the case will be referred to the Department of Justice for collection pursuant to section 504(a) of the Act.[76]

31.    IT IS FURTHER ORDERED that a copy of this Order of Forfeiture shall be sent by Certified Mail/Return Receipt Requested to SBC Communications, c/o Caryn D. Moir, Vice President - Federal Regulatory, 1401 I Street, N.W., Suite 1100, Washington, D.C. 20005.

---

[70]    *See* NAL Response at 5; *see also* NAL Response, Attachment F, "Affidavit of Caryn D. Moir" at ¶ 6

[71]    "The Commission is not required to bargain with its licensees for the information to which it is entitled in order properly to carry out its functions." *See James A. Kay, Jr.*, Decision, FCC 01-341 at ¶ 40 (rel. Jan. 25, 2002) (quoting *Carol Music, Inc.*, 37 FCC 379, 384 (1964)) (acknowledging licensee right to register principled objections to Commission directives but noting that objections do not negate licensee obligation to comply with directives).

[72]    SBC correctly points out that $100,000 is the maximum forfeiture available at this point in this case, *see, e.g.*, NAL Response at ii, iv, 27, 28, but the company misunderstands the reason for that limitation. The Commission is limited here to imposing a maximum $100,000 forfeiture only because this Order is based on a Bureau-level NAL in which the Bureau proposed a forfeiture of $100,000, which is the cap on its delegated authority. *See* 47 C.F.R. § 0.311. We note, however, that had the Commission itself issued the NAL in the first instance, we could have imposed a forfeiture here of up to $120,000 per day, up to a maximum of $1.2 million for the more than 10 days for which SBC's violation continued. *See* 47 U.S.C. § 503(b)(2)(B); *see also* 47 C.F.R. § 1.80(b)(2); *see also Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Forfeiture Maxima to Reflect Inflation*, Order, 15 FCC Rcd 18221 (2000).

[73]    47 U.S.C. § 503(b).

[74]    47 C.F.R. § 1.80.

[75]    *Id.*

[76]    47 U.S.C. § 504(a)

FEDERAL COMMUNICATIONS COMMISSION


William F. Caton
Acting Secretary

# Exhibit C

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. |
| | : | |
| v. | : | |
| | : | |
| RICHARD E. BROWN and | : | VIOLATIONS: 18 U.S.C. § 1341 |
| KEITH J. MADEIROS | : | (Mail Fraud) |

## I N F O R M A T I O N

The United States Attorney charges:

### COUNT ONE

**Introduction**

_____At all relevant times:

1. The E-Rate program (the "Program"), which was created by the United States Congress in the Telecommunications Act of 1996, operated under the auspices of the Federal Communications Commission ("FCC").

2. The Program had two "priorities." Under "Priority 1," the costs for telephone and internet services of qualified school districts were subsidized. Under "Priority 2," the costs of upgrading internet access for qualified school districts were subsidized.

3. The Program was funded from FCC mandated surcharges by telecommunication companies throughout the country to the monthly bills of their customers. The FCC designated Universal Services Administrative Company ("USAC"), a nonprofit corporation, to administer the Program, including collecting the telecommunication company surcharges, and distributing Priority 1 and Priority 2 moneys through USAC's Schools and Libraries Division ("SLD").

4. The E-Rate program was designed to ensure that the neediest schools receive the most financial assistance. All participating school districts were required to fund a percentage of the cost of the equipment and services acquired under the Program (hereinafter referred to as "copay"). The amount of the copay was based on the number of students in the district qualifying for the United States Department of Agriculture's school lunch program, with the neediest school districts eligible for the highest percentage of funding. However, even the neediest schools were required to fund at least 10% of the cost of the acquired equipment and services.

5. A school district seeking Priority 2 funding first was required to select a contractor to perform the necessary telecommunication upgrades. In selecting a contractor, a school district was required to follow state and local procurement regulations

6. Once a contractor was selected, a school district would apply to SLD for the funding needed to pay for the upgrade.

7. Southwestern Bell Communications ("SBC")/Southern New England Telephone Company ("SNET") was the prime contractor to the FCC/USAC for Priority 2 funded telecommunication upgrades to the Hartford, New London, New Haven and Bridgeport, Connecticut school districts.

8. **RICHARD E. BROWN and KEITH J. MADEIROS**, the defendants herein, were account managers for SBC.

9. After SBC was selected as the prime contractor to perform Program funded upgrades for a school district, **BROWN and MADEIROS** were responsible for customer relations. In addition, **RICHARD E. BROWN and KEITH J. MADEIROS** participated in recommending

subcontractors to perform the telecommunication upgrades for the school district, and in reviewing invoices submitted by subcontractors for payment by SBC/SNET.

10.    After subcontractor charges were paid by SBC/SNET, the charges periodically would be invoiced by SBC/SNET to the FCC/USAC for reimbursement from Program funds.

11.    American Networks International, Inc. ("ANI"), Bristol, Connecticut, a company that installs telecommunication wiring, was a first-tier subcontractor to SBC.

12.    Scott A. Federowicz, not a defendant herein, was ANI's project manger. His duties included soliciting business for ANI, hiring second-tier subcontractors, and approving invoices submitted by second-tier subcontractors for payment.

**The Scheme and Artifice**

13.    Beginning in or about November 2002, and continuing through in or about December 2003, in the district of Connecticut and elsewhere, **RICHARD E. BROWN, KEITH J. MADEIROS** and Scott A. Federowicz did devise and did intend to devise a scheme and artifice to defraud the FCC and USAC and to obtain money from the FCC and USAC in the approximate amount of $452,203 by means of materially false and fraudulent pretenses and representations.

14.    It was a part of the scheme and artifice that, in or about September 2002, defendant **BROWN** did cause to be created MRB Associates ("MRB"), which purported to be a business. MRB initially had an address in Port Saint Lucie, Florida, and later in Hope Valley, Rhode Island. MRB held a bank account, but otherwise existed in name only.

15.    It was a further part of the scheme and artifice that, in or about November 2002, defendants **BROWN and MADEIROS** would and did approach Scott A. Federowicz and would and did propose to him that he approve for payment invoices submitted to ANI by MRB for work

purportedly performed, but not in fact performed, to upgrade Program funded school districts' telecommunication capabilities.

16. It was a further part of the scheme and artifice that, initially, Scott A. Federowicz agreed to defendants **BROWN'S and MADEIROS'** proposal to ensure that ANI continued to receive business from SBC/SNET. Later, he requested payment from, and was paid by defendants **BROWN and MADEIROS** approximately $16,917.

17. From in or about December 2002 through in or about February 2003, MRB did submit thirteen invoices to ANI totaling $457,703. Scott A. Federowicz approved for payment invoices totaling $352,066, and MRB received payments from ANI on those invoices totaling that amount.

18. It was a part of the scheme and artifice that, in or about July 2003, defendant **MADEIROS** did cause to be created Responsive Communications Services, Inc. ("RCS"), which purported to be a business with an address in Westerly, Rhode Island. RCS held a bank account, but otherwise existed in name only.

19. It was a further part of the scheme and artifice that, from in or about October 2003 through in or about December 2003, RCS did submit three invoices to ANI totaling $100,137. Scott A. Federowicz approved those invoices for payment, and RCS received payments on those invoices totaling that amount.

20. It was a further part of the scheme and artifice that defendants **BROWN and MADEIROS** did share the money received by MRB and RCS from ANI, minus the amount paid to Scott A. Federowicz.

21. On or about January 31, 2003, in the District of Connecticut, for the purpose of executing

-4-

the aforementioned scheme and artifice and attempting so to do, **RICHARD E. BROWN and KEITH J. MADEIROS,** the defendants herein, and Scott A. Federowicz, not a defendant herein, knowingly and willfully did cause to be placed by ANI in an authorized depository for mail, to be sent and delivered by the United States Postal Service from Bristol, Connecticut to SBC, Tewksbury, MA an invoice for payment, which invoice included $60,000 that ANI had paid to MRB.

In violation of Title 18, United States Code, Section 1341

### COUNT TWO

1. Paragraph 1 through 10, 14 and 18 of Count One of this information are incorporated by reference as if set forth in full herein.

**The Scheme and Artifice**

2. Beginning in or about December 2001 and continuing to in or about May 2004 **RICHARD E. BROWN,** the defendant herein, Keith J. Madeiros, not a defendant herein, and John Doe I and John Doe II, who was an SBC employee, both known to the United States Attorney but not defendants herein, did devise and did intend to devise a scheme and artifice to defraud the FCC and USAC and to obtain money and property from the FCC and USAC in the approximate amount of $503,252 by means of materially false and fraudulent pretenses and representations.

3. It was a part of the scheme and artifice that **BROWN,** Madeiros, and John Doe I and John Doe II, would and did decide that engineers would be used on certain Program funded school district projects, and that SBC/SNET would be charged for the engineering services at inflated rates.

4. It was a further part of the scheme and artifice that, in early 2002, John Doe I did

-5-

approach the owner of a company that provided various services to small businesses (hereinafter "Company A"), and did propose that Company A act as the billing and payment agent for engineering services that John Doe I would arrange for certain Program funded school district projects. The owner of Company A agreed to perform those services.

5. It was a further part of the scheme and artifice that defendant **BROWN** and Madeiros would and did participate in arranging for Company A to become a first-tier subcontractor to SBC/SNET for providing engineering services on certain Program funded school district projects.

6. It was a further part of the scheme and artifice that John Doe I would and did arrange for a company that was in the business of providing engineering services (hereinafter "Company B") to place engineers on certain Program funded school district projects.

7. It was a further part of the scheme and artifice that, from on or about June 5, 2002 through on or about August 4, 2003, Company A, at the direction of John Doe I, sent three invoices for engineering services to SBC/SNET totaling $653,520, and was paid that amount by SBC/SNET. From the $653,520, Company A paid to Company B $276,000 for the engineers that Company B had provided.

8. It was a further part of the scheme and artifice that from the $377,520 by which the invoices to SBC/SNET had been inflated, Company A disbursed, at John Doe I's direction, $194,972 to John Doe I's PNC Bank line of credit. Also, at the direction of John Doe I, Company A disbursed to defendant **BROWN**, through MRB, $78,136, and to Madeiros, through RCS, $85,725.

9. In or about October 2003, Company C became the principle first-tier subcontractor to

SBC/SNET for the New London, Connecticut and the Bridgeport, Connecticut E-Rate funded school district projects.

10.    It was a further part of the scheme and artifice that, after Company C became SBC/SNET's first tier subcontractor, inflated engineering costs were submitted by Company A to Company C at John Doe I's direction.

11.    It was a further part of the scheme and artifice that inflated engineering costs submitted by Company A to Company C were paid by Company C and then reimbursed by SBC/SNET.

12.    It was a further part of the scheme and artifice that, from on or about October 16, 2003 through on or about May 20, 2004, Company A submitted to Company C four invoices for engineering costs totaling $239,065, and received payment from Company C in that amount, from which Company A paid to Company B $113,333 for the engineering services that actually had been provided.

13.    It was a further part of the scheme and artifice that, from the $125,732 by which the invoices submitted by Company A to Company C were inflated, Company A disbursed, at John Doe I's direction, $54,553 to John Doe's PNC Bank line of credit. Also, at the direction of John Doe I, Company A disbursed to Madeiros, through RCS, $43,847.

14.    On or about February 25, 2003, in the District of Connecticut, for the purpose of executing the aforementioned scheme and artifice and attempting so to do, **RICHARD E. BROWN,** the defendant herein, Keith J. Madeiros, not a defendant herein, and John Doe I and John Doe II, not defendants herein, knowingly and willfully did cause to be placed by Company A in an authorized depository for mail, to be sent and delivered by the United States Postal Service from

-7-

Westport, Connecticut, to SBC, Arlington Heights, Illinois, an invoice for payment of $196,220 for engineering services.

In violation of Title 18, United States Code, Section 1341.

## COUNT THREE

1. Paragraphs 1 through 10, 14 and 18 of Count One and paragraph 9 of Count Two of this information are incorporated by reference as it set forth in full herein.

**The Scheme and Artifice**

2. Beginning in or about October 2003, and continuing until in or about March 2004, **RICHARD E. BROWN**, the defendant herein, Keith J. Madeiros, not a defendant herein, and John Doe III, known to the United States Attorney but not a defendant herein, did devise and did intend to devise a scheme and artifice to defraud the FCC and USAC and to obtain money and property from the FCC and USAC in the approximate amount of $608,565 by means of materially false and fraudulent pretenses and representations.

3. It was a part of the scheme and artifice that, on or about February 20, 2004, defendant **BROWN** did cause to be created Chariho Associates (hereinafter "Chariho") which purported to be a business. Chariho had an address in Hope Valley, Rhode Island and held a bank account, but otherwise existed in name only.

4. It was a further part of the scheme and artifice that defendant **BROWN,** Madeiros and John Doe III, a former SBC employee, subsequently employed by Company C as of October 2003,

-8-

would and did agree that John Doe III would hire RCS and Chariho as second-tier subcontractors, knowing and intending that RCS and Chariho would perform no work for Company C.

5.   It was a further part of the scheme and artifice that, on or about October 20, 2003, November 16, 2003 and January 10, 2004, Madeiros submitted a total of five RCS invoices to Company C cumulatively requesting $161,933 for work allegedly performed on the New Haven, Connecticut school district Program funded project, and RCS was paid that amount by Company C.

6.   It was a further part of the scheme and artifice that on January 2, 2004 and February 2, 2004 defendant **BROWN** submitted to Company C a total of eight Chariho invoices cumulatively requesting $446,572 for work allegedly performed on the New London, Connecticut and New Haven, Connecticut school districts' Program funded projects, and Chariho was paid that amount by Company C.

7.   It was a further part of the scheme and artifice that the amounts paid by Company C to Chariho and RCS were reimbursed by SBC/SNET.

8.   It was a further part of the scheme and artifice that, from on or about February 24, 2004 to on or about March 15, 2004, of the $446,572 that Chariho was paid by Company C, defendant **BROWN** disbursed from Chariho to John Doe III $175,199 through BAJ Consulting, a company established by John Doe III for the sole purpose of receiving money from Chariho.

9.   It was a further part of the scheme and artifice that, from on or about February 24, 2004 to on or about June 4, 2004, of the $446,572 that Chariho was paid by Company C, defendant **BROWN** disbursed $103,937 to Madeiros and kept $167,432 for himself.

10.   On or about December 26, 2003, in the District of Connecticut, for the purpose of

executing the aforementioned scheme and artifice and attempting so to do, **RICHARD E. BROWN**, the defendant herein, Keith J. Madeiros, and John Doe III, not defendants herein, for the purpose of executing the aforementioned scheme and artifice and attempting so to do, knowingly and willfully did cause SNET, North Haven, Connecticut to take and receive from the mail, as delivered by the United States Postal Service, an invoice for payment of $18,123 sent to SNET by SBC Datacom, Hoffman Estates, Illinois, which invoice was sent by SBC Datacom to obtain reimbursement of $18,123 that SBC Datacom had paid to Company C for telecommunication Services.

In violation of Title 18, United States Code, Section 1341.

UNITED STATES OF AMERICA

  /s/
KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

  /s/
ANTHONY E. KAPLAN
SUPERVISORY ASSISTANT UNITED STATES ATTORNEY

  /s/
CALVIN B. KURIMAI
ASSISTANT UNITED STATES ATTORNEY

-10-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **COMPTEL,** | ) |
| | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 06CV01718 (HHK) |
| | ) |
| v. | ) |
| | ) |
| **Federal Communications Commission,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF COMPTEL'S STATEMENT OF MATERIAL
## FACTS AS TO WHICH THERE IS A GENUINE DISPUTE

Pursuant to LCvR 7(h) and in response to Defendant Federal Communications Commission's ("FCC") Motion For Summary Judgment, Statement of Material Facts As To Which There Is No Genuine Issue and Declaration of Judy Lancaster submitted in support thereof, Plaintiff COMPTEL hereby submits this Statement of Material Facts As To Which There Is A Genuine Dispute.

1.      By electronic mail from William H. Davenport, Chief, Investigations and Hearings Division, Enforcement Bureau, dated July 20, 2005, Defendant FCC notified Plaintiff COMPTEL that it had identified "approximately *3200* pages of documents" responsive to COMPTEL's April 4, 2005 Freedom of Information Act ("FOIA") request. See Plaintiff's Statement of Material Facts As To Which There Is No Genuine Dispute at ¶12 and Exhibit F at 2 (emphasis added). The FCC never notified COMPTEL that this estimate of pages responsive to COMPTEL's request was erroneous. For the first time in its Motion For Summary Judgment submitted to this Court on February 12, 2007, the FCC asserts that it identified only *544* pages of documents responsive to COMPTEL's

FOIA request. See Defendant's Statement of Material Facts As To Which There Is No

Genuine Issue at ¶5 and Declaration of Judy Lancaster, attorney in the Investigations and

Hearings Division, Enforcement Bureau, FCC at ¶7. The FCC made no attempt to

explain the discrepancy in its representations as to the volume of pages responsive to

COMPTEL's FOIA request nor to describe what happened to the other more than 2600

pages of responsive documents in the months intervening since July 20, 2005.


April 13, 2007                              Respectfully submitted,


                                           Mary C. Albert, DC Bar #347617
                                           Jonathan D. Lee, D/C/ Bar #435586
                                           COMPTEL
                                           900 17th Street N.W., Suite 400
                                           Washington, D.C. 20006
                                           (202) 296-6650
                                           malbert@comptel.org
                                           jlee@comptel.org

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COMPTEL,** ) | |
| ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 06CV01718 (HHK) |
| ) | |
| v. ) | |
| ) | |
| **Federal Communications Commission,** ) | |
| ) | |
| Defendant. ) | |

**[PROPOSED] ORDER**

Upon consideration of Defendant Federal Communications Commission's

("FCC") Motion for Summary Judgment, Plaintiff COMPTEL's Opposition thereto and

the entire record herein, it is hereby

**ORDERED** that the FCC's Motion for Summary Judgment is **DENIED.**

Dated:_____, 2007          _____
                                       Henry H. Kennedy, Jr.
                                       United States District Judge
                                         for the District of Columbia