**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| COMPTEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERAL COMMUNICATIONS | ) |
| COMMISSION, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| AT&T, | ) |
| | ) |
| Intervenor. | ) |

Civil Action No. 06-1718 (HHK)

_____

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF COMPTEL'S MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO INTERVENOR AT&T'S MOTION FOR SUMMARY JUDGMENT

This Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, lawsuit concerns certain Federal Communication Commission ("FCC") records relating to an FCC investigation into allegations that SBC Communications, Inc. ("SBC") violated the FCC's rules when it submitted claims for universal service support for the New London, Connecticut public schools.[1] Complaint at ¶ 1. The parties have cross-moved for summary judgment, in recognition that the issues presented in this lawsuit can be resolved through dispositive motions. For the reasons set forth in Defendant's initial motion, and as explained herein, the Court should enter summary judgment for Defendant FCC. Attached hereto is the FCC's response to the parties' statements of facts and the Supplemental Declaration of Judy Lancaster.

---

[1] During November 2005, SBC completed its acquisition of AT&T Corp., and the combined company is now known as AT&T Inc. For ease of reference, the company is referred to as AT&T herein.

## ARGUMENT

A.    The Sufficiency of FCC's Declarations and Other Preliminary Matters.

As an initial matter, Comptel claims that there are approximately 3200 pages of records at issue in this case. Comptel Memo. at 17; Comptel's Statement of Facts at ¶ 12 (citing a July 20, 2005 e-mail attached to Comptel's Statement of Facts as Ex. F at 2). That is incorrect. The FCC's declarations set forth the number of pages at issue. Comptel mistakenly relies for its assertion on an FCC e-mail dated before the completion of the processing of the request at issue that stated that approximately 3200 pages of records had been identified as potentially responsive. The actual number of responsive pages is much lower. See, e.g., Supplemental Declaration of Judy Lancaster, attached hereto, at ¶¶ 4-5.

Comptel claims that it is entitled to a grant of summary judgment because the FCC failed to provide it with a Vaughn declaration during its administrative processing of the FOIA request at issue. Comptel Memo. at 10-11 (citing Mead Data Cent., Inc. v. United States Dept. of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977)). Contrary to Plaintiff's argument, it is well established that the requester is not entitled to a Vaughn index during the administrative process. Schwartz v. Dep't of the Treasury, 131 F. Supp.2d 142, 147 (D.D.C. 2000) ("there is no requirement that an agency provide a . . . Vaughn index on an initial request for documents"); Edmond v. United States Attorney, 959 F. Supp. 1, 5 (D.D.C. 1997); Judicial Watch, Inc. v. Clinton, 880 F. Supp. 1, 11 (D.D.C. 1995), affirmed on other grounds, 76 F.3d 1232 (D.C. Cir. 1996); Safecard Servs. v. SEC, No. 84-3073, slip op. at 3-5 (D.D.C. April 21, 1986).

In fact, Mead Data does not support Plaintiff's position. Immediately after the sentence that Comptel quotes from the Mead Data decision, the Court of Appeals explains that: "We

cannot agree, however, that failure to follow those procedures in the administrative review of a FOIA request is a valid reason for an appellate court to reverse the judgment of a district court that the requested information is exempt, where those requirements have been satisfied in the district court proceeding." Mead Data, 566 F.2d at 251.

Similarly, this Court's review of the agency's FOIA determinations is de novo, based upon the record and arguments filed in this Court. Id. Thus, Comptel's extensive criticism of FCC's administrative processing of the request is irrelevant. Id. Comptel's arguments about the objective lack of any index of withholdings likewise have become moot during the proceedings before this Court. As explained infra, FCC has provided two declarations describing in detail the records withheld and the basis for the withholdings. Intervenor AT&T also has filed two declarations, with indexes. In a FOIA suit, a federal agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and that each document that falls within the class requested either has been produced, is unidentifiable, or is exempt from disclosure. Students Against Genocide v. Dept. of State, 257 F.3d 828, 833 (D.C. Cir. 2001); Weisberg v. Dept. of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980). That standard is satisfied in this case.

Here, FCC has satisfied the summary judgment requirements by providing the Court and Plaintiff with declarations demonstrating that the records withheld are exempt from disclosure. Hayden v. National Security Agency/Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980). Moreover, an index, separate and apart from a Vaughn declaration, is not essential so long as the nature of the withheld information is adequately described by the agency in a declaration. Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124, 128 (D.C. Cir. 1987); Judicial Watch v. USPS, 297 F.Supp. 2d 252, 257 (D.D.C. 2004)

3

(agency may submit materials in any form as long as reviewing court has reasonable basis to evaluate the claimed exemptions).

To the extent that Comptel may contend that FCC's declarations are insufficient, the Court should reject that argument. Comptel cites Mead Data, 566 F.2d at 260, for the proposition that any declaration or index "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." Comptel Memo. at 10. An agency is entitled to a grant of summary judgment in a FOIA case when its withholdings are proper and based upon a declaration that is "relatively detailed, non-conclusory, and not impugned by evidence . . . of bad faith on the part of the agency." McGhee v. Central Intelligence Agency, 697 F.2d 1095, 1102 (D.C. Cir. 1983)). See also Hayden, 608 F.2d at 1387; Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974).

As the Court of Appeals has recognized, "the explanation of the exemption claim and the descriptions of withheld material need not be so detailed as to reveal that which the agency wishes to conceal, but they must be sufficiently specific to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). The Court has a wealth of information with which to evaluate FCC's proposed withholdings. Defendant FCC has filed two detailed declarations, the first Lancaster Declaration, as well as the Supplemental Lancaster Declaration setting forth an accounting of the Exemption 5 materials at issue. In addition, AT&T's declarations and indexes provide detailed descriptions of the Exemption 4, 6 and 7(c) materials at issue. See Document

4

No. 19, Decl. of Kelly P. Dunbar at Ex. B, attachment A (index of records constituting AT&T's response to FCC's Letter of Inquiry and setting forth the rationale for the confidentiality of those records); Document 19, Declaration of Ann Rotatori at ¶ 7 (describing in detail records at issue subject to withholding under Exemption 4).  The FCC's Supplemental Declaration of Judy Lancaster states that Ms. Lancaster reviewed AT&T's declarations and concluded that "AT&T correctly indexed these records."  Supp. Decl. Lancaster at ¶ 4.

FCC employee Judy Lancaster, in her Supplemental Declaration, describes and specifically indexes the 191 pages of records withheld under FOIA Exemption (b)(5).  Supple. Lancaster Decl. at ¶¶ 5-70.  For example, that declaration describes in detail e-mail chains between FCC employees and Department of Justice employees concerning the FCC's investigation of AT&T and possible referral to the DOJ, and whether certain documents may be provided to DOJ.  Id. at ¶¶ 6-7.  That declaration also described the records withheld on the basis that they contain handwritten notes.  Id. at ¶¶ 8-10.  This is exactly the sort of staff-level preliminary exchange of drafts, views and advice that is protected by the deliberative process privilege.  Together, the parties' declarations are more than adequate for the Court and Plaintiff to assess the withholdings.

Comptel asserts that the Court should review FCC's proposed withholdings in camera.  Comptel Memo. at 8 (requesting in camera inspection of records).  Courts typically exercise their authority to order in camera inspection in exceptional, rather than routine cases.  PHE, Inc. v. United States Dep't of Justice, 983 F.2d 248, 252-53 (D.C. Cir. 1993) (observing that in camera review is generally disfavored); Mead Data, 566 F.2d at 251-52.[2]  In fact, in camera review

---

[2]  See also Taylor v. United States Dep't of Justice, 257 F. Supp. 2d 101, 114 (D.D.C. 2003) (finding in camera review to be unnecessary because of adequacy of defendant's affidavit and

usually is reserved for those cases when there is actual evidence of bad faith on the part of the

agency.  Rugiero v. United States Dep't of Justice, 257 F.3d 534, 547 (6th Cir. 2001) (finding that

the requester failed to demonstrate "strong evidence of bad faith that calls into question the

district court's decision not to conduct an in camera review").[3]  Comptel has not even alleged any

bad faith on the part of FCC, let alone made any showing that would support the exceptional step

of in camera review.

Comptel also argues that it is entitled to a grant of summary judgment because of the

FCC's delay in responding to the FOIA request at issue.  Comptel Memo., Document No. 20, at

7 (arguing statutory time limits "have long since expired . . . [a]s a result, Comptel is entitled to

. . . an order directing the FCC to release the documents requested by Comptel"), 9-10.  Contrary

to Comptel's argument, however, the fact the FCC did not comply with the statutory deadlines

for the initial processing of the request, or for issuing an appeal determination, does not entitle

Plaintiff to an order releasing the records at issue.  Hornbostel v. Dept. of Interior, 305 F.

Supp.2d 21, 28 (D.D.C. 2003)  ("lack of timeliness does not preclude summary judgment for an

agency in a FOIA case").

Finally, Comptel criticizes the FCC because the FCC has not yet released any records,

even though FCC determined at the administrative level, in its initial decision, that certain

records should be released.  See, e.g., Comptel Memo. at 7, 9-10.  As AT&T points out in its

---

Vaughn Index); Animal Legal Def. Fund, Inc. v. Dep't of the Air Force, 44 F. Supp. 2d 295, 304 (D.D.C. 1999) ("'in camera review should not be resorted to as a matter of course . . . .'") (quotation omitted).

[3] If the Court determines that the FCC's declarations and indexes are not sufficiently detailed, the proper remedy is an order that the FCC supplement its declarations.  See, e.g., Davin v. DOJ, 60 F.3d 1043, 1065 (3d Cir. 1995); Coleman v. FBI, 972 F. Supp. 5, 9 (D.D.C. 1995).

Memorandum, Document No. 19, AT&T's intervention in this case has created a situation similar to a reverse FOIA case, in which a party brings a suit in order to prevent an agency from releasing records pursuant to the FOIA.  As explained in more detail below, FCC will refrain from releasing any records until the Court has resolved the pending motions.

**B.**  **The FCC Properly Withheld Records, or Portions of Records, Pursuant To FOIA Exemption 4.**

FOIA Exemption 4 protects confidential commercial or financial information when the requested information is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  5 U.S.C. § 552(b)(4).  As explained in detail in Defendant's motion for summary judgment and supporting papers, and also in Intervenor AT&T's motion for summary judgment and supporting papers, FCC properly is withholding Exemption 4 material.

There does not seem to be any dispute among the parties as to whether the material at issue is commercial or financial information.  Likewise, there does not seem to be any issue as to whether the records at issue were "obtained from a person" for purposes of FOIA Exemption 4, since they were submitted to FCC by AT&T (then SBC), a "partnership, corporation, association, or public or private organization other than an agency."  See 5 U.S.C. § 551(2); Allnet Communication Services, Inc. v. FCC, 800 F. Supp. 984, 988 (D.D.C. 1992).

The debate between the parties seems to be over whether the material at issue is or was "confidential."  Comptel implies that AT&T waived any claim to the confidentiality of its records by failing to designate those materials as confidential business information pursuant to the FCC's regulations when initially submitting that information to the FCC.  Comptel Memo., Document No. 20, at 2, 12-13.  That argument can be readily disposed of.  The FCC's regulations provide that FCC, on its own motion, can designate materials as confidential.  47 C.F.R. §

7

0.459(f). That is exactly what the FCC did in this case with respect to information such as costs and pricing data, its billing and payment dates, and identifying information of AT&T's staff, contractors, and the representatives of its contractors and customers. Lancaster Decl., Attachment D at 4; see also 47 C.F.R. § 0.457(d)(2) (Commission may determine on its own motion that submitted information is confidential). The FCC concluded, inter alia, that release of such information was "likely to substantially harm SBC's competitive position." See Lancaster Decl. at ¶¶ 10-11 and Attachment D thereto at 5.

Comptel also argues that Exemption 4 "does not protect from disclosure the rates AT&T charged or the discounts it provided . . . because that information already is in the public domain." Comptel Memo. at 13 (citing 47 C.F.R. § 54.501(d)(3)). First, just because something is in the public domain (for example, someone's date of birth might be accessible on the internet) does not mean that the government can release that information to the public. See Privacy Act, 5 U.S.C. §552a. Second, the FCC is prepared to release eighteen pages of Form 474s, which the FCC deems to be the sort of publicly-available information addressed in section 54.501(d)(3).[4] The FCC proposes to release this information, subject to the Court's disposition of AT&T's Exemption 7(c) argument for withholding this material. That argument is addressed in section D below.

Comptel also argues that AT&T has made no showing of competitive harm. Comptel Memo. at 14. First, FCC concluded otherwise, as explained in the Lancaster Declaration. See, e.g., Lancaster Decl. at ¶¶ 10-11. Second, AT&T addresses this issue at length in its Memorandum and supporting papers. See Document No. 19 at 23-26. Third, Comptel's cases

---

[4] Comptel's constituent members, which are telecommunications firms, should be familiar with Form 474s.

are inapposite.  Comptel Memo. at 14.  For example, Comptel cites Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291 (D.C. Cir. 1983), for the proposition that a business cannot protect records of customer complaints or employee disgruntlement.  Of course, that is not what AT&T submitted to the FCC in this case.  Instead, as Comptel notes, AT&T's submissions included, inter alia, cost and discount data.  Comptel Memo. at 14; AT&T Memo. at 20-22, 25-26.

This is more than an academic question for Defendant FCC.  Disclosure of the confidential financial and commercial information contained in IHD case file no. EB-04-IH-0342 would impair the ability of the FCC to fulfill its statutory mandate.  The Telecommunications Act of 1996 directed the FCC to create and oversee the E-Rate program.  See 47 U.S.C. § 254(b). In order to effectively perform its regulatory and enforcement duties– both generally and with respect to the E-Rate program-- the FCC relies on the cooperation of its licensees.  Here, AT&T's voluntary disclosure alerted the FCC to a problem, prompted the FCC to investigate that problem, and resulted in AT&T's taking voluntary remedial action.  See Lancaster Decl. at ¶ 20. Release of AT&T's sensitive financial and commercial information would discourage other licensees from voluntarily reporting to the Commission internal compliance problems, out of fear that such voluntary disclosure could result in release of their confidential business information through the FOIA.  Id. at ¶ 21.  This would hinder the FCC's ability to discover and address such problems quickly and effectively, part of FCC's statutory directives.  Id. at ¶ 21.  Additionally, disclosure of AT&T's confidential business information would make it difficult for the FCC to obtain reliable financial and commercial information from other telecommunications companies. Id. at ¶ 22.  See Critical Mass, 975 F.2d at 878 (citing Washington Post Co. v. HHS, 690 F.2d

9

252 (D.C. Cir. 1982) (regarding importance of these interests).

Thus, IHD properly redacted from the records at issue pricing and cost data, and billing and payment dates. Lancaster Decl. at ¶ 18. Pricing and cost data are among the most sensitive corporate information. Id. at ¶ 19. Information regarding the timing of billing and payment could give competitors insights into AT&T's relationships with its customers and suppliers, including whether the customers are prompt payers. Id. Disclosure of this information would give AT&T's competitors an overview of AT&T's costs, pricing, schedules, and operations. Id. Such information could enable competitors to craft offerings and proposals that would allow them to compete more effectively against AT&T for similar business.

**C.   The FCC Properly Withheld Records, or Portions of Records, Pursuant To FOIA Exemption 5.**

In response to the FOIA request, FCC withheld material under Exemption 5 of FOIA because it would be privileged in civil litigation. 5 U.S.C. § 552(b)(5). Comptel argues that FCC has failed to identify adequately its Exemption 5 withholdings at the administrative level. Comptel Memo. at 15. That argument is moot insofar as the materials are described in detail in the two Lancaster declarations.[5]

Importantly, the internal communications Comptel now is seeking are not clearly responsive to its FOIA request for "all pleadings and correspondence" in FCC File No. EB-04-IH-0342. Even if those communications were responsive, Comptel has waived any request for those records by expressly limiting its request at the administrative level. Those materials are subject to withholding under Exemption 5 in any event. On April 12, 2005, Plaintiff expressly

---

[5] Since the parties filed motions for summary judgment on the same day, Comptel did not have FCC's declarations when it prepared and filed its brief.

10

clarified that its FOIA request was for correspondence between AT&T and FCC, not FCC's internal communications. Lancaster Decl., Attachment D, note 5. Although Comptel now purports to want these documents, its change of heart comes too late. Comptel's request on its face, and as expressly limited by Comptel, does not cover internal FCC e-mails, memoranda and other strictly internal documents. The Court therefore need not evaluate FCC's withholding of such records. In Nation Magazine v. Dep't of State, 1995 WL 17660254 at *6 (D.D.C. Aug. 18, 1995), Judge Green noted the possibility that a FOIA plaintiff could be held to have limited a FOIA request by taking "a position at another stage of [the] proceedings that would constitute a waiver . . . ." Cf. Tooley v. Bush, 2006 WL 3783142 at *18 (D.D.C. Dec. 21, 2006) (noting reasonableness of the agency's searches where the agency initially had limited its search based upon a telephone conversation with the requester's counsel); Nation Magazine, 1995 WL 17660254 at *5 (holding that "Plaintiffs' actions in this litigation, however, have partially limited this request") (citation omitted). Comptel is simply overreaching in seeking an order from this Court concerning material that it already represented to FCC was not at issue. See Lancaster Decl., Attachment D, note 5.

Moreover, even if Comptel had not waived its claim to the internal materials, the FCC's decision to withhold them under Exemption 5 is proper. See Supplemental Declaration of Judy Lancaster at ¶¶ 5 et seq. Withheld materials must be both predecisional, Jordan, 591 F.2d at 774, and deliberative, i.e., "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." Vaughn v. Rosen, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). Thus, so long as a document is generated as part of such a continuing process of agency decisionmaking, Exemption 5 is applicable. FCC properly withheld e-mails among

11

FCC staff discussing issues related to the investigation, and staff memoranda dealing with these issues, pursuant to the deliberative process privilege. FCC's internal communications include e-mails seeking advice and assistance from DOJ. Supple. Lancaster Decl. at ¶¶ 6-9 (possible referral to DOJ), 14 (DOJ opinions), 12 (comparing AT&T investigation with past investigations). These materials also include handwritten notes and edits on draft versions of the consent decree. Id. at ¶¶ 19-23. These communications also include staff-level discussion of strategy in settlement negotiations, and internal documents prepared for settlement purposes. Id. at ¶¶ 25-28, 31-34. FCC staff also interpreted AT&T invoices pursuant to FCC's investigatory function and staff discussed how those invoices relate to the investigation. Id. at ¶ 29. FCC withheld drafts and notes created by staff, id. at ¶¶ 32, 48-49, 55-56, 60-65, staff discussion of settlement proposals and analysis, id. at ¶¶ 35-37, and staff discussion of possible courses of action. Id. at ¶ 52.

These communications occurred during pendency of the investigation and thus are pre-decisional, or are predecisional and deliberative with respect to other FCC decisions. IHD's investigation was prompted by an August 6, 2004 letter from AT&T notifying IHD that AT&T had discovered "certain irregularities" during an internal audit that constituted an "apparent violation of the E-rate rules." Lancaster Decl. at ¶ 5. AT&T's notification prompted IHD to issue AT&T an LOI requiring it to provide the FCC with certain company records and information.[6] Id. at ¶ 6. The withheld material reflects core deliberative communications, such as staff-level advice and recommendations, the exchange of drafts, and typewritten notes. The

---

[6] IHD's investigation concluded on December 16, 2004 by the adoption of a Consent Decree. Lancaster Decl. at ¶ 5.

final executed consent decree is releasable.  However, preliminary drafts of the consent decree and an agreement tolling the statute of limitations are protected under Exemption 5 because they reflect the tentative thinking of FCC staff with respect to these issues in drafts, the final versions of which are matters of public record.  See Lancaster Decl. at ¶ 25; Sierra Club v. U.S. Dep't of Interior, 384 F. Supp. 2d 1, 18-20 (D.D.C. 2004) (draft documents were pre-decisional and exempt from disclosure).[7]

As explained in FCC's initial papers, the purpose of the deliberative process privilege is to "prevent injury to the quality of agency decisions."  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975).  Specifically, the bases for this privilege include: (1) encouraging open, frank discussions on matters of policy between subordinates and superiors; (2) protecting against premature disclosure of proposed policies before they are finally adopted; and (3) protecting against the public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action.  See, e.g., Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980); Jordan v. United States Dep't of Justice, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (en banc).  See also Schell v. HHS, 843 F.2d 933, 942 (6th Cir. 1988) ("It is the free flow of advice, rather than the value of any particular piece of information, that Exemption 5 seeks to protect.").

Accordingly, materials such as reports or other documents that summarize issues and advise superiors are properly protected under the deliberative process privilege.  See, e.g.,

---

[7] Additionally, portions of e-mails discussing the draft consent decree that involve communications between FCC staff and AT&T properly are withheld under the settlement privilege embraced by Exemption 5.  Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc. d/b/a Heatway Systems, 332 F.3d 976 (6th Cir. 2003) (recognizing settlement privilege)).

Thompson v. Dep't of the Navy, No. 95-347, 1997 WL 527344, at *4 (D.D.C. Aug. 18, 1997) (protecting materials created to brief senior officials who were preparing to respond to media inquiries, on the basis that "disclosure of materials reflecting the process by which the Navy formulates its policy concerning statements to and interactions with the press" could stifle frank communication within the agency), aff'd, No. 97-5292, 1998 WL 202253, at *1 (D.C. Cir. Mar. 11, 1998) (per curiam).  A category of documents particularly likely to be found exempt under the deliberative process privilege is "drafts."  See, e.g., City of Va. Beach v. Dept. of Commerce, 995 F.2d 1247, 1253 (4th Cir. 1993).

Plaintiff argues that FCC cannot withhold purely factual material pursuant to Exemption 5.  Comptel Memo. at 16.  In any event, it is settled that even factual material can be withheld where the facts themselves reflect the agency's deliberative process.  See, e.g., Nat'l Wildlife, 861 F.2d 1114, 1118 (9th Cir. 1988) (rejecting simplistic fact/opinion distinction, and instead focusing on whether documents in question play role in agency's deliberative process); Skelton v. USPS, 678 F.2d 35, 38-39 (5th Cir. 1982) (explaining that focus should be on whether release of documents would reveal agency's evaluative process).  In fact, the Court of Appeals, sitting en banc, firmly declared that factual information should be examined "in light of the policies and goals that underlie" the privilege and in "the context in which the materials are used."  Wolfe, 839 F.2d at 774; see also Nat'l Wildlife, 861 F.2d at 1119 ("ultimate objective" of Exemption 5 is to safeguard agency's deliberative process).  "Selective" facts, such as FCC's focus on particular invoices during its investigation are therefore entitled to the same protection as that afforded to purely deliberative materials, as their release would "permit indirect inquiry into the mental

processes," Williams v. United States Dep't of Justice, 556 F. Supp. 63, 65 (D.D.C. 1982), and so

"expose" predecisional agency deliberations.    Mead Data, 566 F.2d at 256.

Moreover, factual information can be withheld when it is so inextricably connected to the

deliberative material that its disclosure would expose or cause harm to the agency's deliberations.

If revealing factual information is tantamount to revealing the agency's deliberations, then the

facts may be withheld.    See, e.g., Wolfe, 839 F.2d at 774-76 (protecting mere "fact" of status of

proposal in deliberative process); Tarullo, 170 F. Supp. 2d at 278 ("Although the document does

summarize relevant facts, that summary is so intertwined with . . . recommendations and

opinions . . . that production of a redacted version would be incomprehensible, and the very

selection of facts could also reveal the nature of those recommendations and opinions.").    See

also Quarles v. Dep't of the Navy, 893 F.2d 390, 392-93 (D.C. Cir. 1990).    Similarly, when

factual or statistical information is actually an expression of deliberative communications, it may

be withheld on the basis that to reveal that information would reveal the agency's deliberations.

SMS Data Prods. Group, Inc. v. United States Dep't of the Air Force, No. 88-481, 1989 WL

201031, at **1-2 (D.D.C. Mar. 31, 1989) (holding technical scores and technical rankings of

competing contract bidders predecisional and deliberative).

Consistent with the analysis above, the FCC proposes to release purely factual material,

for example the chart attached to an internal e-mail "containing DOJ opinions." Supple.

Lancaster Decl. at ¶ 11.  As the declaration explains in detail, however, the redacted material

includes, for example, notes of recommendations and views expressed by staff.  These

documents and e-mails record the authors' personal interpretations, recollections, and

impressions of candid discussions (and sometimes the candid discussions themselves)

concerning the ongoing investigation of AT&T and other matters.  Release of these materials would have an adverse effect on the FCC's deliberative process.  Their release would expose the FCC's decision-making process and could chill the free flow of opinion that is necessary to develop policy.  See, e.g., Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048-49 (D.C. Cir. 1982) (permitting the withholding of a draft manuscript under Exemption 5 as a communication "which, if revealed, would expose to public view the deliberative process of an agency" because its disclosure would, among other things, "violate the integrity of the decision-making process").  Additionally, the withheld materials, if released, could confuse the public by revealing opinions that were not adopted in the consent decree executed by AT&T and FCC.  Finally, the very process by which a draft evolves into a final document constitutes a deliberative process warranting protection.  See id.

**D.    The FCC Properly Withheld Records, or Portions of Records Pursuant To FOIA Exemptions 6 and 7(C).**

Here, IHD redacted the names and other identifying information of individuals identified in AT&T's submissions contained in IHD case file no. EB-04-IH-0342.  See Lancaster Decl. at ¶ 29.  Plaintiff does not contest these withholdings and thus Defendant is entitled to a grant of summary judgment as to this issue.  Comptel's Statement of Facts, Ex. E at 2.  Intervenor AT&T seeks to protect FCC's entire investigative file because it was compiled for law enforcement purposes and because its release could reasonably be expected to constitute an unwarranted invasion of AT&T's privacy.  See 5 U.S.C. § 552(b)(7)(C); AT&T's Memo. at 8-20.  As discussed above, AT&T's intervention in this case has created a situation similar to a reverse FOIA case, where AT&T is arguing for withholdings that extend beyond those proposed by FCC. FCC has not yet released any material because all of the responsive records still are in dispute in

16

this litigation.  See AT&T's brief at 21-22 (citing, inter alia, Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1184 (8th Cir. 2000)).

AT&T asks the Court to extend the reach of Exemption 7(c) beyond the applicable case law.  The Supreme Court's recent decision in National Archives and Records Administration v. Favish, 124 S.Ct. 1570, 1580-81 (2004) discussed this exemption as applying to "individuals." Even prior to the decision in Favish, it was well established that individuals have privacy interests in their names, home addresses, and telephone numbers.  See FLRA, 510 U.S. at 500 (recognizing that the privacy interests in home addresses are substantial); National Association of Retired Federal Employees v. Horner, 879 F.2d 873, 875 (D.C. Cir. 1989)(noting that the privacy interests of individuals avoiding disclosure of their names and home addresses are significant). The FOIA exempts from the requirement of disclosure

> (7)  records or information compiled for law enforcement purposes, . . . to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy. . . .

5 U.S.C. § (b)(7)(C).  This exemption, for example, protects the identities of suspects and other persons of investigatory interest who are identified in agency records in connection with law enforcement investigations.  Reporters Comm. for Freedom of the Press v. U.S. Dept of Justice, 816 F.2d 730, 780 (D.C. Cir. 1987), modified on other grounds, 831 F.2d 1124 (D.C. Cir. 1987), rev'd on other grounds, 489 U.S. 749 (1989); Computer Prof'ls for Social Responsibility v. U.S. Secret Serv., 72 F.3d 897, 904 (D.C. Cir. 1996); Nation Magazine v. U.S. Customs Service, 71 F.3d 885, 893, 895-96 (D.C. Cir. 1995); SafeCard Services, Inc. v. S.E.C., 926 F.2d 1197, 1206 (D.C. Cir. 1991).  In addition, the names of law enforcement officers who work on criminal investigations are protected under Exemption 7(C).  Davis v. U.S. Dep't of Justice, 968 F.2d

1276, 1281 (D.C. Cir. 1992); Lesar v. U.S. Dept of Justice, 636 F.2d 472, 487-88 (D.C. Cir.

1980).  Similarly, individuals who provide information to law enforcement authorities, like the

law enforcement personnel themselves, have protectable privacy interests in their anonymity.

Computer Prof'ls for Social Responsibility, 72 F.3d at 904; Farese v. U.S. Dep't of Justice, 683

F. Supp. 273, 275 (D.D.C. 1987).  None of these cases extends Exemption 7 as far as AT&T

suggests.

**E.    FCC Properly Assessed Segregability.**

Due to the procedural posture of this case, no party has contested this issue.  However,

the FOIA requires that if a record contains information that is exempt from disclosure, any

"reasonably segregable" information must be disclosed after deletion of the exempt information,

unless the non-exempt portions are "inextricably intertwined with exempt portions."  5 U.S.C. §

552(b); Mead Data, 566 F.2d at 260.  As explained in FCC's declarations, the agency has met its

requirements.  The fact that FCC continues to propose releases, even up to the filing of this

Memorandum,[8] demonstrates the care and good faith with which FCC has processed the FOIA

request and segregated any applicable material.[9]

---

[8] Specifically, the FCC has determined that it may release portions of e-mails containing material
that do not reflect staff deliberations and that can readily be segregated from deliberative material
without disclosing its context.  See Lancaster Decl. at ¶¶ 31-32.  These consist of a news article
and a chart listing AT&T e-rate projects.  See Lancaster Decl. at ¶ 32.

[9] The Court should bear in mind that FCC is not required "to provide such a detailed
justification" that the exempt material would effectively be disclosed.  Id.  All that is required is
that the government show "with 'reasonable specificity'" why a document cannot be further
segregated.  Armstrong v. Executive Office of the President, 97 F.3d 575, 578-79 (D.C. Cir.
1996).  Moreover, the agency is not required to "commit significant time and resources to the
separation of disjointed words, phrases, or even sentences which taken separately or together
have minimal or no information content."  Mead Data, 566 F.2d at 261.

## **CONCLUSION**

For the foregoing reasons, this Court should grant defendant's motion for summary

judgment, enter summary judgment for Defendant and dismiss Plaintiff's Complaint with

prejudice.

Respectfully submitted,

\_\_\_\_\_s/Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

\_\_\_\_\_s/Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

\_\_\_\_\_s/Peter S. Smith_____
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

Of counsel:

Michael A. Krasnow, Esq.,
Office of General Counsel,
Federal Communications Commission

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| COMPTEL, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    **Civil Action No. 06-1718 (HHK)** |
| | ) |
| FEDERAL COMMUNICATIONS | ) |
| COMMISSION, | ) |
| | ) |
|     Defendant. | ) |

_____

**SUPPLEMENTAL DECLARATION OF JUDY LANCASTER**

1.      I am presently employed as an attorney in the Investigations and Hearings Division ("IHD"), Enforcement Bureau ("EB"), Federal Communications Commission ("FCC" or "Commission").  I have been employed in that capacity since the FCC's EB was created in 1999.

2.      The information set forth in this Supplemental Declaration is based upon my knowledge acquired in my official position in IHD, EB, FCC.

3.      On February 12, 2007, I executed a Declaration in this case.  As set forth in my February 12, 2007 Declaration (at ¶ 33), certain documents contained in IHD case file no. EB-04-IH-0342 are releasable.  These include a (1) June 4, 2004 cover letter with attached Plea Agreement in _United States v. NEC-Business Network Solutions, Inc_. (43 pages, with personally identifiable information redacted from cover letter); (2) May 28, 2004 cover letter with attached Settlement Agreement in _U.S. ex rel. San Francisco Unified School District v. Nippon Electric Co. Business Network Solutions, et al_., No. C 02-2398 CRB; _U.S. v. NEC-Business Network Solutions, Inc_., CR 04-184 CRB (13 pages); and (3) FCC Order _In the Matter of Request for Review of a Decision of the Universal Service Administrative Company by Naperville Community Unit School District 203 Naperville, Illinois, et al_., released February 27, 2001 (8 pages, with the handwriting of FCC staff redacted).

4.      As further set forth in my February 12, 2007 Declaration (at ¶¶ 17-22; ¶¶ 27-30), the records that the FCC withheld from release on the basis of FOIA Exemptions 4, 6, and 7(C) include SBC's September 13, 2004 response (with exhibits) to the FCC's August 24, 2004 letter of inquiry (LOI), a total of 268 pages.  AT&T correctly indexed these records in the Declarations of Ann Rotatori (at ¶¶ 5-7) and Kelly P. Dunbar (at Attachment A to Exhibit B thereto) attached to the Motion for Summary Judgment of Intervenor-Defendant AT&T Inc.  These records are thus not re-indexed here.  SBC's September 13, 2004 response also includes a copy of the FCC's LOI.  The remaining record that the FCC withheld from release to plaintiff on the basis of FOIA Exemption 4

is SBC's August 6, 2004 letter (with attachments) notifying the FCC that SBC had discovered "certain irregularities" during an internal audit that constituted an "apparent violation of the E-rate rules" (15 pages, inadvertently described as "approximately 30 pages" in my Declaration because two duplicate copies were attached together).

5.      As further set forth in my February 12, 2007 Declaration (at ¶¶ 23-26), the FCC withheld from release on the basis of FOIA Exemption 5 a total of 237 pages of records. Duplicate copies of certain documents were inadvertently counted within these 237 pages of records.  These include: (1) SBC's August 6, 2004 letter and attachments thereto (30 pages); (2) the FCC's LOI (9 pages); (3) the cover letter to SBC's September 13, 2004 response to the FCC's LOI, with two other pages from SBC's response attached thereto (3 pages); and (4) the Executed Tolling Agreement between the FCC and SBC (4 pages). The total amount of records that the FCC withheld from release on the basis of FOIA Exemption 5 is thus 191 pages (237 pages minus 46 pages of duplicates.)  Set forth below is an index of these 191 pages of records:

**<u>Records Withheld Pursuant to FOIA Exemption 5</u>**

6.      Seven-page e-mail chain between FCC employees, dated January 6, 2005 through January 11, 2005, subject "RE: SBC Documents," discussing the FCC's investigation of SBC Communications, Inc. ("SBC") for violations of the FCC's rules in connection with the submission of claims for and receipt of universal service support for the New London, Connecticut Public Schools ("FCC's E-rate investigation"), and possible referral to the U.S. Department of Justice ("DOJ").

7.      Two-page e-mail chain between FCC employees, dated January 10, 2005 through January 11, 2005, subject "FW: SBC Documents," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ.

8.      Three-page e-mail chain between FCC employees, dated January 10, 2005 through January 11, 2005, subject "RE: SBC Documents," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ, with handwritten notes.

9.      Two-page e-mail chain between FCC employees, dated January 10, 2005 through January 11, 2005, subject "RE: SBC Documents," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ, with handwritten notes.

10.     Three-page handwritten notes of FCC staff, dated January 10, 2005, discussing coordination and possible courses of action that FCC and/or DOJ can pursue in E-rate investigations in light of proceedings in FCC's E-rate investigation of SBC.

11.     Five-page e-mail chain between FCC staff and DOJ officials, dated December 20, 2004 through January 6, 2005, subject "SBC e-rate consent decree," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to

DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases, with attached one-page chart identifying SBC New London E-rate projects.

12.    Three-page e-mail chain between FCC staff, dated December 20, 2004 through January 6, 2005, subject "FW: SBC e-rate consent decree," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases.

13.    Four-page e-mail chain between FCC staff and DOJ officials, dated December 20, 2004 through January 6, 2005, subject "RE: SBC e-rate consent decree," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases, with attached one-page chart identifying SBC New London E-rate projects.

14.    Three-page e-mail chain between FCC staff and DOJ officials, dated December 20, 2004 through January 6, 2005, subject "FW: SBC e-rate consent decree," discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases.

15.    One-page e-mail between FCC staff, dated December 6, 2004, subject "Tolling Agreement Extension.doc," discussing edits to draft Tolling Agreement Extension between the FCC and SBC.

16.    One-page e-mail between FCC staff, dated November 30, 2004, subject "SBC E-rate," discussing edits to draft Compliance Plan.

17.    One-page e-mail between FCC staff, dated November 9, 2004, subject "RE: SBC E Rate – New London," discussing edits to draft Consent Decree and strategies for presenting FCC counter-offer to SBC.

18.    One-page handwritten note of FCC staff, dated November 9, 2004, containing SBC employee's contact information.

19.    Three-page e-mail chain between FCC staff and SBC officials, dated October 22, 2004 through October 29, 2004, subject heading may not be disclosed because it would reveal protected information, discussing edits to draft Consent Decree and draft Compliance Plan.

20.    Two-page e-mail chain between FCC staff and SBC officials, dated October 22, 2004 through October 29, 2004, subject heading may not be disclosed because it would reveal protected information, discussing edits to draft Consent Decree and draft Compliance Plan.

21.    One-page handwritten notes of FCC staff, dated October 29, 2004, discussing meeting between FCC and SBC officials regarding possible points to be included in Consent Decree and Compliance Plan.

22.    Two-page e-mail between FCC staff, dated October 21, 2004, subject "RE: SBC E Rate," discussing edits to draft Consent Decree.

23.    One-page e-mail between FCC staff, dated October 21, 2004, subject "SBC E Rate," discussing edits to draft Consent Decree, with handwritten notes, and attached five-page draft Consent Decree with edits.

24.    One-page e-mail from FCC official to SBC officials, dated October 12, 2004, subject "Tolling Agreement, EB-04-IH-0342," stating that Tolling Agreement was signed.

25.    One-page e-mail between FCC staff, dated October 8, 2004, subject "FW: SBC e-rate New London," discussing FCC and SBC settlement offers and FCC strategies in settlement discussions.

26.    One-page handwritten notes of FCC staff, dated October 7, 2004, discussing potential settlement terms in FCC's E-rate investigation of SBC.

27.    One-page e-mail between FCC staff, dated October 7, 2004, subject "SBC E Rate – New London," discussing settlement negotiations between FCC and SBC regarding FCC's E-rate investigation, with attached one-page summary of matters at issue prepared for settlement negotiations.

28.    One-page e-mail between FCC staff, dated October 7, 2004, subject "RE: SBC E Rate - New London," discussing potential FCC settlement counter-offers in FCC's E-rate investigation of SBC.

29.    Two-page e-mail between FCC staff, dated October 5 through 7, 2004, subject "RE: SBC New London," discussing invoices at issue in FCC's E-rate investigation of SBC and how invoices may relate to investigation.

30.    One-page e-mail between FCC staff, dated October 5 through 7, 2004, subject "RE: SBC E Rate – Invoices," discussing FCC's interpretation of SBC invoices regarding FCC's E-rate investigation and FCC investigatory practices regarding such invoices.

31.    Four-page memorandum between FCC staff, dated October 5, 2004, prepared for settlement negotiations and discussing matters at issue in FCC E-rate investigation of SBC and the parties' settlement negotiations.

32.    One-page FCC staff typewritten notes, dated September 30, 2004, discussing SBC settlement offer and possible FCC counter-offers.

33.     Two-page e-mail between FCC staff, dated September 28 through September 30, 2004, subject "RE: SBC New London," discussing settlement discussions between FCC and SBC and potential FCC strategies and counter-offers.

34.     Two-page e-mail between FCC staff, dated September 28 through September 30, 2004, subject "RE: SBC New London," discussing settlement discussions between FCC and SBC and potential FCC strategies and counter-offers.

35.     One-page e-mail between FCC staff and USAC official, dated September 23, 2004, subject "Requirement that funds be used at sites specified on the," discussing analysis of FCC rules at issue in FCC's E-rate investigation of SBC and how rules might apply to that investigation.

36.     Two-page handwritten notes of FCC staff, dated September 23, 2004, discussing meeting with SBC and SBC settlement proposals for resolving FCC's E-rate investigation of SBC.

37.     Three-page e-mail chain between FCC officials, dated September 7, 2004 through September 22, 2004, subject "SBC E Rate," discussing FCC staff opinions regarding possible courses of action for FCC to pursue in its E-rate investigation of SBC and possible violations.

38.     Three-page e-mail chain between FCC officials, dated September 20, 2004 through September 21, 2004, subject "FW: SBC E Rate," discussing staff opinions regarding possible courses of action for FCC to pursue in its E-rate investigation of SBC; discussions with SBC officials; and issues regarding settlement.

39.     One-page of handwritten notes of FCC staff, with attached three-page e-mail chain between FCC officials, dated August 25, 2004 through September 14, 2004, subject "RE: SBC E-rate," discussing FCC staff opinions regarding possible courses of action for FCC to pursue in its E-rate investigation of SBC.

40.     Two-page e-mail between FCC staff, dated August 25, 2004 and September 14, 2004, subject "RE: SBC e-rate," discussing FCC staff opinions regarding possible courses of action for the FCC to pursue in its E-rate investigation of SBC.

41.     Two-page e-mail between FCC staff, dated August 25, 2004 through September 7, 2004, subject "RE: SBC E-rate," discussing FCC staff opinions regarding possible courses of action for the FCC to pursue in its E-rate investigation of SBC, with handwritten notes on first page.

42.     Two-page e-mail between FCC staff, dated August 25, 2004 through September 7, 2004, subject "RE: SBC E-rate," discussing FCC staff opinions regarding possible FCC rules at issue in FCC's E-rate investigation of SBC and how these rules might relate to that investigation.

43.    One-page e-mail between FCC staff, dated August 25, 2004, subject "SBC e-rate," discussing issues that FCC should review in connection with its E-rate investigation of SBC.

44.    One-page e-mail between FCC staff, dated August 18, 2004, subject "SBC e-rate," discussing suggested edits to draft FCC LOI to SBC, with handwritten notes.

45.    One-page e-mail between FCC staff, dated August 6, 2004, subject "SBC e-rate," discussing telephone conversation with SBC officials regarding SBC's internal E-rate investigation and the FCC's possible courses of action.

46.    Two-page e-mail between FCC staff and SBC officials, dated August 6, 2004 through August 9, 2004, subject heading may not be disclosed because it would reveal protected information, discussing SBC's August 6, 2004 letter notifying the FCC that SBC had discovered "certain irregularities" during an internal audit that constituted an "apparent violation of the E-rate rules" and possible FCC courses of action.

47.    Two-page e-mail chain between FCC staff and SBC officials, dated August 6, 2004 through August 9, 2004, subject heading may not be disclosed because it would reveal protected information, discussing SBC's August 6, 2004 letter to the FCC described in paragraph 46 above and possible FCC courses of action, with attached 15-page SBC August 6, 2004 letter (with attachments) containing handwritten notes of FCC staff.

48.    Six-page draft FCC Letter of Inquiry to SBC, dated "August __, 2004," with handwritten edits.

49.    Nine-page draft FCC Letter of Inquiry to SBC, dated "August __, 2004."

50.    One-page e-mail between FCC staff and USAC officials, dated April 14, 2004, subject "FW: Surveillance Cameras," discussing whether E-rate pays for certain equipment.

51.    Two-page e-mail between FCC staff, dated February 6, 2004, subject "2/6 TR Daily story on Sprint & E-Rate program," containing FCC staff opinion on news article.

52.    Six-page draft memorandum from FCC staff to other FCC staff, dated "February __, 2004," subject heading may not be disclosed because it would reveal protected information, summarizing issues in another E-rate matter and discussing possible courses of action for the FCC to pursue in that matter, with handwriting and edits.

53.    Six-page draft memorandum from FCC staff to other FCC staff, dated "February __, 2004," subject heading may not be disclosed because it would reveal protected information, summarizing issues in another E-rate matter and discussing possible courses of action for the FCC to pursue in that matter, with handwriting and edits.

54.     Six-page draft memorandum from FCC staff to other FCC staff, dated "February __, 2004," subject heading may not be disclosed because it would reveal protected information, summarizing issues in another E-rate matter and discussing possible courses of action for the FCC to pursue in that matter, with handwriting and edits.

55.     One-page handwritten notes of FCC staff discussing certain "DOJ issues" relating to subject matter that is unclear, dated January 6, 2004.

56.     Two-page handwritten notes of FCC staff, undated, discussing FCC rules associated with possible SBC violations of E-rate program and possible SBC E-rate violations.

57.     Two-page draft Tolling Agreement Extension between FCC and SBC, undated, with handwritten edits.

58.     Two-page draft Tolling Agreement Extension between FCC and SBC, undated.

59.     One-page handwritten notes of FCC staff, undated, discussing timeline of events in connection with FCC's E-rate investigation of SBC and FCC rules related thereto.

60.     Three-page typed notes of FCC staff, undated, subject "SBC E Rate Investigation – New London, CT," summarizing and discussing possible violations and courses of action for the FCC to pursue in its E-rate investigation of SBC, with handwritten notes and edits.

61.     One-page handwritten notes of FCC staff, undated, discussing tasks that FCC may perform in connection with FCC's E-rate investigation of SBC.

62.     Three-page handwritten notes of FCC staff, undated, summarizing and discussing possible violations and courses of action for the FCC to pursue in its E-rate investigation of SBC, with handwritten notes and edits.

63.     One-page handwritten notes of FCC staff, undated, discussing possible SBC violations in connection with FCC's E-rate investigation of SBC.

64.     One-page handwritten notes of FCC staff, undated, subject "Invoices SBC E Rate," discussing information in connection with FCC's E-rate investigation of SBC.

65.     One-page handwritten notes of FCC staff, undated, discussing information in connection with FCC's E-rate investigation of SBC.

66.     Four-page draft Consent Decree between FCC and SBC, undated, with handwritten notes and typed edits.

67.    Six-page draft Consent Decree between FCC and SBC, undated, with typed edits and handwritten notes.

68.    Six-page draft Consent Decree between FCC and SBC, undated, with typed edits and handwritten notes.

69.    Four-page draft Consent Decree between FCC and SBC, undated, with typed edits and handwritten notes, with attached one-page e-mail between FCC and SBC officials (dated October 28, 2004) discussing edits, and three-page memo discussing SBC E-Rate Compliance Program, with FCC staff handwritten notes.

70.    Four-page executed Tolling Agreement between FCC and SBC, with one-page fax transmission cover sheet and one-page confirmation page, and one-page EB cover sheet.

71.    Pursuant to 28 U.S.C. § 1746, I, Judy Lancaster, declare under penalty of perjury that the foregoing is true and correct.  Executed on this 13th day of April, 2007.


_____
Judy Lancaster

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

COMPTEL,                              )
                                      )
     Plaintiff,                       )
                                      )
     v.                               )     Civil Action No. 06-1718 (HHK)
                                      )
FEDERAL COMMUNICATIONS                )
  COMMISSION,                         )
                                      )
     Defendant,                       )
                                      )
AT&T,                                 )
                                      )
     Intervenor.                      )
_____)

## DEFENDANT'S RESPONSE TO THE PARTIES' STATEMENTS OF UNDISPUTED MATERIAL FACTS

Defendant submits this response in support of its statement of material facts as to which there is no genuine issue and in response to Intervenor-Defendant AT&T's Proposed Statement of Undisputed Material Facts, Document No. 19, and Plaintiff Comptel's Statement of Material Facts as to Which There is no Genuine Dispute, Document No. 20. Each of the parties in this case have moved for summary judgment, thus explicitly recognizing that this FOIA case should be resolved on summary judgment.

A.     <u>Response to AT&T's Statement of Facts</u>

AT&T's paragraphs 3, 4, 10 contain characterizations of the record. The referenced documents are the best evidence of their contents. Paragraph 16 is a legal conclusion, not a fact.

B.     <u>Response to Comptel's Statement of Facts</u>

Paragraph 7 includes legal conclusions, and is not material because FCC regulations allow FCC to designate material as confidential on its own motion.

Paragraph 9 is a characterization of the referenced documents, which are the best evidence of their contents.

Paragraph 12 draws incorrect conclusions from, and is a misstatement of, the referenced July 20, 2005 e-mail, which is the best evidence of its contents.

Paragraphs 14 and 15 are characterizations of the referenced documents, which are the best evidence of their contents.

Paragraph 16 is not material, since FCC is not legally required to produce a <u>Vaughn</u> declaration or index during its administrative processing of the FOIA request. Paragraph 21 is not material for the same reason.

Paragraphs 23-26 are not material because a delayed response does not entitled a requester to a grant of summary judgment. Instead, the Court's review of FCC's withholdings is <u>de novo</u>.

Paragraph 27 is moot and is an argument, not a fact. The paragraph is moot because FCC has provided the Court with two declarations. In addition, AT&T has identified in detail the material at issue.

Respectfully submitted,

      s/Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

      s/Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

     s/Peter S. Smith
PETER S. SMITH, D.C. BAR # 465131
Assistant United States Attorney

United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0372

Of counsel:

Michael A. Krasnow, Esq.,
Office of General Counsel,
Federal Communications Commission