## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **COMPTEL,** | ) |
| | ) |
| Plaintiff, | )      Civil Action No. 06CV01718 (RCL) |
| | ) |
| v. | ) |
| | ) |
| **Federal Communications Commission,** | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF COMPTEL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.Pro. 56 and LCvR 7, Plaintiff COMPTEL hereby submits its memorandum of points and authorities in support of its motion for summary judgment against Defendant Federal Communications Commission ("FCC").  COMPTEL seeks an order enjoining the FCC from withholding the records requested by COMPTEL pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, and compelling the FCC to produce the documents improperly withheld.   COMPTEL also requests a declaratory judgment that the FCC has violated the FOIA in this case and that its pattern and practice of ignoring its obligations to comply with the time deadlines set forth in the statute is unlawful and contravenes the intent and purpose of the statute's requirement that an agency shall make records promptly available in response to a FOIA request.

## INTRODUCTION

COMPTEL is a non-profit trade association whose members are communications service providers and their supplier partners.  On April 4, 2005, COMPTEL submitted an electronic FOIA request to the FCC for all pleadings and correspondence in FCC File No.

EBH-04-IH-0342, the file opened to investigate Intervenor AT&T, Inc.[1] for violations of

Section 254 of the Communications Act, 47 U.S.C. §254, and Part 54 of the FCC's rules, 47

C.F.R. §§54.1 *et seq.*, in connection with the submission of claims for and receipt of universal

service funds for the New London, Connecticut Public Schools.[2]  The FCC terminated its

investigation in December 2004 upon issuance of an Order adopting a Consent Decree.[3]

 This case has had a long and tortuous history since COMPTEL filed its FOIA request

more than seven years ago, including a trip to United States Court of Appeals for the Third

Circuit and a trip to the Supreme Court on AT&T's "reverse FOIA" claims.[4]  Nonetheless, the

FCC has yet to comply with its obligations under FOIA.   Even after all hurdles had been

cleared to the release of documents to COMPTEL, the FCC has engaged and continues to engage

in unconscionable delay in producing responsive material to which COMPTEL is entitled.   Not

only is the FCC's refusal to comply with its legal obligations under FOIA disturbing in

COMPTEL's case, it appears to be part of a policy or practice that the FCC follows in processing

all FOIA requests.

## ARGUMENT

 Fed. R.Civ. Pro 56(c) provides that summary judgment shall be rendered forthwith if the

record shows that there is no genuine issue as to any material fact and that the moving party is

---

[1] FCC File No. EB-04-IH-0342 was opened to investigate conduct by SBC
Communications, Inc.  On November 21, 2005, SBC Communications, Inc. consummated its
merger with AT&T Corp. and changed its name to AT&T, Inc.  For convenience, COMPTEL
refers to the former SBC Communications, Inc. as AT&T throughout.

[2] COMPTEL's Statement of Undisputed Facts at ¶¶ 1-2.

[3] COMPTEL's Statement of Undisputed Facts at ¶ 3.

[4] COMPTEL's Statement of Undisputed Facts at ¶ 17.

entitled to a judgment as a matter of law.  Only disputes over facts that might affect the outcome

of the suit should preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.* 477

U.S. 242, 248 (1986).   There is no dispute over any material fact that might affect the outcome

of this suit and COMPTEL is entitled to judgment as a matter of law.

## I.      The FCC Has Routinely Disregarded Its FOIA Obligations

The substantive law governing COMPTEL's motion is straightforward.  The FOIA

requires every federal agency, upon request, to make "promptly available to any person" any

"records" so long as the request "reasonably describes such records" and the records are not

subject to an exemption from disclosure.  5 U.S.C. §552(a)(3).  *Assassination Archives &*

*Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003).  The statute sets forth specific time

limits within which federal agencies must act on FOIA requests.  5 U.S.C. §552(a)(6)(A).  To the

extent an agency seeks to withhold records, it must provide an estimate of the volume of records

it proposes to withhold.  5 U.S.C. §552(a)(6)(F).  The FCC failed to comply with any of these

statutory requirements.

When the government withholds responsive material, it bears the burden of

demonstrating the applicability of at least one of nine specific exemptions.  5 U.S.C. §552(b).

The law is clear that

> [i]f an agency invokes an exemption, it bears the burden of establishing the
> applicability of the claimed exemption.  And, even if an agency establishes an
> exemption, it must nonetheless disclose all reasonably segregable, nonexempt
> portions of the requested record(s). 5 U.S.C. §552(b).

*Assassination Archives & Research Ctr. v. C.I.A*, 334 F.3d at 57.   The FCC redacted all

or nearly all of the text of the 193 pages produced to COMPTEL on November 1, 2011

but failed to make the particularized showing that would allow COMPTEL or the Court

to determine whether any of the asserted exemptions protect the redacted material.

3

The FCC has cavalierly ignored its obligations under FOIA.  COMPTEL filed its FOIA request with the FCC in April 2005.  COMPTEL was forced to file this suit because of the FCC's failure to act on COMPTEL's administrative appeal eleven months after it was filed. Even after the Supreme Court's March 1, 2012 decision rejecting AT&T's objections to disclosure and repeated requests from COMPTEL, the FCC failed to produce any responsive documents.  One month after COMPTEL filed a Motion to Lift the Stay in this proceeding and three months after the Supreme Court's decision, the FCC finally made the first responsive documents available, 18 percent of which were in the public domain.[5]  The FCC did not produce additional responsive documents until a full eight months after the Supreme Court's decision.[6] The text of the documents produced was entirely or vitually all redacted.[7]

It was another seven months before the FCC acted on COMPTEL's administrative appeal of the redactions made in the second production.  Although the FCC granted in part COMPTEL's administrative appeal and determined that it was entitled to additional material on June 19, 2012,[8] another month has passed and the agency has yet to release any additional information.  Such dilatory conduct is a blatant violation of 5 U.S.C. §552(a)(6)(A)(i) and (ii), but par for the course in the FCC's processing of FOIA requests.[9]

---

[5]     COMPTEL Statement of Undisputed Facts at ¶¶ 13, 18-19.

[6]     COMPTEL Statement of Undisputed Facts at ¶ 21.

[7]     COMPTEL Statement of Undisputed Facts at ¶ 22.

[8]     COMPTEL Statement of Undisputed Facts, Exhibit 5 at ¶¶ 2, 21.

[9]     See Federal Communications Commission, Freedom of Information Act Annual Report Fiscal Year 2011 at 13 (average response time for administrative appeals was 307 days) available at  http://www.justice.gov/oip/fy11.html; Federal Communications Commission, Freedom of Information Act Annual Report Fiscal Year 2010 at 13 (average response time for administrative appeals was 389 days) available at http://www.justice.gov/oip/fy10.html; Federal Communications Commission, Freedom of Information Act Annual Report Fiscal Year 2009 at

When an agency denies a request for records, as the FCC has done with COMPTEL's

request, Section 552(a)(6)(F) of FOIA requires the agency to estimate the volume of records that

it proposes to withhold.  The FCC has failed to comply with this statutory requirement.  The

FCC informed COMPTEL on June 22, 2005, more than two months after it received

COMPTEL's FOIA request, that it was reviewing the documents in File No. EB-04-IH-0342  in

response to COMPTEL's request.[10]   One month later, on July 20, 2005, the FCC said it had

identified approximately 3200 pages of documents responsive to COMPTEL's FOIA request and

estimated the cost to retrieve, review and copy the documents at $2237.70.[11]   Two weeks later,

on August 5, 2005, the FCC issued its decision granting in part and denying in part COMPTEL's

request.[12]  That decision said nothing about the volume of records the FCC proposed to release

or withhold.[13]

Not until the first round of summary judgment briefs were filed in this Court in February

2007 did the FCC represent that there were only a little over 500 pages responsive to

---

13 (average response time for administrative appeals was 653 days) available at
http://www.justice.gov/oip/fy09.html; Federal Communications Commission, Freedom of
Information Act Annual Report Fiscal Year 2008 at 13 (average response time for administrative
appeals was 388 days) available at http://www.justice.gov/oip/fy08.html; Federal
Communications Commission, Freedom of Information Act Annual Report Fiscal Year 2007 at 1
(average response time for administrative appeals was 540 days) available at
http://www.justice.gov/oip/fy07.html; Federal Communications Commission, Freedom of
Information Act Annual Report Fiscal Year 2006 at 1 (average response time for administrative
appeals was 338 days) available at http://www.justice.gov/oip/fy06.html; Federal
Communications Commission, Freedom of Information Act Annual Report Fiscal Year 2005 at 2
(average response time for administrative appeals was 292 days) available at
http://www.justice.gov/oip/fy05.html.

[10]     COMPTEL Statement of Undisputed Facts at ¶ 5.

[11]     COMPTEL Statement of Undisputed Facts at ¶ 5.

[12]     COMPTEL Statement of Undisputed Facts at ¶ 7 and [#20, Exhibit C].

[13]     COMPTEL Statement of Undisputed Facts at ¶ 9.

COMPTEL's FOIA request.[14]   This is in contrast to the estimate of 3200 pages that the FCC identified as responsive to COMPTEL's request in July 2005 when it was well into its review of the File and when it asked COMPTEL for a commitment to pay $2238.00 in fees to complete its review and copying of the documents.[15]   The FCC Enforcement Bureau issued its decision just two weeks after receiving COMPTEL's commitment to pay the fee.[16]   Because COMPTEL requested records from a single Enforcement Bureau file, estimating the volume of documents in that file would not have been a difficult or complicated task and surely could have been accomplished with a degree of certainty in the month between June 22, 2005 and July 20, 2005. Volumewise, it would be difficult to confuse one ream of paper (500 pages) with six reams of paper (3000 pages).  To the extent that the FCC has withheld the other 2600-2700 pages of documents it identified as responsive to COMPTEL's request and used as the basis for calculating the search and copying fee,  it has an obligation to disclose that fact under Section 552(a)(6)(F) and to identify the basis for withholding under Section 552(b).  *King v. United States Dep't of Justice,* 830 F.2d 210, 223-224 (D.C. Cir. 1987) (agency must describe each document or portion thereof withheld and the consequences of disclosing the sought-after information).  The FCC has failed to do either.  The Court should enter a finding that the FCC's conduct in this case has been unlawful and that its failure to disclose the volume of material withheld violates FOIA.  The Court should also enter a finding that the FCC's delays in making responsive documents available to COMPTEL have been unreasonable and inexcusable.

---

[14]     COMPTEL Statement of Undisputed Facts at ¶ 12.

[15]     COMPTEL Statement of Undisputed Facts at ¶ 5.

[16]     COMPTEL Statement of Undisputed Facts at ¶¶ 6-7.

FOIA imposes no limits on this Court's equitable powers to enforce its terms. *Payne Enterprises Inc. v. United States,* 837 F. 2d 486, 494 (D.C. Cir. 1988). As discussed below, the FCC has failed to meet its burden of proving that many of the redactions it has made to the documents produced are justified under one or more of the nine FOIA exemptions. The Court should issue an order directing the FCC to produce unredacted versions of the documents discussed below without further delay.

## II.     The FCC Has Failed To Justify Withholding Any Material

The purpose of the FOIA is to "permit access by the citizenry to most forms of government records." *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973), *cert. denied,* 415 U.S. 977 (1974). FOIA provides that all documents must be made available to the public unless specifically exempted. The exemptions from disclosure are to be narrowly construed. *Id.* COMPTEL seeks an order compelling the FCC to produce unredacted versions of certain of the documents produced by the FCC on November 1, 2011 that the FCC alleges are exempt from disclosure pursuant to Exemptions 4, 5, 6 and 7(C).[17]

The FCC bears the burden of demonstrating the applicability of a FOIA exemption to every document or portion of a document that it withholds from disclosure. The D.C. Circuit has described that burden as follows:

> the burden which the FOIA specifically places on the Government to show that the information withheld is exempt from disclosure cannot be satisfied by the sweeping and conclusory citation of an exemption plus submission of disputed material for *in camera* inspection. . . . Thus, *we require that when an agency seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.*

---

[17]     COMPTEL Statement of Undisputed Facts at ¶ 22.

*Mead Data Cent., Inc. v. United States Dep't. Of The Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) (emphasis added), citing *Vaughn v. Rosen*, 484 F.2d 820, 824-26 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974).

Neither the Declarations of Judy Lancaster submitted by the FCC to this Court with its first round of summary judgment papers[18] nor the FCC's June 19, 2012 decision[19] come close to providing this Court with an adequate foundation to review the soundness of the FCC's redactions. On the contrary, the Declarations and the FCC's decision contain the very types of "conclusory and generalized allegations of exemptions" that have been repudiated by the D.C. Circuit as insufficient to satisfy an agency's burden under FOIA. See *Vaughn v. Rosen*, 484 F.2d at 826. The lack of detail precludes a finding that the FCC has satisfied its burden of proving that Exemptions 4, 5, 6 or 7(C) protect the redacted material from disclosure.

Exemption 4 protects from disclosure trade secrets and commercial or financial information obtained from a person and privileged or confidential. 5 U.S.C. §552(b)(4). The FCC has failed to demonstrate that the material it has redacted pursuant to Exemption 4 meet each of these criteria.

Exemption 5 protects from disclosure inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency. 5 U.S.C.§ 552(b)(5). The Exemption is designed to protect documents normally privileged in the civil discovery context. Documents that are protected by the deliberative process privilege may be withheld from disclosure as may documents that are protected by the attorney work product privilege. *Dep't. of the Interior v. Klamath Water Users Protective*

---

[18]    See February 12, 2007 Declaration of Judy Lancaster [#21, Attachment 1] and April 13, 2007 Supplemental Declaration of Judy Lancaster [#26, Attachment 1].

[19]    COMPTEL Statement of Undisputed Facts, Exhibit 5.

*Ass'n.*, 532 U.S. 1, 8 (2001); *Coastal States Gas Corporation v. Dep't of Energy,* 617 F.2d 854, 862 (D.C. Cir. 1980); *Mead Data Cent., Inc. v. United States Dep't. of the Air Force*, 566 F.2d 242. The FCC's allegations that the deliberative process privilege or work product privilege protect the redacted material from disclosure are unsupported by the requisite detailed justification and must be rejected.

Exemption 6 protects from disclosure personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. 5 U.S.C. §552(b)(6). The FCC has invoked Exemption 6 to redact the names of agency staff  who authored or received copies of e-mails, memoranda and other correspondence at issue, but failed to demonstrate that disclosure of the names would constitute a clearly unwarranted invasion of their personal privacy.

Finally, Exemption 7(C) protects records or information compiled for law enforcement purposes but only to the extent that the production of such records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy. 5 U.S.C. §552(b)(7)(C). The FCC also cited Exemption 7(C) to redact the names of agency staff who authored or received the documents at issue, but failed to demonstrate that Exemption 7(C) protects any of the material redacted.

**A.  Communications With AT&T**

The FCC has redacted pursuant to Exemptions 4, 5, 6 and 7(C) virtually all of 12 documents to which AT&T was a party. Those documents are described in Ms. Lancaster's Supplemental Declaration as follows:

**Document No. 14**: This document corresponds to the one described in Paragraph 19 of Ms. Lancaster's Supplemental Declaration: "Three-page e-mail chain between FCC staff and SBC officials, dated October 22,2004 through October 29, 2004, subject heading may not be disclosed

because it would reveal protected information, discussing edits to draft Consent Decree and draft Compliance Plan."[20]

**Document No. 15:** This document corresponds to the one described in Paragraph 20 of Ms. Lancaster's Supplemental Declaration: "Two-page e-mail chain between FCC staff and SBC officials, dated October 22,2004 through October 29, 2004, subject heading may not be disclosed because it would reveal protected information, discussing edits to draft Consent Decree and draft Compliance Plan."[21]

**Document 19:** This document corresponds to the one described in Paragraph 24 of Ms. Lancaster's Supplemental Declaration: "One page e-mail from FCC official to SBC officials, dated October 12, 2004 subject 'Tolling Agreement, EB-04-IH-0342,' stating that Tolling Agreement was signed."[22]

**Document 41:** This document corresponds to the one described in Paragraph 46 of Ms. Lancaster's Supplemental Declaration: "Two- page e-mail between FCC staff and SBC officials, dated August 6, 2004 through August 9, 2004, subject heading may not be disclosed because it would reveal protected information, discussing SBC's August 6, 2004 letter notifying the FCC that SBC had discovered 'certain irregularities' during an internal audit that constituted an 'apparent violation of the E-rate rules' and possible FCC courses of action." [23]

**Document 42:** This document corresponds to the one described in Paragraph 47 of Ms. Lancaster's Supplemental Declaration:  "Two-page e-mail between FCC staff and SBC officials, dated August 6, 2004 through August 9, 2004, subject heading may not be disclosed because it would reveal protected information, discussing SBC's August 6, 2004 letter to the FCC described in Paragraph 46 above and possible FCC courses of action with attached 15 page SBC August 6, 2004 letter (with attachments) containing hand written notes of FCC staff."[24]

**Document 52:** This document corresponds to the one described in Paragraph 57 of Ms. Lancaster's Supplemental Declaration: "Two-page draft Tolling Agreement between FCC and SBC, undated, with handwritten edits."[25]

---

[20]     Supplemental Declaration of Judy Lancaster at ¶19.  [#26, Attachment 1].

[21]     *Id.*  at ¶20.

[22]     *Id.* at ¶24.

[23]     *Id.* at ¶46.

[24]     *Id.* at ¶47.

[25]     *Id.* at ¶57.

**Document 53:**  This document corresponds to the one described in Paragraph 58 of Ms. Lancaster's Supplemental Declaration: "Two-page draft Tolling Agreement between FCC and SBC, undated." [26]

**Document 61:**  This document corresponds to the one described in Paragraph 66 of Ms. Lancaster's Supplemental Declaration:  "Four-page draft Consent Decree between FCC and SBC, undated, with handwritten notes and typed edits." [27]

**Document 62:**  This document corresponds to the one described in Paragraph 67 of Ms. Lancaster's Supplemental Declaration:  "Six-page draft Consent Decree between FCC and SBC, undated, with typed edits and handwritten notes." [28]

**Document 63:**  This document corresponds to the one described in Paragraph 68 of Ms. Lancaster's Supplemental Declaration:  "Six-page draft Consent Decree between FCC and SBC, undated, with typed edits and handwritten notes." [29]

**Document 64:**  This document corresponds to the one described in Paragraph 69 of Ms. Lancaster's Supplemental Declaration:  "Four-page draft Consent Decree between FCC and SBC, undated, with typed edits and handwritten notes, with attached one-page e-mail between FCC and SBC officials (dated October 28, 2004) discussing edits, and three-page memo discussing SBC E-Rate Compliance Program, with FCC staff handwritten notes." [30]

**Document 65**:  This document corresponds to the one described in Paragraph 58 of Ms. Lancaster's Supplemental Declaration: "Four-page executed Tolling Agreement between FCC and SBC, with one-page fax transmission cover sheet and one-page confirmation page, and one-page EB cover sheet." [31]

 **Exemption 5.**  The deliberative process privilege of Exemption 5 is designed to serve the

objectives of avoiding premature disclosure of agency decisions and encouraging the free

exchange of ideas among administrative personnel.  *Mead Data Cent., Inc. v. United States*

*Dep't. of the Air Force*, 566 F.2d at 257.  It goes without saying that communications with a

---

[26] *Id.* at ¶58.

[27] *Id.* at ¶66.

[28] *Id.* at ¶67.

[29] *Id.* at ¶68.

[30] *Id.* at ¶69.

[31] *Id.* at ¶70.

third party adversary are not intra-agency or inter-agency memoranda or letters. Exemption 5

cannot be used to shield documents exchanged between an agency and an outside party. *NAACP*

*Legal Defense and Educational Fund v. United States Dep't of Justice,* 612 F. Supp. 1143

(D.D.C. 1985) (correspondence with a third party is not protected by Exemption 5); *Philadelphia*

*Newspapers, Inc. v. Dep't of Health and Human Services,* 69 F.Supp. 2d  63, 68 (D.D.C. 1999)

(any documents disclosed to a third party may not be withheld under Exemption 5).  Nor can

Exemption 5 be used to shield internal agency memoranda that record or reflect offers made to a

third party by the government and counteroffers made by the third party in response.

       The FCC claims that it withheld these materials pursuant to Exemption 5 because they

relate "to settlement discussions."[32]  There is no federal settlement privilege in the discovery

context or under Exemption 5.  *In re Subpoena Issued to Commodity Futures Trading*

*Commission,* 370 F. Supp. 2d 201 (D.D.C. 2005) (rejecting plea to recognize federal settlement

privilege); *.NAACP Legal Defense and Educational Fund v. DOJ,* 612 F. Supp. at 1146; *Center*

*for Auto Safety v. U.S. Dep't of Justice,* 576 F. Supp. 739, 749 (D.D.C. 1983), *vacated on other*

*grounds,* 1983 U.S. Dist. LEXIS 15611 (D.D.C. 1983) (Exemption 5 does not protect consent

decree documents shared with defendant either during or after settlement negotiations);

*Mokhiber v. U.S. Dep't of Treasury,* 335 F. Supp. 2d 65 (D.D.C. 2004) (Exemption 5 does not

protect information pertaining to settlement discussions between an agency and a third party).

While F.R.E. 408 offers some protection for settlement discussions, it only limits a document's

admissibility at trial for the purpose of proving liability, not its disclosure for other purposes.

*Center for Auto Safety v. DOJ,* 576 F. Supp. at 749.   The FCC's assertion that its "precedent

---

[32]     COMPTEL Statement of Undisputed Facts, Exhibit 5 at ¶17.

permits the withholding of material relating to settlement discussions pursuant to Exemption 5"[33] does not provide a basis for sustaining its Exemption 5 claim.  As the court stated in *Center for Auto Safety v. DOJ,* 576 F. Supp. at 749, there is no clear Congressional intent to include a settlement negotiation privilege in Exemption 5.  The FCC is not free to rewrite the statute to create such a privilege or to interpret Exemption in a manner contrary to the intent of Congress.

Documents 52 and 53 and documents 61 through 64 are redacted in their entirety and the text of Document 42 is virtually all redacted.   Ms. Lancaster's Supplemental Declaration states that Documents 42 and 64 contain handwritten notes of FCC staff, that documents 52 and 61-63 contain handwritten notes and typed edits and that Document 53 is an undated draft agreement between the FCC and AT&T.  The FCC does not disclose who the authors of the documents are, the author(s) of the handwritten notes and typed edits or whether those handwritten notes or edits or draft agreements were authored by or shared with AT&T.  Under these circumstances, Exemption 5 cannot be invoked to protect these documents from disclosure under the deliberative process privilege.

**Exemption 6.**  The FCC has invoked Exemption 6 to selectively redact authors, addressees and individuals who were copied on the documents as well as the text of some of the emails.  Exemption 6 is designed to protect the confidentiality of personal matters.  *United States Dep't of State v. Washington Post Co.,* 456 U.S. 595, 600 (1982).  Under Exemption 6, the government bears a heavy burden to demonstrate that disclosure would constitute a clearly unwarranted invasion of personal privacy.  The presumption in favor of disclosure under Exemption 6 "is as strong as can be found anywhere" in FOIA.  *Washington Post Co. v. United States Dep't of Health and Human Services,* 690 F. 2d 252, 261 (D.C. Cir. 1982).

---

[33]     *Id.*

The FCC stated that "the names and information at issue that have been redacted identify private individuals and government employees,"[34] but it did not demonstrate how disclosure of any of the names or other information that have been redacted would constitute a clearly unwarranted invasion of personal privacy.  The FCC's conclusory statement and generalized claim of exemption is insufficient to meet the FCC's burden of proving that Exemption 6 protects any of the redacted information.  *Akin, Gump, Strauss, Hauer & Feld v. United States Dep't of Justice*, 503 F. Supp. 2d 373, 379 (D.D.C. 2007) (conclusory statements and generalized claims of exemption are insufficient to justify withholding).

The FCC alleges that "the individual's protected privacy interest in his or her own personal information exists even when the information 'is not of an embarrassing or intimate nature.'"[35]  While this may be a correct statement of the law, the names of government employees are not personal information in which they have a protected privacy interest.  *VoteHemp, Inc. v. Drug Enforcement Administration,* 567 F. Supp. 2d 1, 14-15 (D.D.C. 2004) (redacted names of DEA employees are not protected by Exemption 6); *Aguirre v. Securities and Exchange Commission,* 551 F. Supp. 2d 33, 51 (D.D.C. 2008) (correspondence does not become personal solely because it identifies government employees; names of government employees who authored documents and received documents from third parties do not constitute personal information protected from disclosure by Exemption 6).

---

[34]  *Id.* at ¶11.  Neither Ms. Lancaster's Declaration nor her Supplemental Declaration explained why or how Exemption 6 protected the names of FCC employees [#21, Attachment 1; #26, Attachment 1].

[35]  *Id.*

Section 293.11 of Title 5 of the Code of Federal Regulations[36] provides that the names and duty stations of federal employees are available to the public. Moreover, the names, telephone numbers and e-mail addresses of FCC employees are available on the FCC's website. The names of the FCC employees that have been readacted by the FCC were acting in their official capacities as representatives of the government, not as private citizens. The FCC employees whose names were redacted from the correspondence with AT&T clearly have no expectation of privacy with respect to their names and employment at the FCC and disclosure of those names would not constitute a clearly unwarranted invasion of privacy. *Akin, Gump, Strauss, Hauer & Feld v. DOJ,* 503 F. Supp. 2d at 382 (privacy interest protected by Exemption 6 is the individual's interest in controlling dissemination of information regarding personal matters).

The FCC alleges globally and without tying its allegation to this particular enforcement matter that identifying FCC staff that worked on an Enforcement Bureau investigation "still can lead to unwanted exposure and contacts from third parties that would constitute clearly unwarranted invasions of privacy." Even if there was any merit to the FCC's allegation, which COMPTEL disputes, the Enforcement Bureau investigation involved in this matter was closed more than seven and one-half years ago. The FCC has failed to identify any unwanted exposure that may result from disclosure of the names of staff that would constitute a clearly unwarranted invasion of personal privacy. Nor has it identified any third parties or categories of third parties that might be interested in contacting or likely to contact those staff members in a manner that would invade their personal privacy.

---

[36]    5 C.F.R. §293.11.

**Exemption 7(C).** The FCC also invokes Exemption 7(C) to withhold the names of FCC

staff level employees whose names appear on the correspondence with AT&T.   The FCC

contends that disclosure of the "connection of any specific staff level employee to any one

investigation" could reasonably be expected "to cause an unwarranted intrusion of personal

privacy for staff  level employees that outweighs the public interest in releasing their names."[37]

The FCC's contention is disingenuous at best.  As the FCC itself admits, it disclosed the name of

at least one staff level employee involved in the investigation in both the Consent Decree and the

August 5, 2005 Enforcement Bureau FOIA decision, both of which are public documents.[38]   It is

difficult to imagine how the FCC could possibly contend that disclosure of the names of staff

who worked on the investigation and who authored or were copied on correspondence with

AT&T in response to a FOIA request would cause an unwarranted invasion of their personal

privacy, but disclosure of the names of staff who worked on the investigation in FCC documents

released to the public would not cause an unwarranted invasion of their personal privacy.

Even if the Court were to accept as valid the Commission's contention that disclosing the

names of staff level employees involved in the investigation would violate their personal privacy

rights, which it should not, the Commission has already violated those rights.  A copy of an e-mil

chain produced to COMPTEL on June 3, 2011 reveals the names of 9 different FCC staff

members involved in the matter.  A copy of the same e-mail chain produced to COMPTEL on

November 1, 2011 selectively redacts all but three of those names.[39]  The FCC's arbitrary and

---

[37]     COMPTEL Statement of Undisputed Facts, Exhibit 5 at ¶15.

[38]     *Id.*

[39]     Compare the redactions on Document 6 produced on November 1, 2011 with the
redactions on the identical document produced on June 3, 2011 at Pages 292-295, attached as
Exhibit A hereto.  Also compare the redactions on Document 46 produced on November 1, 2011

capricious interpretation of what constitutes a clearly unwarranted invasion of personal privacy as evidenced by its inconsistent redactions on the same document calls into question the good faith nature of its response to COMPTEL's FOIA request.

The FCC also has improperly invoked Exemption 7(C) to protect the names of individuals who authored or received copies of the correspondence between the Commission and AT&T or who sent faxes to the Commission.[40]  COMPTEL disputes both that the names of any of the individuals that were redacted pursuant to Exemption 7(C) from the documents exchanged between the Commission and AT&T were "compiled for law enforcement purposes" or that disclosure of those names could reasonably be expected to constitute an unwarranted invasion of personal privacy.  The names of the individuals who authored or received copies of the correspondence were not subjects, witnesses or confidential sources in the investigation, but counsel representing AT&T in the investigation.  And, as the FCC itself acknowledged, it publicly identified those individuals in the Consent Decree and the August 2005 Enforcement Bureau FOIA decision.[41]  Again, the FCC's arbitrary and capricious interpretation of what constitutes an unwarranted invasion of personal privacy calls into question the good faith nature of its response to COMPTEL's FOIA request.

The FCC has redacted the text of Documents 41 and 42 pursuant to Exemption 7(C), but has not even attempted to show that disclosure of the text is likely to cause an unwarranted

---

with the redactions on the identical document produced on June 3, 2011 at pages 297-298, attached as Exhibit B hereto.

[40]     COMPTEL Statement of Undisputed Facts, Exhibit 5 at ¶13.

[41]     *Id.* at ¶14. As the FCC noted, the AT&T employees who were identified in the public documents did not object to or "seek remediation" of the disclosure of their names. *Id.* at n. 44.

invasion of privacy. [42]  In the unlikely event that any of the redacted text reflects the names or other identifying information of individuals who were subjects, targets, witnesses or confidential sources in the FCC's investigation, COMPTEL has no objection to the redaction of that limited identifying information.

Exemption 4.  In some cases, the FCC has improperly invoked Exemption 4 to delete the names of authors, addressees, "contacts" or senders of faxes to the Commission.[43]  Needless to say, the FCC made no attempt to demonstrate, nor could it, that the names of individuals corresponding with the Commission or copied on correspondence with the Commission constitute trade secrets or privileged and confidential commercial or financial information.

The FCC has also redacted the entire text of Documents 15 and 42 pursuant to Exemption 4.   In her Supplemental Declaration, Ms. Lancaster described Document 15 as e-mails between FCC staff and AT&T officials discussing edits to the draft Consent Decree and Compliance Plan.  In its June 19, 2012 decision, the FCC stated that the edits were made by AT&T and that the Compliance Plan was proffered by AT&T.[44]  It did not, however, state that the document contained any confidential commercial or financial information let alone identify the nature of any confidential commercial or financial information contained therein.  The FCC's failure to do so is fatal to its claim that it properly withheld the document under Exemption 4. *National Parks & Conservation Ass'n. v. Morton,* 498 F. 2d 765, 766 (D.C.Cir. 1974)  (in order to bring a matter within Exemption 4, government must show that information is commercial or financial, obtained from a person and privileged or confidential).

---

[42]     *Id.* at ¶¶12-15.

[43]     *I.e.,*  Documents 14, 15, 19 , 41, 42, 64, 65.

[44]     COMPTEL Statement of Undisputed Facts, Exhibit 5 at ¶19.

Ms. Lancaster described Document 42 as e-mails between FCC staff and AT&T officials discussing AT&T's August 6, 2004 letter to the FCC and possible FCC courses of action with attached 15 page AT&T August 6, 2004 letter containing handwritten notes of FCC staff. The FCC already produced to COMPEL on June 3, 2011 a copy of AT&T's August 6, 2004 letter (with attachments) with limited redactions to protect AT&T's confidential commercial or financial information. COMPTEL does not challenge those redactions here. The handwritten notes of FCC staff, however, are not protected from disclosure pursuant to Exemption 4 because they were not obtained from a "person" within the meaning of the Exemption. *Philadelphia Newspapers, Inc. v. HHS,* 69 F. Supp. 2d at 67 (material not obtained "from a person" may not be withheld under Exemption 4). Moreover, the FCC's wholesale redaction of a letter already produced again calls into question its good faith in asserting exemptions from disclosure.

The FCC attempts to justify its wholesale redactions by stating that "even the placement of redactions on the document could indicate the deliberative analysis of the staff, which is protected under Exemption 5."[45]  If the FCC were correct, which it is not, redacted documents would always be exempt from disclosure under Exemption 5 because the location of redactions "could indicate the deliberative analysis of the staff."  Such a result would be contrary to Section 552(b) of FOIA which provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" and that "the amount of information deleted . . . shall be indicated at the place in the record where such deletion is made."  In any event, because the FCC has already made available  a copy of the document with limited redactions, any deliberative process privilege has

---

[45]      *Id.* at ¶17. n. 56.

been waived.  The FCC's baseless assertions of privilege from disclosure again call into question

its good faith in responding to COMPTEL's FOIA request.

     The FCC also claims that "material provided and exchanged in settlement negotiations

is not customarily released to the public by the provider or other parties" and that "[d]isclosure of

settlement discussion material could harm the commercial interests of submitting parties and is

very likely to impair the Commission's ability to carry out settlement negotiations efficiently,

contrary to the public interest in conserving scarce government resources and in encouraging

settlement negotiations."[46]  In so arguing, the FCC is attempting to rewrite Exemption 4 just as it

attempted to rewrite Exemption 5.  Whether particular information would customarily be

released to the public is not the only relevant inquiry in determining whether Exemption 4

applies.  *National Parks & Conservation Ass'n. v. Morton,* 498 F. 2d  at 767.  The Exemption

protects only (1) trade secrets and (2) commercial or financial information obtained from a

person and privileged or confidential.   The e-mails authored by the FCC were not obtained from

a person, thus barring their protection under Exemption 4.  The FCC does not allege that any of

the information contained in the subject e-mails consists of  trade secrets or commercial or

financial information obtained from AT&T, release of which would cause competitive harm to

AT&T, nor does it tie its theoretical allegation of commercial harm either to the material

redacted or to AT&T.

     The burden is on the agency to demonstrate actual competition and a likelihood of

competitive harm to justify withholding material under Exemption 4.  *Pacific Architects and*

*Engineers, Incorporated v. The Renegotiation Board*, 505 F.2d 383, 385 (D.C. Cir. 1974)

(agency resisting disclosure must present a detailed justification showing the extent to which

---

[46]    *Id.*  at ¶19.

disclosure will cause substantial harm to competitive position of entity from whom information obtained).  For purposes of Exemption 4, competitive harm is harm flowing from the affirmative use of proprietary information.  *CNA Financial Corporation v. Donovan,* 830 F.2d  1132, 1154 (D.C. Cir. 1987). The FCC's conclusory and generalized allegations of commercial harms that may result from disclosure of materials exchanged in settlement negotiations are unacceptable and insufficient to support its decision to withhold the e-mails.  *See Public Citizen Health Research Group v. Food and Drug Administration,* 704 F. 2d 1280, 1291  (D.C. Cir. 1983); *National Parks & Conservation Ass'n v. Morton,* 498 F. 2d 770 (fact that information is of a kind that would not  generally be made available for public perusal is not sufficient to support application of Exemption 4; government must also show that disclosure will harm legitimate private or government interests in secrecy).  The Court must reject the FCC's contention that Exemption 4 protects the e-mails.  *Cf. M/A-Com Information Systems v. United States Dep't of Health and Human Services,* 656 F. Supp. 691 (D.D.C. 1986) (portions of documents containing accounting and other internal procedures proposed by a company to obtain consent dismissal of debarment proceeding protected by Exemption 4).

To the extent that the FCC seeks to broaden the coverage of Exemption 4 to protect discussions of settlement between the government and a private party, citing *M/A-Com Information Systems v. United States Dep't of Health and Human Services,*[47] it is way out of line. In that case, the Court held only that portions of documents containing accounting and other internal procedures submitted to the government by a company in settlement negotiations were protected from disclosure by Exemption 4, not that settlement discussions themselves were

---

[47]    *Id.*, n. 69.

protected.  Significantly, the FCC cites no case decided by any court holding that Exemption 4

protects documents reflecting settlement discussions between the government and an adversary.

Having failed to demonstrate that Exemptions 4, 5, 6 or 7(C) protect the material

redacted from Documents 14, 15, 19, 41, 42, 52, 53 and 61-65, the FCC must be ordered to

produce the documents without redactions.  With respect to Document 42,  COMPTEL does not

object to the redactions made in the copy of AT&T's August 6, 2004 letter to the FCC that was

already produced but does object to the redaction of any handwritten notes.

### B.    Documents that Post-Date The Consent Decree

The Commission's investigation into possible E-rate violations by AT&T was

terminated with the Order approving the Consent Decree, which was released on December 16,

2004.[48]  The FCC has asserted that the deliberative process privilege of FOIA Exemption 5

protects from disclosure the majority of the text contained in Documents 1 through 9, all of

which post-date the Consent Decree, but it has failed to meet its burden of showing that the

Exemption does indeed protect any of the redacted materials.  It has also asserted that Exemption

6 protects from disclosure the authors and recipients of Documents 1 though 9, but it has failed

to demonstrate that disclosure of these names would constitute an unwarranted invasion of

personal privacy.

Ms. Lancaster's Supplemental Declaration describes the documents that post-date the

Consent Decree as follows:

> **Document 1**: This document corresponds to the one described in Paragraph 6 of Ms.
> Lancaster's Supplemental Declaration:  "Seven-page e-mail chain between FCC
> employees dated January 6, 2005 through January 11, 2005, subject 'RE: SBC
> Documents,' discussing the FCC's investigation of SBC Communications, Inc. for
> violations of the FCC's rules in connection with the submission of claims for and
> receipt of universal service support for the New London Connecticut Public Schools

---

[48]     COMPTEL's Statement of Undisputed Facts at ¶3.

('FCC's E-rate investigation'), and possible referral to the U.S. Department of Justice ('DOJ')."

**Document 2:** This document corresponds to the one described in Paragraph 7 of Ms. Lancaster's Supplemental Declaration: "Two-page e-mail chain between FCC employees, dated January 10, 2005 through January 11, 2005, subject 'FW: SBC Documents,' discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ."

**Document 3:** This document corresponds to the one described in Paragraph 8 of Ms. Lancaster's Supplemental Declaration: "Three-page e-mail chain FCC employees, dated January 10, 2005 through January 11, 2005, subject 'FW: SBC Documents,' discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ, with handwritten notes."

**Document 4:** This document corresponds to the one described in Paragraph 9 of Ms. Lancaster's Supplemental Declaration: "Two-page e-mail chain between FCC employees, dated January 10, 2005 through January 11, 2005, subject 'RE: SBC Documents,' discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ, with handwritten notes."

**Document 5:** This document corresponds to the one described in Paragraph 10 of Ms. Lancaster's Supplemental Declaration: "Three-page handwritten notes of FCC staff, dated January 10, 2005, discussing coordination and possible courses of action that FCC and/or DOJ can pursue in E-rate investigation in light of proceedings in FCC's E-rate investigation of SBC."

**Document 6:** This document corresponds to the one described in Paragraph 11 of Ms. Lancaster's Supplemental Declaration: "Five-page e-mail chain between FCC staff and DOJ officials, dated December 20, 2004 through January 6, 2005, subject 'SBC's e-rate consent decree,' discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases, with attached one-page chart identifying SBC New London E-rate projects."

**Document 7:** This document corresponds to the one described in Paragraph 12 of Ms. Lancaster's Supplemental Declaration: "Three-page e-mail chain between FCC staff, dated December 20, 2004 through January 6, 2005, subject 'FW: SBC E-rate consent decree,' discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases."

**Document 8:** This document corresponds to the one described in Paragraph 13 of Ms. Lancaster's Supplemental Declaration: "Four-page e-mail chain between FCC staff and DOJ officials, dated December 20, 2004 through January 6, 2005, subject 'RE: SBC e-rate consent decree,' discussing whether documents associated with the FCC's E-rate

investigation of SBC may be provided to DOJ and containing DOJ opinions regarding that investigation vis-à-vis similar investigations in other cases, with attached one-page chart identifying SBC New London E-rate projects."

**Document 9:** This document corresponds to the one described in Paragraph 14 of Ms. Lancaster's Supplemental Declaration: "Three-page e-mail chain between FCC staff and DOJ officials, dated December 20, 2004 through January 6, 2005, subject 'FW: SBC e-rate consent decree,' discussing whether documents associated with the FCC's E-rate investigation of SBC may be provided to DOJ and containing DOJ opinions regarding the investigation vis-à-vis similar investigations in other cases."[49]

**Exemption 5.** Two conditions must be met before the deliberative process privilege will be applied. First, the information at issue "must actually have been predecisional in the sense of being prior in time to the final decision of the agency" and second, "the ideas or opinions expressed must actually have been deliberative in the sense of contributing to the give and take of the consultative process." The Exemption protects recommendations, proposals, suggestions and other subjective documents which reflect the personal opinion of the writers rather than the policy of the agency so long as those recommendations, proposals, suggestions and other subjective documents actually predate the agency decision. *ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 132 (D.D.C. 2008); *Coastal States Gas Corporation v. DOE*, 617 F. 2d 854, 866 (D.C. Cir. 1980); *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978).

Documents 1 through 9 all postdate the Commission's Order approving the Consent Decree so the FCC's claim for protection of the documents pursuant to the deliberative process privilege fails to meet the first condition. While acknowledging that the subject documents are not predecisional with respect to the Consent Decree, the FCC states that

responsive material that post-dates a particular decision, however, may be deliberative and pre-decisional as to other matters and thus protected under Exemption 5. The documents at issue are emails between Commission staff and between Commission staff

---

[49]      [#26, Attachment 1 at ¶¶6-14].

and Department of Justice staff discussing issues relating to referral, sharing of documents, and possible courses of action that can be pursued by either agency.  We have reviewed the information withheld.  The information does not document or explain past Commission decisions, but instead discusses issues relating to whether matters could be referred to, and associated documents shared with, the Department of Justice; coordination with respect to other investigations and prosecutions involving similar or related issues; possible courses of action that could be pursued; and related deliberative observation and analysis.[50]

Neither this statement by the FCC nor the explanation in Ms. Lancaster's Declarations is sufficient to meet the FCC's burden of proving that Documents 1 through 9 have been properly withheld.  The D.C. Circuit has ruled that an index that identified who wrote a document, to whom it was addressed, the date of the document and a brief description of its contents was "patently inadequate" to permit a court to decide whether Exemption 5 was properly invoked to withhold material.  *Coastal States Gas Corporation v. DOE*, 617 F. 2d at 861.  Because the FCC has selectively redacted the names of the parties who authored the e-mails and the names of the parties to whom the e-mails were addressed or who were copied on the e-mails, its allegation that these 9 documents are exempt from disclosure is not supported by even the minimal information the Court found "patently inadequate"  in *Coastal States Gas Corporation v. DOE.  See also, People for the American Way Foundation v. United States Dep't of Education*, 516 F. Supp. 2d 28 (D.D.C. 2007) (agency must disclose names and affiliations of all senders and recipients of documents withheld pursuant to deliberative process privilege).

In order to determine whether a document is deliberative, "the identity of the parties to the memorandum is important; a comment from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made."  *Coastal States Gas Corporation v. DOE*, 617 F. 2d 854, 868; *Jordan v. United States Dep't of Justice*, 591 F.2d 753,

---

[50]    COMPTEL's Statement of Undisputed Facts, Exhibit 5 at ¶ 16.

774 (deliberative process privilege protects only communications between subordinates and superiors that are actually antecedent to the adoption of agency policy).   The FCC's refusal to fully identify the authors and/or addressees of Documents 1 through 9 precludes the Court from making a determination that the FCC properly withheld any of them under the deliberative process privilege. *People for the American Way Foundation v. Dep't of Education*, 516 F. Supp. 2d at 34 (agency must provide the court with a reasonable basis to evaluate claim of privilege). Moreover, the FCC's statement that the emails do not document or explain past Commission decisions, but instead discuss issues relating to whether matters could be referred to, and associated documents shared with, DOJ, possible courses of action that could be pursued "and related deliberative observation and analysis" is insufficient to allow the Court to determine that the contents of the documents are protected from disclosure by the deliberative process privilege.

To the extent that any of the e-mails withheld pursuant to Exemption 5 reflect the FCC's decision or an explanation of the FCC's decision not to pursue "other possible causes of action," they are final decisions and must be produced in unredacted form. *National Labor Relations Board v. Sears Roebuck & Co.,* 421 U.S. 132 (1975) (internal memoranda that explain decisions not to file a complaint are final opinions made in the adjudication of a case that fall outside the scope of Exemption 5); *SafeCard Services, Inc. v. Securities and Exchange Commission*, 926 F.2d 1197, 1204 (D.C. Cir. 1991) (agency's decision not to file injunctive action against a particular entity is final agency action in the adjudication of a case); *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 774 (opinions and interpretations that embody agency's effective law and policy not protected from disclosure by Exemption 5).   In addition, to the extent that any of the documents reflect a resolution of the referral issue or the document sharing issue, they must be produced in unredacted form.   An agency may not invoke the deliberative process

privilege to "shield a body of 'secret law' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Coastal States Gas Corporation v. DOE*, 617 F. 2d at 867.

FOIA reflects the strong public policy that the public is entitled to know what the government is doing and why and for this reason, Exemption 5 is to be narrowly construed. *NAACP Legal Defense and Educational Fund v. DOJ*, 612 F. Supp. at 1147.   The FCC is well aware that AT&T's E-rate violations were not limited to the New London, Connecticut School District, but indeed were perpetrated in four different Connecticut School Districts and involved millions of dollars.[51]   The FCC took no action against AT&T with respect to E-rate violations in the other three school districts.  Under these circumstances, the FCC's decision not to pursue "other possible causes of action" is significant and should be exposed to the light of day.

**Exemption 6.**  For the reasons discussed above,[52] the FCC has not met its burden of demonstrating that disclosure of the authors, addressees, or individuals copied on Documents 1 through 9, all of whom are presumably government employees acting in their official capacities, would constitute a clearly unwarranted invasion of their personal privacy.

## C.  Documents That Pre-Date The Consent Decree

The remaining documents produced by the FCC appear to pre-date the Commission's Order approving the Consent Decree, but the FCC has failed to demonstrate that Exemption 5

---

[51]     Two AT&T employees pled guilty to mail fraud in connection with their participation in E-rate program activities in the four Connecticut school districts and were subsequently debarred by the FCC from participating in the program for three years. *Notice of Suspension and Initiation of Debarment Proceedings for Richard Brown*, 22 FCC Rcd 17341, 2007 FCC Lexis 7115 (2007); *Notice of Debarment for Richard Brown*, 22 FCC Rcd 20569, 2007 FCC Lexis 8883 (2007); *Notice of Suspension and Initiation of Debarment Proceedings for Keith J. Madieros*, 23 FCC Rcd 7961, 2008 FCC Lexis 719 (2008); *Notice of Debarment for Keith J. Madieros*, 23 FCC Rcd 7959, 2008 FCC Lexis 4143 (2008).

[52]     See pages 13-15, *supra*.

shields Documents 10-12, 13, 17-18, 20, 22-26, 28-30, 32-33, 34, 35-40, 46, 47-49 from

disclosure or that Exemptions 4, 6 or 7(C) protect the identity of the authors or recipients of the

documents.  Ms. Lancaster's Supplemental Declaration provides the following information for

these documents:

> **Documents 10-12:** E-mails between FCC staff  discussing edits to draft tolling
> agreement extension between FCC and AT&T, edits to draft Compliance Plan and edits
> to draft   Consent Decree and strategies for presenting FCC counter-offer to AT&T.[53]
>
> **Document 13:** One page handwritten note of FCC staff, dated November 9, 2004,
> containing SBC employee's contact information.[54]
>
> **Document 17:** E-mail between FCC staff discussing edits to Consent  Decree.[55]
>
> **Document 18:** E-mail between FCC staff discussing edits to draft Consent
> Decree, with handwritten notes and attached five-page draft Consent Decree with edits.[56]
>
> **Document 20:** E-mail between FCC staff discussing FCC and AT&T
> settlement offers and FCC strategies in settlement discussions.[57]
>
> **Document 22:**  E-mail between FCC staff discussing settlement negotiations between
> FCC and SBC with attached one page summary of matters at issue prepared for
> settlement  negotiations. [58]
>
> **Documents 23-25:**  E-mails between FCC staff  discussing (1) potential FCC

---

[53]    These documents are described in Paragraphs 15-17 of Ms. Lancaster's Supplemental
Declaration [#26, Attachment 1].

[54]    This document is described in Paragraph 18 of Ms. Lancaster's Supplemental Declaration
[#26, Attachment 1].

[55]    This document is described in Paragraph 22 of Ms Lancaster's Supplemental Declaration
[#26, Attachment 1].

[56]    This document is described in Paragraph  23 of Ms Lancaster's Supplemental Declaration
[#26, Attachment 1].

[57]    This document is described in Paragraph 25 of Ms. Lancaster's Supplemental Declaration
[#26, Attachment 1].

[58]    This document is described in Paragraph 27 of Ms. Lancaster's Supplemental Declaration
[#26, Attachment 1].

counteroffers, (2) invoices at issue and how invoices might relate to investigation, (3) FCC's interpretation of AT&T invoices and FCC's investigatory practices regarding such invoices. [59]

**Document 26:** Memorandum between FCC staff prepared for settlement negotiations and discussing maters at issue and the parties' settlement negotiations.[60]

**Documents 28-29:** E-mails between FCC discussing SBC settlement offer and possible FCC counteroffers and discussing settlement discussions between FCC and SBC and potential FCC strategies and counteroffers. [61]

**Document 30:** E-mails between FCC staff and USAC official discussing analysis of rules at issue in FCC's investigation of AT&T and how rules might apply to investigation. [62]

**Documents 32-33:** E-mail chain between FCC officials discussing FCC staff opinions regarding possible courses of action to pursue in its investigation of AT&T and possible violations; discussions with AT&T officials; and issues regarding settlement. [63]

**Document 34:** One page of handwritten notes of FCC staff, with attached three page e-mail chain between FCC officials discussing FCC staff opinions regarding possible courses of action for the FCC to pursue. [64]

**Documents 35-40:** E-mails between FCC staff discussing FCC staff opinions regarding possible courses of action for the FCC to pursue, discussing possible FCC rules at issue and how the rules might relate to the investigation, discussing issues that FCC should review, discussing suggested edits to draft FCC Letter of Inquiry to AT&T,

---

[59]     These documents are described in Paragraphs 28-30 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

[60]     This document is described in Paragraph 31 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

[61]     These documents are described in Paragraphs 33-34 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

[62]     This document is described in Paragraph 35 of Ms Lancaster's Supplemental Declaration {#26, Attachment 1].

[63]     These documents are described in Paragraphs 37-38 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

[64]     This document is described in Paragraph 39 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

discussing telephone conversation with AT&T officials and FCC's possible courses of action. [65]

**Document 46**: E-mail between FCC staff, dated February 6, 2004, subject 2/6 TR Daily story on Sprint & E-Rate program" containing FCC staff opinion on news article. [66]

**Document 47-49:** Six-page draft memorandum from FCC staff to other FCC staff dated February __, 2004 subject heading may not be   disclosed because it would reveal protected information, summarizing issues in another E-rate matter and discussing possible courses of action for the FCC to  pursue in that matter, with handwriting and edits. [67]

   **Exemptions 4, 5, 6 and 7(C).**  The FCC has not identified the authors of or any of the parties that received any of these e-mails or memoranda.  Without the identity of the parties to the e-mails or memoranda, it is impossible for the Court to sustain a claim that any of them are protected from disclosure by Exemption 5's deliberative process privilege.  *Coastal States Gas Corporation v. Dep't of Energy*, 617 F. 2d at 861, 868.  Nor did the FCC make any showing with respect to the deliberative process involved and what role any of the documents played in that process.  *Id.* at 868 (agency has burden of establishing what deliberative process is involved and the role played by the documents in issue in the course of that process).  For these reasons, the FCC's assertion that Exemption 5 protects any of the redacted material.

   The FCC's attempt to use Exemption 4 to protect the identities of the authors and recipients of the documents is similarly unavailing.  The FCC has not alleged, nor could it, that the authors or recipients of any of these e-mails or memoranda constitute trade secret or

---

[65]     These documents are described in Paragraphs 40-45 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

[66]     This document is described in Paragraph 51 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

[67]     These documents are described in Paragraphs 52-54 of Ms. Lancaster's Supplemental Declaration [#26, Attachment 1].

privileged and confidential commercial or financial information obtained from a person.  Finally, the FCC cannot invoke Exemption 6 or 7(C) to shield the identity of the FCC staff members who authored or received the documents for the reasons discussed above.[68]  Because the FCC has failed to meet its burden of demonstrating that the redacted material in any of these documents is protected from disclosure, the Court should order them produced in unredacted form.

A few of these documents warrant more detailed discussion to illustrate the frivolous nature of the FCC's exemption claims.  The entirety of Document 13 is redacted pursuant to Exemptions 4 and 5.  The FCC provided no explanation, nor could it, as to how an AT&T employee's contact information could be considered a trade secret or competitively sensitive commercial or financial information or warrant protection under the deliberative process privilege.  Although COMPTEL has no objection to the redaction of the AT&T employee's contact information, any additional information in the document must be disclosed.  If in fact the only information in the document is the SBC employee's contact information, the FCC's good faith in claiming that that information is protected by Exemptions 4 and 5 is again called into question.

In addition to its failure to provide the minimal information necessary for the Court to determine that Exemption 5 protects any of the redacted material, the information that Ms. Lancaster did provide for Documents 20, 26, 28 and 29 demonstrates that they must be disclosed without redaction.  Exemption 5 cannot be used to shield internal agency memoranda that record or reflect offers made to AT&T by the FCC or offers or counteroffers made by AT&T to the FCC.  *Mead Data Cent., Inc. v. Dep't. of the Air Force*, 566 F.2d at 257-258 (information about negotiation process with third party is not protected by deliberative process privilege; all of the

---

[68]    See pages 13-18, *supra*.

information as to what the agency offered and what the third party counter-offered must be disclosed).

With respect to Document 30, the FCC claimed for the first time in its June 19, 2012 decision that the e-mail between "FCC staff and USAC official" discussing an analysis of FCC rules at issue in the investigation of AT&T, is protected by the attorney work product privilege.[69] The FCC contends that the "text of the email is the work product produced at the direction of the EB attorney in anticipation of litigation." The FCC's refusal to identify the parties to the e-mail, who prepared the analysis of the FCC's rules or whether that analysis was shared with AT&T makes it impossible for the Court to find that the work product privilege protects this document.

The Universal Service Administrative Company ("USAC") is an independent non-government corporation that administers the FCC's universal service fund and related programs, including the E-rate program.[70] The FCC's rules define USAC's responsibilities as "billing contributors, collecting contributions to the universal service support mechanisms, and disbursing universal service support funds."[71] USAC is not authorized to play an analytical role for the FCC. Indeed Section 54.702(c) of the FCC's rules provides that USAC may not make policy or interpret unclear provisions of the FCC's rules.[72] For the FCC to ask a "USAC official" to prepare an analysis of FCC's rules in anticipation of litigation would appear to be inconsistent with, and contrary to, the role USAC is authorized to play under Section 54.702, calling into question the FCC's assertion of work product privilege.

---

[69]     COMPTEL's Statement of Undisputed Facts, Exhibit 5, n.49.

[70]     47 C.F. R. §702(a).

[71]     47 C.F.R. §54.702(b).

[72]     47 C.F.R. §54.702(c),

The FCC has also failed to show that the deliberative process privilege protects the document. The deliberative process privilege covers only documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated. *Klamath Water Users Protective Ass'n.,* 532 U.S. at 9. Communications with outside consultants have been deemed part of the deliberative process only where they played the same role in an agency's deliberations as documents prepared by agency personnel. *Id.* at 10—11. The FCC has not alleged that the redacted material in Document 30 played any role in its decision making process and for that reason, it must be produced. *Coastal States Gas Corporation v. Dep't of Energy,* 617 F. 2d at 868 (rejecting agency's contention that straightforward application of regulations to specific factual situations protected by Exemption 5).

With respect to Document 46, the FCC produced the news article but redacted the "FCC staff opinion." While one might infer that the FCC staff opinion on the news article is personal rather than that of the FCC, the FCC has failed to show what role, if any, the opinion or the document played in the process of agency deliberations. The email is dated seven months before the FCC opened its investigation of AT&T and the FCC has not alleged that the staff opinion was in any way deliberative or that it contributed to the give and take of the consultative process in resolving the AT&T investigation. For this reason, it must be produced. *ICM Registry, LLC v. Dep't of Commerce,* 2007 U.S. Dist. LEXIS 22853 (D.D.C. 2007) (agency failed to demonstrate that record of a State Department officer's reaction to a newspaper article was predecisional and deliberative). The FCC's mere recitation of the buzz words "staff opinion" is not sufficient to justify withholding the redacted material pursuant to Exemption 5.

The FCC redacted Documents 47 through 49 in their entirety pursuant to Exemptions 5 and 6.  In addition to the fact that the parties to the memoranda are not disclosed (precluding a finding that the memoranda are protected by the deliberative process privilege), Exemption 5 does not protect any purely factual material that appears in the documents in a form that is segregable without compromising the deliberative or policy making material contained therein. *Environmental Protection Agency v. Mink*, 410 U.S. 73 (1973) (agency must demonstrate by surrounding circumstances that particular documents are purely advisory or deliberative and contain no separate factual information); *Sterling Drug v. Federal Trade Commission,* 450 F.2d 698 (D.C. Cir. 1971) (while communications of thoughts and opinions are to be protected, statements of fact are subject to disclosure).  A summary of issues would appear to be more factual than deliberative.  To the extent that any parts of Documents 47, 48 or 49 or any of the other documents contain statements of fact, those portions must be produced.

In its June 19, 2012 decision, the FCC claimed for the first time that Documents 47 through 49 are attorney work product.[73]  Specifically, the FCC states that the documents "constitute the work product of EB attorneys prepared in anticipation of the administrative litigation that may ensue from enforcement investigations, as well as potential federal court litigation challenging such enforcement actions."[74]  Such a general and conclusory allegation is insufficient to allow the Court or COMPTEL to make a reasoned determination as to whether the documents are protected by the attorney work product privilege. *Coastal States Gas Corporation v. Dep't of Energy,* 617 F. 2d at 866 (to demonstrate that the work product privilege protects a document, agency must establish in its affidavits or indexes the fact that a specific claim had

---

[73]     COMPTEL Statement of Undisputed Facts, Exhibit 5 at ¶18.

[74]     *Id.*

arisen, was disputed by the company and was discussed in the memorandum); *Senate of Puerto Rico ex Rel Judiciary Committee v. United States Dep't of Justice*, 823 F. 3d 574 at 586-87 (D.C. Cir. 1987) (DOJ affidavit asserting that withheld documents "were prepared by Civil Rights Division attorneys in anticipation of litigation" insufficient to demonstrate that they were attorney work product).

It is unclear what information the FCC is asserting is protected by Exemption 6 – whether it is the names and employer of the FCC staff who authored or received the memoranda or the entirety of the text of Documents 47 through 49. If it is the former, as discussed above, the FCC has failed to demonstrate how disclosure of the names of FCC employees acting in their official capacities would constitute a clearly unwarranted invasion of their personal privacy. If it is the latter, the FCC does not explain how these memoranda are personnel, medical or similar files or how the disclosure of the text of these documents would constitute an unwarranted invasion of personal privacy, let alone whose personal privacy would be invaded.

## III.   COMPTEL Is Entitled To Judgment As A Matter Of Law

An agency's unreasonable delays in disclosing non-exempt documents violate the purpose and intent of FOIA and this Court has the jurisdiction and the duty to remedy such abuses by enjoining the FCC from withholding the records requested by COMPTEL and ordering the production of the records improperly withheld. 5 U.S.C. §552(a)(4)(B)); *Payne Enterprises, Inc. v. United States,* 837 F. 2d 486, 494 (D.C. Cir. 1988) (courts have a duty to prevent agencies from engaging in unreasonable delays in disclosing non-exempt documents); *Electronic Privacy and Information Center v. Dep't. of Justice*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006) (same); *United States Dep't. of Justice v. Tax Analysts*, 492 U.S. 136 (1989). The undisputed facts show that the FCC identified and reviewed approximately 3200 pages of

records responsive to COMPTEL's FOIA request in June and July 2005,[75] but represented to this Court in February and April 2007 that there were only a little over 500 pages of responsive records.[76]  The FCC has never explained, in Ms. Lancaster's Declarations or otherwise, what happened to the other 2600-2700 pages nor has it disclosed that it is withholding approximately 2600 pages of responsive material as required by FOIA Section 552(a)(6)(F) or the basis for the withholding as required by FOIA Section 552 (b).

The undisputed facts also show that the FCC has not come close to complying with the statutory deadlines for resolving COMPTEL's FOIA request.[77]  It waited more than 3 months after the Supreme Court's March 1, 2011 decision rejecting AT&T's objections to release of the records to produce the first 362 pages of documents.  It waited 8 months after the Supreme Court's decision before releasing an additional 193 pages of documents it had identified as responsive to COMPTEL's FOIA request back in early 2007.  It waited an additional 7 months to issue a decision on COMPTEL's application for administrative review of the second production.   And despite the passage of another month, it has failed to produce any of the additional materials to which it determined COMPTEL was entitled on administrative review.

The undisputed facts also show that the FCC has not demonstrated with the requisite particularity that FOIA Exemptions 4, 5, 6 or 7(C) protect the redacted material in the second production.  Because the FCC has failed to justify the redactions under any of the nine FOIA exemptions, it is improperly withholding this material from COMPTEL.  COMPTEL is entitled to an order enjoining the FCC from continuing to withhold the redacted material.  Given the

---

[75]     COMPTEL Statement of Undisputed Facts at ¶ 5.

[76]     [#21, Attachment 1; #26, Attachment 1].

[77]     COMPTEL Statement of Undisputed Facts at ¶¶ 1, 11, 23.

FCC's consistent and repeated failures to adhere to its obligations under FOIA, COMPTEL is also entitled to a declaratory judgment that the FCC has acted unlawfully by engaging in unreasonable delays and improperly withholding responsive material.

## CONCLUSION

For the foregoing reasons, Plaintiff COMPTEL respectfully requests that the Court grant its motion for summary judgment against Defendant FCC and issue an order

1) enjoining the FCC from withholding the documents and redacted material responsive to COMPTEL's FOIA request discussed herein;

2) compelling the FCC to disclose the total volume of documents responsive to COMPTEL's FOIA request that it has not yet produced, including the other 2600 to 2700 pages identified as potentially responsive to COMPTEL's FOIA request in July 2005, and to produce a detailed description of each document withheld and why it is exempt from disclosure;

3) declaring that the FCC has violated the Freedom of Information Act and acted unlawfully by engaging in unreasonable delays and improperly withholding responsive material.

Respectfully submitted,

July 23, 2012

_____
Mary C. Albert, DC Bar # 347617
COMPTEL
900 17th Street, N.W. Suite 400
Washington, D.C.  20006
202-296-6650
malbert@comptel.org

Counsel for Plaintiff

# EXHIBIT A



(b) (6)

**From:** (b) (6)
**Sent:** Thursday, January 06, 2005 1:50 PM
**To:** (b) (6)
**Cc:** Hillary, DeNigro; Eric Bash; (b) (6)
**Subject:** SBC e-rate consent decree

(b) (5)

(b) (6)

(b) (5)

(b) (6)

Non-Public
For Internal Use Only

(b) (6)



1

(b) (6)

*** Non-Public: For Internal Use Only ***

-----Original Message-----
From: (b) (6)
Sent: Thursday, January 06, 2005 12:05 PM
To: Hillary, DeNigro
Cc: (b) (6)                                        Cathy Carpino; (b) (6)
(b) (6)
Subject: RE: SBC e-rate consent decree


Hillary,

(b) (5)

(b) (6)

*** Non-Public: For Internal Use Only ***

-----Original Message-----
From: (b) (6)
Sent: Thursday, January 06, 2005 10:07 AM
To: (b) (6)                   Hillary, DeNigro; Eric Bash
Cc:                       (b) (6)                        Cathy Carpino;
(b) (6)
Subject: FW: SBC e-rate consent decree
(b) (5)

*** Non-Public: For Internal Use Only ***

-----Original Message-----
From: (b) (6)
Sent: Wednesday, January 05, 2005 6:16 PM
To: (b) (6)
Cc:
Subject: FW: Another e-rate settlement

(b) (6)

(b) (5)

(b) (5)

(b) (5)                                                --(b) (6)

-----Original Message-----
From: (b) (6)
Sent: Monday, December 20, 2004 11:18 AM
To: (b) (6)
Cc:
(b) (6)
Subject: RE: Another e-rate settlement

(b) (5)

-----Original Message-----
From: (b) (6)
Sent: Monday, December 20, 2004 12:26 PM
To: (b) (6)
(b) (6)

Subject: Another e-rate settlement

This one was handled by the FCC's Enforcement Bureau (EB). (b) (5)
(b) (5)

An investigation into possible E-rate violations by SBC Communications was terminated by
the FCC last week with the adoption of a Consent Decree. According to the Decree, SBC had
found that its Connecticut subsidiary "...may have used or received E-Rate funds in a
manner inconsistent with the Commission's rules and orders. More specifically, SBC
informed the Bureau that, with respect to the NLPS [New London Public Schools], SBC
Connecticut invoiced the Schools and Libraries Division ("SLD") of the Universal Service
Administrative Company ("USAC") in one funding year for services provided in another; that
SBC Connecticut invoiced SLD for services it provided to certain schools and other
entities for which it had not sought and obtained authorization; and that SBC Connecticut
invoiced SLD for services that are not eligible for USF support."

As a part of the settlement, SBC refunded the amounts collected in connection with the erroneous invoices, withdrew any outstanding invoices, and agreed to "...make a voluntary contribution to the United States Treasury in the amount of five hundred thousand dollars ($500,000)..."

An important part of the Consent Decree, which may be of interest to other service providers as well, is an agreement by SBC to institute an E-rate "Compliance Plan" to include, at a minimum:

(1) The establishment and maintenance of an E-rate compliance program including both training packages and training sessions for all "...employees responsible for sales, account management, and project management relating to E-Rate contracts and services."

(2) The designation of a regional E-rate expert "...responsible for answering day-to-day E-Rate questions posed by employees in their business units and bringing potential violations of the E-Rate rules to the attention of the SBC Legal Department."

(3) The establishment and maintenance of "...an E-Rate Oversight Team to provide training and act as a resource for SBC's business units regarding the rules and requirements of the E-Rate Program."

(4) The establishment and maintenance of "E-Rate Oversight Team Subcommittees" with responsibilities for program requirements, training, marketing and communications, billings and collections, and process standardization.

(5) The designation of "...an employee with appropriate background and experience in E-Rate matters to act as SBC's principal point of contact with the SLD for questions relating to interpretation of the E-Rate rules, requests for extensions of E-Rate deadlines, and appeals of adverse decisions by SLD."
----------------------------------

Disclaimer: This newsletter may contain unofficial information on prospective E-rate developments and/or may reflect E-Rate Central's own interpretations of E-rate practices and regulations. Such information is provided for planning and guidance purposes only. It is not meant, in any way, to supplant official announcements and instructions provided by either the SLD or the FCC.

If you have received this newsletter from a colleague, and you would like to receive your own copy of E-Rate Central's E-Rate News for the Week, send an e-mail to subscribe@e-ratecentral.com.  Please include your name, organization, telephone, e-mail address and whether you want to receive the plain text version or the html version.

If you would like to be removed from our distribution list, send an e-mail to unsubscribe@e-ratecentral.com.  Please include your name, organization, telephone number, and the e-mail address which receives our newsletters.

For questions, suggestions or problems related to receiving this newsletter, contact news@e-ratecentral.com

PAGES 292-295

(b) (5)

**From:** (b) (5)
**Sent:** Thursday, January 06, 2005 1:50 PM
**To:** (b) (2), b (6)
**Cc:** Hillary, DeNigro; Eric Bash; Elizabeth Mumaw; Christopher Olsen
**Subject:** SBC e-rate consent decree

E-Rate
plications.doc (34 k)
(b)(2 &
6)



(b)(5)

(b)(2 & 6)

1

http://www.fcc.gov/eb

*** Non-Public: For Internal Use Only ***

-----Original Message-----
From: (b)(2 & 6)
Sent: Thursday, January 06, 2005 12:05 PM
To: Hillary, DeNigro
Cc: Charles Willoughby; Thomas Bennett; Karen Onyeije; Cathy Carpino; Elizabeth Mumaw;
Debra Weiner; Christopher Olsen; Eric Bash
Subject: RE: SBC e-rate consent decree

Hillary,

(b) (5)

(b)(2 & 6)

*** Non-Public: For Internal Use Only ***

-----Original Message-----
From: Debra Weiner
Sent: Thursday, January 06, 2005 10:07 AM
To: Christopher Olsen; Hillary, DeNigro; Eric Bash
Cc: Charles Willoughby; Thomas Bennett; (b) (2), b (6)    Karen Onyeije; Cathy Carpino;
Elizabeth Mumaw
Subject: FW: SBC e-rate consent decree
Importance: High

(b) (5)

*** Non-Public: For Internal Use Only ***

-----Original Message-----
From: (b)(5), (b)( 6), (b)( 7)(C))
Sent: Wednesday, January 05, 2005 6:16 PM
To: Charles Willoughby; Debra Weiner
Cc: (b)(5), (b)( 6), (b)( 7)(C))
Subject: (b) (5)

Debra and Charles,

(b) (5)

(b) (5)

(b) (5)                                            (b)(5), (b)( 6), (b)( 7)(C))

-----Original Message-----
From: (b)(5), (b)( 6), (b)( 7)
Sent: Monday, December 20, 2004 11:18 AM
To: (b) (2), b (6)                    'Thomas.Bennett@fcc.gov'
Cc: (b)(5), (b)( 6), (b)( 7)(C))
(b)(5), (b)( 6), (b)( 7)(C))

(b) (5)

-----Original Message-----
From: (b)(2 & 6)
Sent: Monday, December 20, 2004 12:26 PM
To: (b)(5), (b)( 6), (b)( 7)(C))
(b)(5), (b)( 6), (b)( 7)(C))

Cc: (b)(2 & 6)
Subject: (b) (5)

(b) (5)

(b) (5)



**EXHIBIT B**



From: Cathy Carpino
Sent: Friday, February 06, 2004 9:29 AM
To: ▊ Hillary DeNigro
Subject: 2/6 TR Daily story on Sprint & E-Rate program:

## SPRINT SEEKS WAIVER OF CHANGES TO `E-RATE' FUNDING MECHANISM

Sprint Corp. has filed a petition with the FCC seeking a waiver of recent changes the Commission made to the administration of funds under the Universal Service Administrative Co.'s Schools and Libraries Division that no longer allow priority one funding to go toward PBX and key systems as part of an existing end-to-end service configuration.

The Commission's "E-rate" program came under fire last year after investigations were launched by the FCC's Office of Inspector General, the Federal Bureau of Investigation, the Department of Justice, and Congress into apparent fraud and abuse.  Since its inception in 1997, the E-rate program has provided more than $9.8 billion to subsidize telecom and Internet services for schools and libraries.

The Commission last December took several measures to curb waste, fraud, and abuse and increase the number of recipients of E-rate funds, including eliminating priority one funding for PBXs and key systems (TRDaily, Dec. 17, 2003).  The Commission reasoned that this was appropriate because "the PBX is necessary to maintain the internal communications network, but not its end-to-end access to telecommunications services."  PBXs, however, would continue to be eligible for priority two funding.

In a petition filed Feb. 3 in CC docket 02-6, Sprint said the elimination of priority one funding "poses a serious hardship to schools and libraries who are in the midst of a multiyear contract to obtain telecommunications service under these end-to-end service configurations."  Sprint said, "These applicants reasonably expected to continue to receive priority one funding for these configurations for the entire contract term, and the elimination of such funding threatens their ability to obtain critical services within budget."

Sprint asked the Commission to allow schools and libraries that are in the middle of multiyear contracts to continue to obtain priority one funds for PBXs for the remainder of their contracts.  Sprint said it had

1

80 customers with two to four years remaining in their contracts that stand to lose priority one funding. - Margaret Boles, mboles@tr.com

Privileged and Confidential
Non-Public: For Internal Use Only

(b)(2 & 6)

**From:**
**Sent:**         Cathy Carpino
               Friday, February 06, 2004 9:29 AM
**To:**          (b)(2 & 6)
**Subject:**      2/6 TR Daily story on Sprint & E-Rate program:

(b) (5)

## SPRINT SEEKS WAIVER OF CHANGES
## TO `E-RATE' FUNDING MECHANISM

Sprint Corp. has filed a petition with the FCC seeking a waiver of
recent changes the Commission made to the administration of funds
under the Universal Service Administrative Co.'s Schools and
Libraries Division that no longer allow priority one funding to go
toward PBX and key systems as part of an existing end-to-end service
configuration.

The Commission's "E-rate" program came under fire last year after
investigations were launched by the FCC's Office of Inspector
General, the Federal Bureau of Investigation, the Department of
Justice, and Congress into apparent fraud and abuse. Since its
inception in 1997, the E-rate program has provided more than $9.8
billion to subsidize telecom and Internet services for schools and
libraries.

The Commission last December took several measures to curb waste,
fraud, and abuse and increase the number of recipients of E-rate funds,
including eliminating priority one funding for PBXs and key systems
(TRDaily, Dec. 17, 2003). The Commission reasoned that this was
appropriate because "the PBX is necessary to maintain the internal
communications network, but not its end-to-end access to
telecommunications services." PBXs, however, would continue to be
eligible for priority two funding.

In a petition filed Feb. 3 in CC docket 02-6, Sprint said the elimination
of priority one funding "poses a serious hardship to schools and
libraries who are in the midst of a multiyear contract to obtain
telecommunications service under these end-to-end service
configurations." Sprint said, "These applicants reasonably expected to
continue to receive priority one funding for these configurations for
the entire contract term, and the elimination of such funding threatens
their ability to obtain critical services within budget."

Sprint asked the Commission to allow schools and libraries that are in
the middle of multiyear contracts to continue to obtain priority one
funds for PBXs for the remainder of their contracts. Sprint said it had

80 customers with two to four years remaining in their contracts that stand to lose priority one funding. - Margaret Boles, mboles@tr.com

Privileged and Confidential
Non-Public: For Internal Use Only